# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

BETHANY CHRISTIAN SERVICES;
BETHANY CHRISTIAN SERVICES OF
MICHIGAN; and BETHANY CHRISTIAN
SERVICES USA, LLC,

   Plaintiffs,

v.

SUSAN CORBIN, in her official capacity as
director of the MICHIGAN DEPARTMENT OF
LABOR AND ECONOMIC OPPORTUNITY;
POPPY SIAS HERNANDEZ, in her official
capacity as Executive Director of the OFFICE OF
GLOBAL MICHIGAN.

   Defendants.

CASE NO. 1:24-cv-00922

---

## PLAINTIFFS' VERIFIED COMPLAINT

---

"That's not consistent with our state values." That's what Poppy Hernandez, the Director of the Office of Global Michigan ("OGM"), said about Bethany Christian Services' constitutionally protected practice of hiring people who ascribe to Bethany's foundational Christian beliefs. In the months since, OGM has targeted Bethany Christian.

For the first time in a decades-long relationship, OGM inserted contract language in grant agreements requiring Bethany Christian to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement." (*see* Ex. A, URM25-9909 BCS ILP p. 28; Ex. B, URM25-9901 BCS FC-IL p. 28; Ex. C, URM25-9911 p. 33.)

It then denied Bethany Christian's bids for programs it has provided for decades, creating a situation where Bethany Christian's ability to fulfill its religious mission will be severely curtailed not just beginning October 1, 2024 when the existing contracts expire, but also for the foreseeable future. The Bethany Christian employees who provided the refugee services funded by these grants will be lost, thereby eliminating or significantly reducing Bethany Christian's capacity to do the work.

Throughout this process, OGM refused to provide any meaningful response to Bethany Christian's request for information about OGM's "values." Bethany Christian submitted a detailed, 10-page letter describing its hiring practices and explaining their compliance with constitutional and legal standards. It then repeatedly asked OGM whether it believed these practices conflicted with language OGM began inserting in RFPs and contracts. OGM never provided any substantive response.

OGM's actions (and silence) demonstrate that OGM will not fund a Christian organization that hires individuals who are committed to its religious mission unless OGM has no other alternative. This discrimination is simply not allowed under the United States Constitution or the federal regulations governing the administration of the federal funding behind the programs at issue.

Accordingly, Bethany Christian brings this lawsuit to vindicate its right to continue to fulfill its religious mission in the service of refugees.

## **PARTIES**

1.      Bethany Christian Services is a Michigan nonprofit corporation with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan 49503.

2

2.      Bethany Christian Services of Michigan is a Michigan nonprofit corporation with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan. 49503.

3.      Bethany Christian Services USA, LLC is a Delaware limited liability company with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan. 49503.[1]

4.      Susan Corbin is the Director of the Michigan Department of Labor and Economic Opportunity. Her office address is 105 W. Allegan St., Lansing, Michigan 48933. She is being sued in her official capacity.

5.      Poppy Sias Hernandez is the Executive Director of the Office of Global Michigan. Her official address is 105 W. Allegan St., Lansing, Michigan 48933. She is being sued in her official capacity.

### JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises 42 U.S.C. § 1983 and other federal law to redress the deprivation of rights guaranteed by the First Amendment to the United States Constitution under color of State law, custom or usage.

7.      This Court has personal jurisdiction over the Defendants because all Defendants reside and transact business in the State of Michigan.

8.      The declaratory and injunctive relief sought is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

---

[1] Bethany Christian Services, Bethany Christian Services of Michigan, and Bethany Christian Services USA, LLC are hereinafter collectively referred to as "Bethany Christian."

9.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Bethany Christian's claims occurred in this judicial district.

**BACKGROUND**

I.     **Bethany Christian has a long history of serving people in need.**

10.    Bethany Christian began in 1944 when two Christian women, Marguerite Bonnema and Mary DeBoer, were motivated by their faith to take in a baby girl who needed a home. Marguerite and Mary took in five more young children that year before partnering with Andrew VanderMeer to establish Bethany Christian Home as a nonprofit organization.

11.    In 1951, Bethany Christian became licensed by the state of Michigan to facilitate adoption, placing 25 infants with Christian families that first year.

12.    Today, Bethany Christian operates in all 50 states and, at any given time, serves tens of thousands of people in need. Its work spans adoption, foster care, family-based care, family strengthening and counseling, and refugee work. In 2023 alone, Bethany Christian served 57,167 clients in 81 locations around the world. (*See* 2023 Annual Report, Bethany Christian Services, available here: https://bethany.org/about-us/annual-report/2023.) In the United States, it served 28,405 vulnerable kids and families. (*See id*.)

13.    Bethany Christian served 20,130 refugees in 2023. (*See id*.)

14.    Bethany Christian's motivation to continue carrying on this work is an unwavering commitment to Jesus Christ and the Christian faith. (See About Us, Bethany Christian Services, available here: https://bethany.org/about-us ("Our actions are inspired by faith . . . . Our core beliefs are simple: We love God and we love people.").)

4

15.     Bethany Christian's mission is to demonstrate the love and compassion of Jesus Christ by protecting children, empowering youth, and strengthening families through quality social services.

16.     This commitment compels Bethany Christian to serve and support the most vulnerable members of our community by demonstrating the love and compassion of Jesus Christ to their clients.

## II.     Bethany Christian and OGM partner to help refugees succeed and thrive in West Michigan.

17.     Bethany Christian has been providing refugee services since the 1970s, and it has partnered with various departments of the state government to provide those services since the early 2000s.

18.     The OGM operates as a pass-through entity for federal refugee funding in the State of Michigan. OGM selects organizations (like Bethany Christian) to receive federal funding and assist in refugee resettlement. (*See, e.g.*, Ex. D, Bethany Christian's Bid to RFP No. RSS25-0001.)

19.     Three categories of refugee resettlement contracts are relevant here.

20.     First, Bethany Christian provides reception and placement services. Under these reception and placement contracts, Bethany Christian performs initial reception and placement services during a refugee's first 30-90 days in the United States. These programs are federally funded by the Bureau of Population, Refugees, and Migration within the United States Department of State.

21.     Bethany Christian provides up to an additional 240 days of resettlement and placement services pursuant to matching grants from the Office of Refugee Resettlement, which is part of the U.S. Department of Health and Human Services.

22.     In addition to providing funding, the State Department allocates a certain number of refugees to a given location and then provides the funding to support the number of refugees allocated.

23.     This year, Bethany provided reception and placement services in Michigan as a direct contractor of the Department of State and as a sub-contractor to Church World Service ("CWS"), who held the direct contract.

24.     Although the reception and placement contracts are directly from the federal government, OGM wields considerable influence over who receives these contracts.

25.     Second, Bethany Christian provides refugee supplemental services. These supplemental services contracts go hand-in-hand with reception and placement programs. Accordingly, if an agency receives reception and placement funding, it receives supplemental services funding as a matter of course.

26.     The supplemental services funding provides everything from employment services to medical care to ensure that the agency is able to position the refugee-clients to succeed in the community.

27.     In Michigan, OGM operates as a pass-through entity to distribute federal funds from the Office of Refugee Resettlement under the Administration of Children and Families within the United States Department of Health and Human Services.

28.     Bethany Christian has been directly contracting with and partnering with the State of Michigan to administer supplemental services programs since about 2003.

29.     Third, Bethany Christian runs Unaccompanied Refugee Minor ("URM") programs.

30.     Here too, OGM operates as a pass-through entity for federal funding from the Office of Refugee Resettlement under the Administration of Children and Families within the United States Department of Health and Human Services.

31.     Bethany Christian is one of two URM providers in the Grand Rapids and, Kalamazoo, and Traverse City areas. For years, Bethany Christian has directly contracted with OGM, in its pass-through capacity, to receive funding to support its provision of these programs.

32.     OGM's general practice is to award the various contracts on a three-year cycle.

33.     OGM conducts a full bidding process for the first year's contract.

34.     OGM then renews the contracts on an annual basis for the next two years.  OGM might request some new contract terms, but it would not re-bid the contracts until the three-year cycle had concluded.

35.     Despite being in the middle of a three-year cycle for the supplemental services and URM contracts, OGM rebid all of the contracts under which Bethany Christian provided refugee-related social services in West Michigan in mid-2024.

## III.     Bethany Christian's Statement of Faith embodies the mission that drives the organization.

36.     Bethany Christian believes that its Christian religion calls it to serve refugees and those in need by demonstrating the love and compassion of Jesus Christ in all that Bethany Christian does.

37.     Bethany Christian sincerely believes it can only demonstrate the love and compassion of Jesus Christ if its employees personally experience the love and compassion of Jesus Christ as Christians.

38.     Accordingly, for decades, Bethany Christian has had a Statement of Faith. Although the wording of the Statement of Faith has changed over the years, the meaning has not.

Every iteration of the Statement of Faith has affirmed that Bethany is a Christian organization. (*See, e.g.*, Ex. F, 2010 Statement of Faith (noting that Bethany Christian "is founded upon the Scriptures which reveal the triune God.").)

39.     Bethany Christian has long required employees to affirm in writing their personal agreement with the Statement of Faith. (*See, e.g.*, Ex. F, 2010 Statement of Faith ("Members of the national board, local boards, staff and adoptive applicants indicate their personal agreement with Bethany's Statement of Faith by signing below.").)

40.     Bethany Christian's current Statement of Faith is the Apostles' Creed. It states:

> Bethany Christian Services is united in our belief of the core tenets
> of our faith as outlined in the Apostles' Creed:
>
> I believe in God, the Father almighty,
> creator of heaven and earth.
>
> I believe in Jesus Christ,
> God's only Son, our Lord,
> who was conceived by the Holy Spirit,
> born of the virgin Mary,
> suffered under Pontius Pilate,
> was crucified, died, and was buried.
> On the third day he rose again;
> he ascended into heaven,
> he is seated at the right hand of the Father,
>  and he will come to judge the living and the dead.
>
> I believe in the Holy Spirit,
> the global church,
> the communion of saints,
> the forgiveness of sins,
> the resurrection of the body,
> and the life everlasting.
>
> By signing this Statement of Faith, Bethany board and staff
> members indicate their personal agreement with Bethany's
> Statement of Faith.

(Ex. G, Current Statement of Faith.)

41.     The Apostles' Creed is one of the oldest and most widely recognized summations of the core tenets of the Christian faith. It is thus generally applicable to virtually all Christian denominations, doctrines, practices, and experiences. Bethany Christian selected the Apostles' Creed as its Statement of Faith to embrace Christian diversity without straying from its mission to embody Jesus Christ's love and compassion in the service of others.

**IV.    The Christian faith is integral to daily life at Bethany Christian.**

42.     Bethany Christian's faith extends beyond the Statement of Faith itself.

43.     Faith is a regular and integral part of daily life at Bethany Christian. Staff members regularly pray before meetings. Bethany Christian's values affirm the importance of Bethany Christian's faith. And messages from leadership routinely focus on scripture and the need "to press forward with bold faith despite all circumstances" along with the admonition to "remember that our strength comes from God." (*See* Ex. H, Notecards from Bethany Christian's CEO to Staff Leaders.)

44.     Bethany Christian's July 2020 "Employee Satisfaction Survey" included a question about "[t]ime for personal and group expressions of faith at work is an important part of my work experience at Bethany." Notably, almost all respondents said they either agree or strongly agree.

**V.     Bethany Christian's religious hiring policies are well known.**

45.     Bethany Christian has been open and transparent about its religious hiring practices.

46.     The requirement is included in all job postings.

47.     It is included in the Handbook (Ex. I, Handbook); displayed on Bethany Christian's website (it is posted in both English and Spanish) (Bethany Christian Website,

available here: https://bethany.org/about-us/careers); and recruiters, who are often the first ones to communicate with applicants, are instructed to inform all applicants of the requirement.

48. In 2015, Bethany Christian supported H.B. 4118 in Michigan, which amended state law to ensure that faith-based foster care agencies like Bethany Christian were allowed, based on "well settled principles of constitutional law" and "to the fullest extent permitted by state and federal law," to function according to their faith convictions without being punished by the state. *See* Mich. Comp. Laws § 722.124e.

49. As this Court noted, that law was "designed to ensure" that child-placement agencies could continue to work in the field "and still profess and promote the traditional Catholic [and Christian] belief that marriage as ordained by God is for one man and one woman." *Buck v. Gordon*, 429 F. Supp. 3d 447, 450 (W.D. Mich. 2019).

50. Despite Michigan law, in 2019, Michigan government officials met with Bethany Christian leaders and told them that if Bethany Christian declined to help LGBTQ couples to obtain foster licensing, the Michigan Department of Health and Human Services would commence a licensing investigation. And if the department found that there was discrimination, the state would reserve the right to take or suspend Bethany's Child Placing Agency license.

51. Bethany Christian complied with these government demands and began placing children with same-sex couples, and still does.

52. But let there be no mistake: these government threats were unlawful, and in federal litigation pursued by another religious social services agency, the Michigan Department of Health and Human Services stipulated to entry of judgment against it for violating the First Amendment's Free Exercise Clause.

**V.**     **Bethany Christian stays committed to the Statement of Faith.**

53.     These controversies did not sway Bethany Christian's commitment to its

Statement of Faith. Bethany Christian maintained the policy that employees were still required to

personally agree to, and sign, the Statement of Faith.

54.     The only exceptions permitted under Bethany Christian's policy are those granted

by its CEO.

55.     But hiring managers at Bethany Christian's 36th Street office in Grand Rapids had

been making exceptions without approval of the CEO.

56.     This issue came to the fore in mid-2023 when Bethany Christian closed its 36th

Street office and provided space at Bethany Christian's main Grand Rapids location for the staff

who had worked in the 36th Street office.

57.     When the 36th Street office staff transitioned to the main Grand Rapids location,

Bethany Christian's Chief Operating Officer, Lorita Shirley, welcomed them and addressed the

Statement of Faith. She explained that Bethany Christian had not abandoned its commitment to

the Statement of Faith. Nonetheless, Shirley noted that Bethany Christian would not require

existing non-Christian employees to sign the Statement of Faith.

58.     Shirley also walked through Bethany Christian's Advocacy and Activism policy.

Aware of the diverse views on controversial social and political issues held by its staff, Bethany

Christian adopted a policy intended to promote a loving and compassionate work environment

for all its staff members.

59.     The current version of the policy, which continues to communicate the same

message and requirements Shirely shared in 2023, states, in relevant part:

> Bethany seeks to create a physical environment that respects our
> diverse clients and employees. At Bethany, we are committed to

> respecting colleagues' differing views and political affiliations. Motivated by our faith, we strive to love one another as God loves us, even when we are not in agreement on significant issues. Bethany is committed to fostering a workplace that respects and values diverse perspectives, opinions, and beliefs on public opinion issues.
>
> It is essential that Bethany maintains a balanced work environment that upholds professionalism, mutual respect, and integrity. To avoid disrupting business operations or creating an uncomfortable or hostile work environment for other employees or clients, employees shall refrain from displaying items that can be perceived as polarizing or distracting from our mission. This includes hanging flags, signs, or other items that display an employee's social or political views in the physical workplace.

(Ex. J, Advocacy & Activism Policy.)

60.     Several of the 36th Street staff members did not agree with the Advocacy Policy or Bethany Christian's dedication to its Statement of Faith.

61.     Three employees who held leadership roles in the Grand Rapids Refugee & Immigrant Services Division ("RIS"), which had previously been located (almost exclusively) at the 36th Street office, organized an "Interfaith Breakfast" to conflict with Bethany Christian's annual Christmas Breakfast because of their disagreement with Bethany Christian's Statement of Faith and Advocacy Policy.

62.     They invited everyone in the Division except for senior leaders.  This was particularly problematic because the three employees organizing the event oversaw and directed the Grand Rapids RIS Division.

63.     Thus, the 278 staff members who received this invitation, were not just asked to choose between the office-wide organization-sponsored Christmas Breakfast and the competing "Interfaith Breakfast," they were asked to choose between their employer and their supervisors.

64.     Bethany Christian met with those three RIS leaders and informed them that their actions were insubordinate.

65.     Two of these leaders quit on December 7, 2023. Bethany Christian ended its employment relationship with the third on December 11, 2023.

66.     Two of these former RIS leaders have since been hired by another social services organization and OGM.

**VI.     OGM requests a meeting with Bethany Christian.**

67.     On December 7, 2023, OGM's Deputy Director emailed Bethany Christian to set up a meeting because he had been "made aware recently of some changes in hiring practices at BCS, and ha[d] some concerns as it relates to both State of Michigan and federal Office of Refugee Resettlement requirements around non-discrimination and equity practices for hiring and employment." (Ex. K, Dec. 7, 2023 Email from OGM.)

68.     He indicated that he "would like to schedule some time as soon as possible to discuss these changes and ensure any hiring practices align with our contract requirements." (*Id.*)

69.     The call was held on December 14, 2023. The attendees included: Defendant Sias Hernandez, OGM's Deputy Director, OGM's Refugee Administrative Manager, and six of Bethany's vice presidents and senior vice presidents.

70.     OGM's Deputy Director was only in the meeting for a matter of minutes before experiencing internet issues and having trouble connecting.

71.     Sias Hernandez led the call and did most of the talking. She contended that Bethany Christian had changed its employment policy and eliminated waivers of the Statement of Faith.

72.     She said that Bethany Christian's religious hiring practices were "inconsistent with our state values."

73.     OGM's Deputy Director reconnected to the virtual meeting. He questioned Bethany Christian as to how the RIS leaders whom he perceived as "strong partners" could have left Bethany Christian.

74.     He claimed that Bethany Christian was discriminating against other religions and was in violation of language in contracts with OGM.

75.     At the end of the call, Bethany Christian asked if OGM would put its concerns in writing, so that Bethany Christian could submit a written response. OGM agreed to do so.

## VII.  OGM asserts that Bethany Christian's religious hiring practices violate contractual language.

76.     OGM expressed its written concerns in a letter on December 18, 2023. (*See* Ex. L, Emails Between OGM and L. Shirley.)

77.     The letter began by noting that OGM contracts contain the following language:

> Non-Discrimination: Under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., Grantee and its subgrantees agree not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability. Breach of this covenant is a material breach of this Grant.

> Services shall be provided to the maximum extent feasible in a manner that is culturally and linguistically compatible with a refugee's language and cultural background. [Ex. M, Dec. 18, 2023 Requests from OGM.]

78.     OGM then asserted that it:

has received multiple pieces of evidence or complaints from prior and existing staff at Bethany Christian Services, indicating that managers have been instructed not to proceed with interviews or hiring of individuals that identify themselves as Muslim or who are not comfortable embracing the BCS Statement of Faith. We were informed that some existing staff who received waivers to signing the Statement of Faith prior to some process changes will be allowed to stay on board, but that no exceptions will be granted moving forward. [*Id.*]

79.   OGM then requested:

Request 1: Provide OGM with an assurance of compliance with the above contract language and plan for a hiring exceptions process by Thursday, December 21, 2023. Provide written policy that is in compliance with the above non-discrimination clause, as well as documentation to OGM that the written policy on non-discrimination has been shared with BCS management. . . .

Request 2: Provide OGM with a plan to address the concerns of staff, community members, and clients with regard to the expectations around the statement of faith and the lack of inclusion in current practices and communications. Provide OGM with assurances (or an acknowledgement) that no employees or contractors will be retaliated against for filing complaints. . . .

Request 3: Provide OGM with a plan to replace these individuals, and consistent with Request #1, ensure that hiring practices are both non-discriminatory and ensure that individuals reflect the cultural, linguistic, and demographic characteristics of the populations being served. . . . [*Id.*]

80.   OGM demanded a response within three days. (*See* Ex. L, Emails Between OGM and L. Shirley.)

## VIII.   After Bethany Christian provides complete, thorough responses to each of OGM's requests, OGM never responds.

81.   On December 20, 2023, Bethany Christian sent a preliminary response identifying that it complied with all state and federal laws, that Bethany Christian's management team is aware of the written non-discrimination policy, that Bethany Christian has a policy against retaliating against whistleblowers, and finally that Bethany Christian needed more time to

respond to concerns expressed regarding the Statement of Faith. (*See* Ex. L, Emails Between OGM and L. Shirley.)

82.    OGM responded, "We are anxious to see further details and action, as some of your initial responses are inconsistent with information that has been provided to us, and responses received during our call with BCS leadership." (*See id.*) It asked for a complete response by January 5, 2024.

83.    Consistent with that timeline, Bethany Christian submitted a complete response on January 5, 2024, that transparently identified its religious mission, its policies, the unauthorized waivers, and the legal support for its practices. (*See* Ex. N, Jan 5, 2024 Response to OGM's Requests.)

84.    Bethany Christian first explained the importance of the Statement of Faith to its identity as an organization. (*See id.* ("Indeed, we are Bethany Christian, and our entity was founded by two women motivated by their faith in Jesus Christ to emulate his love and compassion in the service of others.").)

85.    Bethany Christian then explained why its practice of hiring co-religionists does not violate "section 3.6 and Attachment A, Section 1.2(3) of the Grant Agreement related to Grant No. RES23-4103," which was the contractual language OGM quoted in its letter.  (*See id.*)

86.    Bethany Christian specifically explained that Section 3.6 of the Grant Agreement requires compliance with the Elliott-Larsen Civil Rights Act (Ex. N, Jan 5, 2024 Response to OGM's Requests ("This is boilerplate language that has been included in all state contracts for decades.")), but "[t]he requirements of the Elliott-Larsen Civil Rights Act . . . are limited by the state and federal constitutions as has been decided by multiple courts." (*Id.*)

87.     Bethany Christian further explained that ELCRA's prohibition against discrimination as applied to a faith-based organization's hiring of coreligionists would not withstand strict scrutiny under applicable precedent. (*Id.*)

88.     Bethany Christian also explained that federal law prohibits OGM from imposing a secular hiring requirement on Bethany Christian Services. In particular, the federal regulations contained in 45 C.F.R. part 87 that protect the equal treatment of faith-based organizations receiving federal funding through the U.S. Department of Health and Human Services (HHS) applies to Bethany Christian Service's contracts with OGM. (*Id.*)

89.     Having addressed the legality of its hiring practices, Bethany Christian dispelled OGM's claim that Bethany Christian had changed its hiring policy, pointing out that requiring employees to sign the Statement of Faith had been Bethany Christian's policy for decades, and that the granting of waivers was limited to the rare circumstances where hiring coreligionists was not possible. (*Id.*)

90.     Bethany Christian also addressed OGM's concerns expressed in the December 14th call regarding the Advocacy Policy:

> OGM expressed concerns on the December 14 call with an advocacy policy that Bethany Christian Services has adopted. Bethany Christian Services does have an advocacy policy that outlines our principles, values, and guidelines for engaging in policy and advocacy efforts. The purpose of this policy is to guide the organization in advocating for the best interests of children, youth, and families served through Bethany Christian Service's programs in alignment with our values and reflects our recognition of and respect for the significant diversity of both our clients and staff. Considering the divisiveness that can be created in today's political climate and the fact that Bethany Christian is a nondenominational Christian organization with employees who have differing Christian viewpoints on certain issues, the advocacy policy contains requirements aimed at maintaining respect for individual differences in the workplace. [*Id.*]

91.     Finally, Bethany Christian reiterated its commitment to its anti-retaliation policy; offered to review any specific situations that had been brought to OGM's attention (other than, of course, requiring employees to "sign a statement of faith and otherwise operate as a Christian organization, both of which are lawful"); and outlined its plan for replacing the three individuals in program director positions that led refugee programming and had left Bethany Christian. (*Id.*).

92.     OGM never provided any substantive response.

93.     A few weeks later, Bethany held discussions with CWS, the prime contractor with OGM for the reception and placement contracts for which Bethany had been providing services for years. In those discussions, CWS informed Bethany for the first time that it intended to provide those services itself instead of contracting with Bethany Christian.

## IX.    OGM meets with Bethany Christian and CWS and informs Bethany Christian that it will be "moving forward" with CWS.

94.     Until early 2024, Bethany Christian and Samaritas were the only providers of reception and placement services in the Grand Rapids area.  CWS's entry into this service line meant there would be three—rather than two—agencies. That, in turn, created greater capacity and opened the door for helping more refugees.

95.     Bethany Christian believed that the additional capacity would allow OGM to request a larger allocation of refugees for Grand Rapids from the Department of State.

96.     In mid-June 2024, OGM held a telephone call with representatives from Bethany Christian and CWS.

97.     During this call, OGM advised that it did not want three providers, and that instead of increasing the number of refugees, the numbers would be reduced.

98.     OGM further explained that it would continue the existing programs for the remainder of this fiscal year after which OGM intended to work with CWS.

99.     OGM purported to justify this decision because of Bethany Christian's staff turnover in Grand Rapids and Kalamazoo.

100.    Bethany Christian had not experienced unusual staff turnover in Kalamazoo.

101.    Bethany Christian replaced the staff who left the Grand Rapids RIS Division, and there had been no effect on Bethany's provision of services under its contracts.

102.    Ultimately, OGM asserted that it had "discretion" to choose the "best partner" and to "choose who we want to work with."

### X.     OGM inserts a new requirement in RFPs for Bethany Christian to create opportunities to employ staff that represent the "religions of the newcomer populations being served."

103.    In July of 2024, OGM issued Requests for Proposals ("RFP") for all the refuge-services related work performed by Bethany Christian under contracts issued by OGM.

104.    These RFPs were a departure from past practice, because they prematurely opened contracts for bid earlier than the normal three-year cycle.

105.    OGM's RFP's process was also unusual in that it departed from OGM's standing practice of using an RFP internet portal to submit proposals. With the portal, providers would log in and submit their documents. The portal provided helpful transparency because the public (and other providers) could view the comments that providers submitted.

106.    This year, OGM adopted a submission-by-email process. Under this new system, comments, questions, and responses were sent to particular email addresses, and the public is not able to see the comments from providers.

107.    Additionally, all the RFPs (except those for URM services) included new language requiring the contracting agency (e.g., Bethany Christian) to create opportunities to employ staff that represent "religions of the newcomer populations being served."

108.    Bethany Christian asked for clarification whether the "employment and hiring practices" Bethany Christian described in its "January 2024 response" would be "allowed under the non-discrimination and diversity, equity, and inclusion requirements," and if not "what changes would be necessary to Bethany Christian's practices to comply with the non-discrimination and diversity, equity, and inclusion requirements."  (*See* Ex. O, July 16, 2024 Email from T. Nolan; Ex. P, July 23, 2024 Email from Refugee Services.).)

109.    Because of the new process OGM implemented this year, these comments are not publicly available. They would, however, have been publicly available if OGM had been using the RFP portal.

110.    The only response Bethany Christian ever received was no response at all: "In fairness to other bidders, the OGM cannot provide insight into an appropriate or acceptable response to the RFP proposal.  As stated in the RFP, the OGM will be looking for proposals that, among other things, ensure compliance with the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., as well as the requirement that the grantee create opportunities to employ staff that represent the cultural, national origin, and religions of the newcomer populations being served under the agreement." (Ex. P, July 23, 2024 Email from Refugee Services.)

111.    Having received that non-response, Bethany submitted an attachment to each RFP response (except with regard to the URM contracts because those RFPs did not contain the religious-hiring language) with proposed contract-language changes to ensure that there was no

question that Bethany's religious hiring practices were in accord with each party's understanding

of what any contract required. (Ex. Q, Email and Attachment Containing Proposed Changes.)

112.    OGM never substantively responded to Bethany Christian's contract-revision

requests.

## XI.    OGM continues hamstringing Bethany Christian by denying its bid for the supplemental services contracts, even though it received the R&P contract.

113.    Because CWS had subcontracted the reception and placement responsibilities to

Bethany Christian in the past, it does not currently have the capacity to fully replace Bethany

Christian. Thus, OGM had effectively no option but to support Bethany Christian's direct bid

with the Department of State and the Department of Health and Human Services for the current

fiscal year for the Kalamazoo area.

114.    Accordingly, OGM supported Bethany Christian's bid (*see* Ex. E, July 2, 2024

Letter of Support from OGM), and Bethany Christian was awarded those reception and

placement contracts directly from the federal agencies.

115.    Bethany Christian then fully expected that it would receive the accompanying

Supplemental Services grant for Kalamazoo from OGM.  As described above, Supplemental

Services contracts are given—as a matter of course—to accompany R&P services, so that the

agency may provide complete services to support the refugees allocated to it.

116.    OGM, however, denied Bethany Christian's bid for the Kalamazoo supplemental

services contract.

117.    The effect of that denial is to hamstring Bethany Christian's ability promote

successful transitions for refugees into life in their new country because Bethany Christian does

not have the funding to provide the requisite supplemental social services, and the agencies that

have received the funding will only provide those services to refugee families served by Bethany

Christian if those other agencies have surplus capacity.

118.    OGM also denied Bethany Christian's bid for contracts to provide Supplemental

Services and other related services in the Grand Rapids area.

119.    OGM also denied Bethany contracts for the services that it had been providing in

the Traverse City area.

120.    Bethany Christian has appealed the decision to deny supplemental services

contracts. In its appeal, Bethany Christian explained that it has been "the incumbent provider of

the RSS Employment Program in Grand Rapids, Michigan, since 2009 and the RSS Post-

Resettlement Program since 2017. During this time, we have consistently met or exceeded

performance expectations, as demonstrated by our successful implementation, comprehensive

services, and strong community partnerships . . . ." (Ex. R, Aug. 27, 2024 Appeal Letter.)

121.    The appeal letter continued: "On August 22, 2024, we received notification that

our proposal was not selected for renewal. The notification did not provide a specific rationale

for this decision, which is concerning given our track record and the community's reliance on our

services. The abrupt transition, scheduled for September 30, 2024, poses significant risks to the

stability of services provided to the refugee population, including disruption of essential client

support and employment for our staff." (*Id*.)

122.    The appeal letter also noted concerns that the decision violates the Grants Policy

(the appeal letter specifically referenced the supplemental services RFP questions Bethany

Christian had submitted and received no substantive response to); concerns about the integrity of

the process; and concerns about a negative impact of the service community. (*Id*.)

123.    OGM failed to even provide an acknowledgment of receipt of the appeal.

124.     Bethany Christian sent a follow up email on September 6, 2024 inquiring into the status of the appeal and raising concerns regarding efforts by the replacement provider to schedule transition meetings before the appeal is resolved. Bethany Christian noted that proceeding with the transition before the appeal was resolved could lead to disruptions in services to the vulnerable refugee populations being served and cause unnecessary displacement of Bethany Christian staff. (Ex. S, Sept. 6, 2024 Email from L. Shirley.)

125.     Bethany Christian "kindly request[ed] a formal response outlining the next steps in the appeals process" and sought OGM's "clarification and guidance on how to proceed."

126.     This time OGM acknowledged receipt of the email. But again, OGM provided no substantive response.

## XII.   OGM targets Bethany Christian in the URM contracts as well.

127.      As noted, Bethany Christian is one of two providers of URM services in the Kalamazoo and Grand Rapids service areas. No other agencies have the capacity or infrastructure to provide all the services that Bethany Christian provides.

128.     So OGM had little choice but to award the URM services grants to Bethany Christian.

129.     On July 31, 2024, OGM informed Bethany Christian that it won six URM contracts.

130.     OGM, however, only sent Bethany Christian the contract documents for three of those contracts. (*See* Exs. A, B, C, URM Contracts).)

131.     To this day, OGM has not sent to Bethany Christian the contract documents for the other three URM contracts, even though those contracts are set to start on October 1, 2024.

132.     The three contracts that OGM did send contained religion-focused language that was not present in the URM RFPs, including a requirement that Bethany Christian must agree to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement." (*See* Ex. A, URM25-9909 BCS ILP p. 28; Ex. B, URM25-9901 BCS FC-IL p. 28; Ex. C, URM25-9911 p. 33.)

133.     Bethany Christian responded to OGM with emails asking for clarification and amendment. Specifically, Bethany Christian sought clarification as to whether Bethany Christian Services' employment and hiring practices as described in the January 2024 response were allowed under the non-discrimination provision in the proposed URM agreements.  If not, Bethany Christian asked OGM to explain what changes would be necessary to Bethany Christian's practices to comply with the non-discrimination and diversity, equity, and inclusion requirements. (*See* Ex. T, Aug. 7, 2024 Email from N. Hurst.)

134.     Bethany Christian reminded OGM that it had already noted in its response to the supplemental services RFPs that it cannot "agree to 'create opportunities to employ staff that represent the . . . religions of the newcomer populations being served,' under this agreement as many of those newcomer populations are adherents to other religious faiths. Bethany Christian cannot agree to create opportunities to hire individuals who cannot agree to Bethany Christian's statement of faith because Bethany Christian's very purpose in providing the services under the grant is to fulfill its religious mission of sharing the love and compassion of Jesus Christ." (*See id.*)

135.     Accordingly, Bethany Christian proposed to amend the requirement to create employment opportunities by limiting it to "the cultures and national origins of the newcomer populations being served." (*See id*.)

136.     Again, OGM provided no response.

137.     Bethany Christian followed up on the requested changes to the URM agreements on August 22, 2024. (*See* Ex. U, Email Correspondence Between N. Hurst and OGM.)

138.     When that email did not elicit a substantive response, Bethany followed up again on August 29, 2024. (*Id.*)

139.     By September 9, 2024, OGM still had not provided a substantive response to Bethany Christian even though the contracts are supposed to be effective on October 1, 2024.

140.     Throughout this period, consistent with its religious mission, Bethany Christian has been charitably disinclined to believe that OGM officials intended to harm Bethany Christian because of its religious beliefs and practices.

141.     OGM's persistent failure to respond to communications requesting straightforward answers to Bethany Christian's practices is inconsistent with Bethany Christian's past experience with OGM's responsiveness to questions and inquiries from Bethany Christian.

142.     Out of respect for Sias Hernandez and OGM, Bethany Christian's General Counsel reached out to Sias Hernandez on August 27, 2024 to request a meeting by Friday, September 6, 2024, to seek to address any issues between Bethany Christian and OGM. (*See* Ex. V, Aug. 27, 2024 Email from N. Hurst.)

143.     Sias Hernandez did not respond. Nor did anyone else from OGM.

## CLAIMS

### Count I (42 U.S.C. § 1983)
### Violation of the First Amendment Free Exercise Clause
### Exclusion from Otherwise Available Government Benefits

144.     Bethany Christian incorporates by reference all the preceding paragraphs.

145.    "The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson v. Makin*, 596 U.S. 767, 778 (2022).

146.    Accordingly, "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

147.    Likewise, government action must pass strict scrutiny where it "operates to identify and exclude otherwise eligible" entities "on the basis of their religious exercise," "[r]egardless of how the benefits and restrictions are described." *Carson v. Makin*, 596 U.S. 767, 789 (2022).

148.    Here, through the actions described above, including by requiring Bethany Christian to "create opportunities to employ staff that represent the ... religions of the newcomer populations being served under this agreement" (*see* Ex. A, URM25-9909 BCS ILP p. 28; Ex. B, URM25-9901 BCS FC-IL p. 28; Ex. C, URM25-9911 p. 33), OGM is conditioning the receipt of funding for refugee programs on whether Bethany Christian abandons its religious practice of hiring other Christians.

149.    OGM is thus excluding Bethany Christian from an otherwise available government benefit because of Bethany Christian's religious identity, beliefs and exercise.

150.    OGM's actions therefore trigger strict scrutiny.

151.    OGM's actions do not serve a compelling government interest, are not narrowly tailored, and thus violate the Free Exercise Clause rights of Bethany Christian.

### Count II (42 U.S.C. § 1983)
### Violation of the First Amendment Free Exercise Clause
### Not Neutral and Generally Applicable

152.    Bethany Christian incorporates by reference all the preceding paragraphs.

153.    Government practices that burden religion are subject to strict scrutiny if they are

not neutral and generally applicable. *Fulton v. City of Philadelphia, Penn.*, 593 U.S. 522, 542

(2021).

154.    To avoid strict scrutiny, policies must be neutral and generally applicable on their

face, *and* the government must implement them in a neutral and generally applicable manner. *See*

*Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (cleaned up).

155.    Here, OGM has adopted a policy requiring all social services providers to create

opportunities to hire individuals of the same religion as the population being served.

156.    OGM apparently believes that this policy is required or supported by ELCRA.

157.    But the policy is not neutral and generally applicable.

158.    Government policies are not neutral "whenever they treat any comparable secular

activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

159.    ELCRA contains an exception allowing the consideration of "religion" as part of

an affirmative action plan.

160.    ELCRA also allows discrimination in compensation, terms, conditions, and

privileges of employment if based on seniority.

161.    Government policies are not "generally applicable if" they "invite the government

to consider the particular reasons for a person's conduct by providing a mechanism for

individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533

(2021) (cleaned up).

162.    ELCRA provides for individual exemptions that invite the government to consider the particular reasons for a person's conduct.

163.    OGM's actions are also subject to strict scrutiny because OGM has not applied ELCRA or the federal regulations in a faith-neutral manner.

164.    OGM did not previously impose a contractual obligation to create opportunities to hire individuals of the same religion as the population being served.

165.    No law or regulation requires OGM to do so.

166.    OGM included this language purely as a matter of discretion, and only after telling Bethany Christian that its religious practice was inconsistent with OGM's "values."

167.    OGM has the discretion to waive the requirement that Bethany Christian create opportunities to hire individuals of the same religion as the population being served.

168.    Each of these reasons is individually sufficient to subject OGM's policy to strict scrutiny.

169.    Finally, OGM's policy is subject to strict scrutiny because it has a practice of allowing other groups to receive grants even though the latter discriminate on the basis of protected categories in their hiring practices and in the client groups they serve.

170.    OGM's policy does not survive strict scrutiny, because it does not serve a compelling interest of the "highest order and is" not "narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up).

171.    Even if OGM's actions are not subject to strict scrutiny, Bethany Christian's Free Exercise rights have still been violated. OGM has no legitimate interest in impairing in this fashion Bethany Christian's exercise of its religious beliefs by requiring it to hire or create opportunities to hire individuals who do not affirm Bethany Christian's religious mission.

**Count III (42 U.S.C. § 1983)**
**Violation of the First Amendment Free Exercise Clause**
**Targeting**

172.    Bethany Christian incorporates by reference all the preceding paragraphs.

173.    "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993) (cleaned up).

174.    Where a neutral and generally applicable policy is a "veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it advances interests of the highest order and is narrowly tailored in pursuit of those interests." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (cleaned up).

175.    As the Supreme Court put it, "a government policy will not qualify as neutral if it is specifically directed at religious practice." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (emphasis added; cleaned up). A policy can fail this test if "a religious exercise is its object." *Id.* (cleaned up).

176.    Factors relevant to this inquiry include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

177.    Here, Bethany Christian's religious exercise is the target of OGM's policy and actions.

178.    OGM did not previously include the language at issue here, and nothing requires it to do so now. As discussed, neither ELCRA nor the federal regulations prohibit Bethany Christian from hiring co-religionists. (*See* Ex. P, Jan. 5, 2024 Response to OGM.)

179.    OGM included this language purely as a matter of discretion, and only after telling Bethany Christian that its religious practice was inconsistent with OGM's "values."

180.    After that conversation, OGM's actions made its position crystal clear: it would not contract with Bethany Christian unless it had no other option.

181.    It abruptly issued off-cycle RFPs, made the bid process less transparent, and refused Bethany Christian's repeated requests for clarification.

182.    It also added new language—into both RFPs and contracts—that it crafted to exclude Bethany Christian.

183.    As OGM well knows, Bethany Christian cannot agree to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement," because that is fundamentally inconsistent with its sincerely held religious belief that it must hire Christians to carry out its mission of loving and serving people in Jesus' name, and its longstanding religious practice of doing so.

184.    The addition of the religious employment language only affects Bethany Christian because it is the only social-service provider that provides refugee-related services for OGM in West Michigan that has a policy limiting employment to individuals who affirm a statement of faith.

185.    OGM's policy is therefore subject to strict scrutiny.

186.    OGM's policy does not survive strict scrutiny, because it does not serve a compelling interest of the "highest order and is" not "narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up).

**Count IV (42 U.S.C. § 1983)**
**Violation of the First Amendment Free Speech and Assembly Clauses**
**Expressive Association**

187.    Bethany Christian incorporates by reference all the preceding paragraphs.

188.    "Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up).

189.    By conditioning contracts and grants on making a plan to hire people of other religions, OGM has forced Bethany Christian to choose between its religious beliefs and mission, and its access to significant federal financial resources needed to continue to provide refugee services in West Michigan.

190.    Bethany Christian's association has a communicative purpose—to demonstrate the love and compassion of Jesus Christ.

191.    Bethany Christian sincerely believes that only Christians can demonstrate the love and compassion of Jesus Christ because Christians personally believe in Jesus and personally experience that love and compassion.

192.    OGM's actions unconstitutionally force Bethany Christian to expressively associate with people who do not hold the same religious views and therefore cannot pursue the mission with the united purpose and messaging.

193.    OGM's actions therefore trigger strict scrutiny.

194.    OGM's actions do not serve a compelling government interest, are not narrowly tailored, and thus violate the Free Speech and Assembly Clause rights of Bethany Christian.

195.    Indeed, OGM's actions lack even a rational basis and therefore violate the Constitution for this additional reason.

## **PRAYER FOR RELIEF**

Wherefore, Bethany Christian asks the Court to:

1.    Declare that OGM may not penalize—in any way—Bethany Christian for its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission;

2.    Declare that OGM's exclusion of Bethany Christian from otherwise available grant funding is an unconstitutional violation of the latter's rights under the First Amendment's Free Exercise Clause;

3.    Declare that OGM's policy of requiring and/or pressuring Bethany Christian to abandon its sincerely held religious belief violates Bethany Christian's rights under the First Amendment's Free Exercise Clause;

4.    Declare that any contract requirement restricting or prohibiting Bethany Christian from continuing to exercise its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission, including the language requiring Bethany Christian to "create opportunities to employ staff that represent the ... religions of the newcomer populations being served under this agreement," is unconstitutional and OGM may not include it in any RFPs, contracts, or any other documents which in any way affect the distribution of funding;

5.      Enter preliminary and permanent injunctive relief ordering:

a.      OGM to preserve the status quo regarding Bethany Christian's provision of refugee-related services in the Grand Rapids, Kalamazoo, and Traverse City areas pending final judgment in this action;

b.      OGM to re-bid the contracts for refugee services without penalizing, or including any contractual requirement that has the effect of penalizing, Bethany Christian for its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission;

c.      That OGM is prohibited from employing any process, or including any language or requirement in any RFPs, contracts, or other grant-related documents, that interfere with its obligation not to discriminate against Bethany Christian on the basis of religion or its expressive association; and

d.      That OGM is prohibited from forcing, or pressuring in any way, Bethany Christian to choose between the opportunity to receive grant money or to continue adhere to its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission.

6.      Award compensatory and/or nominal damages, reasonable attorneys' fees, costs, and any equitable or other relief that is just and proper.

Date: September 9, 2024

/s/ Matthew T. Nelson
Jonathan E. Lauderbach (P51313)
Matthew T. Nelson (P64768)
Katherine G. Boothroyd (P85881)
Daniel S. Brookins (P86665)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave NW, Ste. 1500
Grand Rapids, MI 49503
616.752.2000
jlauderbach@wnj.com
mnelson@wnj.com
kboothroyd@wnj.com
dbrookins@wnj.com

Lori D. Kepner*
Steven T. McFarland*
Center For Law & Religious Freedom
CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Suite 302
Springfield, VA 22151

*Application for admission to be submitted

*Attorneys for Plaintiffs Bethany Christian Services, Bethany Christian Services of Michigan, and Bethany Christian Services USA, LLC*

## **<u>VERIFICATION</u>**

I verify that the foregoing Verified Complaint for and on behalf of Bethany Christian Services, Bethany Christian Services Michigan, and Bethany Christian Services USA, LLC, was duly prepared under my direction; that the facts stated therein have been assembled by authorized employees and counsel for Bethany Christian Services; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

Date:   September 9, 2024               Bethany Christian Services

By:   _____
       Brad Keller
       Sr. Vice President of Operations