UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BETHANY CHRISTIAN SERVICES;
BETHANY CHRISTIAN SERVICES OF
MICHIGAN; and BETHANY CHRISTIAN
SERVICES USA, LLC,

       Plaintiffs,

v.

SUSAN CORBIN, in her official capacity as
director of the MICHIGAN DEPARTMENT
OF LABOR AND ECONOMIC
OPPORTUNITY; POPPY SIAS
HERNANDEZ, in her official capacity as
Executive Director of the OFFICE OF
GLOBAL MICHIGAN.

       Defendants.

Case No. 1:24-cv-00922-JMB-PJG

Hon. Jane M. Beckering

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

**EXPEDITED CONSIDERATION REQUESTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    Bethany Christian's work is motivated by its religious mission..........................2

    Bethany Christian partners with Michigan to provide services to refugees .......................3

    Some Bethany Christian supervisors in the Refugee & Immigration Services
    Division oppose its hiring and advocacy policies .................................................5

    OGM informs Bethany Christian that its religious hiring practices are not
    consistent with its contracts or state values .........................................................6

    Bethany Christian provides a complete, thorough response to each of OGM's
    requests, but OGM does not give any substantive response .................................8

    OGM meets with Bethany Christian and CWS and informs Bethany Christian that
    it will be "moving forward" with CWS (i.e. not Bethany Christian) .................................9

    OGM inserts a new contractual religious-hiring requirement targeting Bethany
    Christian.................................................................................................................9

    Bethany Christian appeals to OGM regarding various contracts and contract
    denials ...................................................................................................................12

ARGUMENT ......................................................................................................... 14

    I.    Bethany Christian is likely to succeed on the merits of its constitutional
        claims because Defendants have violated the Free Exercise Clause ...................15

        A.    OGM's conduct is subject to strict scrutiny because it
            discriminates against Bethany Christian because of its sincerely
            held religious beliefs and religious practices ...............................................17

            1.    Strict scrutiny applies because OGM's policy is not
                generally applicable .......................................................................17

            2.    Strict scrutiny applies because OGM's policy is a thinly
                veiled targeting of Bethany Christian's faith-based practice ........22

        B.    Defendants cannot satisfy strict scrutiny .....................................................25

ii

II.      Bethany Christian will suffer irreparable harm without a preliminary
         injunction ................................................................................................29

III.     The balance of equities tips in Bethany Christian's favor and an injunction
         is in the public interest .........................................................................31

CONCLUSION.......................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bowen v. Roy*,
   476 U.S. 693 (1986) ....................................................................................16

*Buck v. Gordon*,
   429 F. Supp. 3d 447 (W.D. Mich. 2019) ....................................................23

*Burwell v. Hobby Lobby Stores, Inc.*
   573 U.S. 682 (2014) ....................................................................................26

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) ....................................................................................15

*Champion v. Secretary of State*,
   761 N.W.2d 747 (2008) ...............................................................................18

*Church of Lukumi Babalu, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................................................................. *passim*

*Deja Vu of Nashville, Inc. v. Metro. Government of Nashville & Davidson
   County, Tennessee,*
   274 F.3d 377 (6th Cir. 2001) .......................................................................15

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ............................................................................. *passim*

*Hall v. Baptist Memorial Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000) .......................................................................19

*Kennedy v. Bremerton School District*,
   597 U.S. 507 (2022) ..............................................................................15, 22

*Libertarian Party of Ohio v. Husted*,
   751 F.3d 403 (6th Cir. 2014) ..................................................................29, 31

*Mattia v. City of Center Line, Michigan*,
   2017 WL 6422069 (E.D. Mich. Dec. 18, 2017) ..........................................31

*Newsom v. Norris*,
   888 F.2d 371 (6th Cir. 1989) .......................................................................29

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................31

Page(s)

*Obama for America v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ...........................................................................15

*Porth v. Roman Catholic Diocese of Kalamazoo,*
    536 N.W.2d 195 (Mich. Ct. App. 1995) ...........................................................24

*Seattle's Union Gospel Mission v. Wood,*
    142 S. Ct. 1094 (2022)........................................................................................18

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
    600 U.S. 181 (2023)............................................................................................27

*Susan B. Anthony List v. Driehaus,*
    814 F.3d 466 (6th Cir. 2016) ......................................................................17, 25

*United States v. Playboy Entertainment Group nc.,*
    529 U.S. 803 (2000)............................................................................................28

*Ward v. Polite,*
    667 F.3d 727 (6th Cir. 2012) ......................................................................17, 22

*Weishuhn v. Catholic Diocese of Lansing,*
    756 N.W.2d 483 (2008) ...............................................................................18, 24

*Winter v. National Resources Defense Council, Inc.,*
    555 U.S. 7 (2008)................................................................................................14

*Yoder v. Wisconsin,*
    406 U.S. 205 (1972)............................................................................................26

*Youth 71Five Ministries v. Williams,*
    No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ..............................20, 21

**Statutes**

42 U.S.C. § 2000e ....................................................................................................18

Mich. Comp. Laws § 37.2208...................................................................................19

Mich. Comp. Laws § 37.2209.....................................................................................7

Mich. Comp. Laws § 37.2211...................................................................................19

**Other Authorities**

45 C.F.R. 87.3 .......................................................................................................8, 24

Page(s)

U.S. Constitution, Amendment. I.................................................................................15

# INTRODUCTION

The Office of Global Michigan ("OGM") and its leaders have decided that Plaintiff Bethany Christian's practice of hiring people who affirm its religious mission is contrary to "state values." And apparently for that reason, Defendants and their agencies have decided to terminate, to the extent possible, OGM's relationship with Bethany Christian. About six months after OGM made its "state-values" accusation, OGM issued new requests for proposal for the contracts under which Bethany Christian was providing services. In most of those RFPs, OGM included new contract language requiring Bethany Christian to agree to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement." This language targets Bethany Christian, and only Bethany Christian, because it is the only refugee-services provider in West Michigan with a requirement that its employees affirm a statement of faith. But the nation's foundational values—the values set forth in the Bill of Rights—are at odds with government prohibitions of the free exercise of religion. And so state values must give way Bethany Christian's civil rights, and the Defendants' actions that impair Bethany Christian's constitutional rights should be enjoined.

Bethany Christian comes to court reluctantly. It has a long and mutually beneficial partnership with the State of Michigan to provide federally funded refugee-related services. So before coming to court, it has communicated with OGM more than a dozen times since the beginning of the year to seek to resolve the issues presented here. Not once has OGM provided a substantive response.

But Bethany Christian has reached the point that, without judicial intervention, it will suffer irreparable harm. On October 1, Bethany Christian will lose most of the federal pass-through funding to provide refugee-related services in West Michigan. As a result, dozens of

Bethany Christian staff members who specialize in providing services to refugee populations will need to find new positions at Bethany Christian or other employment. Indeed, Bethany Christian is already losing staff members who are concerned for their own livelihoods because of OGM's religious discrimination. The result of all of this will be that Bethany Christian is facing the very real prospect that it will not have the excellent, experienced staff to provide refugee-related services at the conclusion of this litigation even though Bethany Christian has a substantial likelihood of prevailing. And thus Bethany Christian faces not just the irreparable harm inherent in the deprivation of its constitutional rights but also more traditional irreparable harm.

OGM's transition to a new provider for the services that Bethany Christian is currently providing is already underway, and OGM has informed Bethany Christian that it will stop providing new client referrals to Bethany Christian beginning on September 15. So, even though the new contracts do not take effect until October 1, Bethany Christian is already suffering the effects of OGM's unlawful conduct. An order to maintain the status quo while the action is pending is urgently needed—a preliminary injunction by September 26, 2024.

## BACKGROUND

**Bethany Christian's work is motivated by its religious mission.**

Bethany Christian Services was founded in 1944 by two Christian women who were motivated by their faith to take in a baby girl who needed a home. (Verified Compl. ¶ 10, ECF No. 1, PageID.4.) They took in five more children that year before establishing Bethany Christian Home. (*See id.*) Today, Bethany Christian Services operates in all 50 states and, at any given time, serves tens of thousands of people in need. (*Id.* at ¶ 12, PageID.4.) Its work spans adoption, foster care, family-based care, family strengthening and counseling, and refugee work. (*Id.*)

Bethany Christian's mission is "to demonstrate the love and compassion of Jesus Christ by protecting children, empowering youth, and strengthening families through the highest quality social services." (*Id.* at ¶ 15, PageID.5.) Bethany Christian sincerely believes it can only demonstrate the love and compassion of Jesus Christ if its employees personally experience the love and compassion of Jesus Christ as Christians and thus can demonstrate what they themselves have experienced. (*Id.* at ¶ 37, PageID.7.) In accordance with this belief, Bethany Christian has had a Statement of Faith for decades, and Bethany Christian has long required employees to affirm in writing their personal agreement with the Statement of Faith. (*Id.* at ¶¶ 38-39, PageID.7-8.)

Bethany Christian is open and transparent about its religious hiring practices. (*Id.* at ¶45, PageID.9.) The requirement is included in all job postings. (*Id.* at ¶ 46, PageID.9.) It is displayed on Bethany Christian's website. (*Id.* at ¶ 47, PageID.9.) And it is listed in the Handbook. (*Id.*)

**Bethany Christian partners with Michigan to provide services to refugees.**

For more than 20 years, Bethany Christian has worked with the State of Michigan to provide a wide range of refugee-related services. (*Id.* at ¶ 28, PageID.6.) OGM is the Michigan agency currently responsible for fulfilling the State's obligations to pass-through refugee funding from federal agencies like the U.S. Department of Health & Human Services ("HHS"). (*Id.* at ¶ 27, PageID.6.) OGM selects organizations (like Bethany Christian) to receive federal funding and provide actual services to refugees. (*Id.* at ¶ 18, PageID.5.)

Three categories of refugee resettlement contracts are relevant in this case. First, Bethany Christian provides reception and placement services for refugees during their first 30 to 330 days in the United States. (*Id.* at ¶¶ 20-21, PageID.5.) These services are federally funded by grants from the State Department's Bureau of Population, Refugees, and Migration and HHS's Office

of Refugee Resettlement ("ORR"). (*Id.* at ¶¶ 21-22, PageID.5-6.) Even though these grants are made by federal agencies, the state agencies responsible for providing other services to the refugees have considerable influence over which placement agencies receive the federal grants. (*Id.* at ¶ 24, PageID.6.)

In 2024, Bethany Christian is the direct recipient of federal reception and placement services grants in Traverse City and the subcontractor of another provider—Church World Service ("CWS")—in the Grand Rapids and Kalamazoo areas. (*Id.* at ¶¶ 23-24, PageID.6.) In the latter areas, Bethany Christian provided 100% of the reception and placement services under the CWS contract because CWS did not have on-the-ground operations in West Michigan. (*See id.* at ¶ 94, PageID.18.)

Second, Bethany Christian provides supplemental services to the same clients to whom it is providing reception and placement services. (*Id.* at ¶ 25, PageID.6.) These supplemental services include transportation, employment-related assistance, and medical care, and are necessary to promote the clients' successful transition into life in their new country. (*Id.* at ¶ 26, PageID.6.) Most of the funding for supplemental services contracts comes from OGM, which distributes federal funds from ORR. (*Id.* at ¶ 27, PageID.6.) Because of the inefficiency that would be imposed on the refugee clients if they needed to obtain services from different agencies, the agency that receives reception and placement funding is best suited to receive supplemental services funding. (*See id.* at ¶ 25, PageID.6.)

Third, Bethany Christian provides services including housing for refugee minors who arrive in the United States unaccompanied by adult family members. (*Id.* at ¶ 29, PageID.6.) Here too, OGM operates as a pass-through entity for federal funding from ORR for Unaccompanied Refugee Minors or "URM" grants. (*Id.* at ¶ 29-30, PageID.6-7.) For years,

Bethany Christian has directly contracted with OGM, in its pass-through capacity, to receive funding to support its provision of these programs. (*Id.* at ¶ 31, PageID.7.) In 2024, Bethany Christian held URM grant contracts for Kalamazoo and Grand Rapids. (*Id.* at ¶¶ 127, 129, PageID.23.)

### Some Bethany Christian supervisors in the Refugee & Immigration Services Division oppose its hiring and advocacy policies.

In mid-2023, Bethany Christian closed its 36th Street office and provided space at Bethany Christian's main Grand Rapids location for the staff who had worked in the 36th Street office. (*Id.* at ¶ 56, PageID.12.) It soon became clear that the hiring managers at Bethany Christian's 36th Street office in Grand Rapids had been making exceptions to Bethany Christian's policy of requiring employees to affirm the Statement of Faith without approval of Bethany Christian's CEO. (*Id.* at ¶ 54-55, PageID.11.)

When the 36th Street office staff transitioned to the main Grand Rapids location, Bethany Christian's Chief Operating Officer, Lorita Shirley, welcomed them and addressed the Statement of Faith. (*Id.* at ¶ 57, PageID.11.) She explained that though Bethany Christian would not require existing non-Christian employees to sign the Statement of Faith, Bethany Christian had not abandoned its commitment to the Statement of Faith. (*Id.*) She also previewed Bethany Christian's Advocacy and Activism Policy which required employees to refrain from displaying items that could be perceived as polarizing, including items that display social or political views. (*Id.* at ¶ 58, PageID.11.) Several of the 36th Street staff members did not agree with these Bethany Christian policies. (*Id.* at ¶ 60, PageID.12.)

Three employees who held leadership roles in the Grand Rapids Refugee & Immigrant Services Division ("RIS"), which had previously been located (almost exclusively) at the 36th Street office, showed their disagreement with Bethany Christian's policies by organizing an

"Interfaith Breakfast" to conflict with Bethany Christian's annual Christmas Breakfast. (*Id.* at ¶ 61, PageID.12.) These supervisors invited the rest of the Division's staff, but not senior leaders, to attend. (*Id.* at ¶ 62, PageID.12.) They thus put these Bethany Christian workers in the position of having to choose between Bethany Christian and their supervisors. (*Id.* at ¶ 63, PageID.12.) Bethany Christian met with the three RIS leaders and informed them that their actions were insubordinate. (*Id.* at ¶ 64, PageID.13.) Two of these leaders quit on December 7, 2023. (*Id.* at ¶ 65, PageID.13.) Bethany Christian ended its employment relationship with the third on December 11, 2023. (*Id.*)

**OGM informs Bethany Christian that its religious hiring practices are not consistent with its contracts or state values.**

On the same day two of the RIS leaders quit, OGM's Deputy Director emailed Bethany Christian and demanded a meeting. (12/07/23 Email from B. Cabanaw to Bethany Christian, ECF No.1-11, PageID.212.) He told Bethany Christian that OGM had been "made aware recently of some changes in hiring practices at BCS, and ha[d] some concerns as it relates to both State of Michigan and federal Office of Refugee Resettlement requirements around non-discrimination and equity practices for hiring and employment." (*Id.*) A week later during a video conference to address OGM's concerns, OGM's Director told Bethany Christian's leaders that its sincerely held religious belief that it needed to hire Christians to carry out its mission was inconsistent with the state's "values." (Verified Compl. at ¶ 72, PageID.14.) She further contended that Bethany Christian had changed its employment policy to eliminate waivers of the Statement of Faith. (*Id.* at ¶¶ 71-72, PageID.12-13.) OGM's Deputy Director claimed that Bethany Christian was discriminating against other religions and was in violation of language in contracts with OGM. (*Id.* at ¶ 74, PageID.14.)

6

At the end of the video conference, Bethany Christian asked if OGM would put its concerns in writing so that Bethany Christian could provide a written response. (*Id.* at ¶ 75, PageID.14.) OGM did so. (12/18/23 Request from OGM, ECF No.1-13, PageID.222.) OGM's letter noted that its contracts with Bethany Christian contained the following language:

> Non-Discrimination: Under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., Grantee and its subgrantees agree not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability. Breach of this covenant is a material breach of this Grant. [12/18/23 Request from OGM, ECF No.1-13, PageID.222.][1]

OGM asserted that it had received complaints from staff at Bethany Christian regarding its Statement of Faith, and particularly that no exceptions to the requirement that employees affirm Bethany Christian's Statement of Faith would be granted in the future. (12/18/23 Request from OGM, ECF No.1-13, PageID.222.)

 OGM then made three requests of Bethany Christian: (1) provide assurance of compliance with the contract language quoted above; (2) provide a plan to address concerns; and (3) provide a plan to replace staff through hiring practices that are non-discriminatory and ensure that the individuals reflect the cultural, linguistic, and demographic characteristics of the populations being served. (*Id.*, PageID.222-223.)

---

[1] ELCRA requires that this language be included in state contracts. Mich. Comp. Laws § 37.2209.

**Bethany Christian provides a complete, thorough response to each of OGM's requests, but OGM does not give any substantive response.**

Bethany Christian submitted a complete response on January 5, 2024, that transparently identified its religious mission, its policies, the unauthorized waivers, and the legal support for its practices. (1/05/24 Letter to OGM, ECF No.1-14, PageID.225-232.) Bethany Christian first explained the importance of the Statement of Faith to its identity as an organization. (*Id.*, PageID.226.) Bethany Christian then explained why its practice of hiring co-religionists does not violate the contractual language OGM quoted in its letter. (*Id.*, PageID.226-227.) Bethany Christian specifically explained that though OGM had required compliance with the Elliott-Larsen Civil Rights Act for decades, the requirements of the Elliott-Larsen Civil Rights Act are limited by the state and federal constitutions such that Bethany Christian's practices were lawful. (*Id.*, PageID.228.) Moreover, as Bethany Christian explained, federal law prohibits OGM from imposing a secular hiring requirement on Bethany Christian Services. (*Id.*) In particular, the federal regulations contained in 45 C.F.R. part 87 that protect the equal treatment of faith-based organizations receiving federal funding through the HHS applies to Bethany Christian Service's contracts with OGM. (*Id.*) And those regulations prevented OGM from interfering with Bethany Christian's religious hiring practices. (*Id.*)

Having addressed the legality of its hiring practices, Bethany Christian also dispelled OGM's claim that Bethany Christian had changed its hiring policy. (*Id.*, PageID.228-229.) Bethany Christian pointed out that requiring employees to sign the Statement of Faith had been Bethany Christian's policy for decades and that exceptions were granted, although infrequently, by the CEO. (*Id.*)

OGM did not provide any substantive response. (Verified Compl. at ¶ 92, ECF No. 1, PageID.18.)

**OGM meets with Bethany Christian and CWS and informs Bethany Christian that it will be "moving forward" with CWS (i.e. not Bethany Christian).**

In recent years, Bethany Christian and Samaritas were the only providers of refugee reception and placement services in West Michigan. (*Id.* at ¶ 94, PageID.18.) But shortly before a joint meeting with CWS and OGM, CWS suddenly informed Bethany Christian that it would not be renewing certain subcontracts with Bethany Christian. Instead, for the first time, CWS would provide direct services to refugees in Grand Rapids and Kalamazoo. (*See id.* at ¶ 93, PageID.18.)

Initially, Bethany Christian saw CWS's entry into this service line as a positive development: there would be three, rather than two, agencies providing services which would create greater capacity and open the door for helping more refugees. (*Id.* at ¶¶ 94-95, PageID.18.) But on June 17, 2024, Bethany Christian learned what was really afoot. (*See id.* at ¶¶ 96-97, PageID.18.) OGM held a call with representatives from Bethany Christian and CWS where OGM advised that instead of increasing the number of refugees being served, the numbers would remain the same and Bethany Christian's allocations of services would be reduced in favor of CWS. (*See id.* at ¶ 97, PageID.18.) OGM said it was shifting the service provider to one that had no operations in Grand Rapids because of Bethany Christian's staff turnover. (*Id.* at ¶ 99, PageID.19.) Perhaps because this was so pretextual, OGM ultimately asserted that it could pick whoever it wanted to work with. (*Id.* at ¶ 102, PageID.19.) And it apparently did not want to work with Bethany Christian anymore.

**OGM inserts a new contractual religious-hiring requirement targeting Bethany Christian.**

Over the next weeks, OGM issued RFPs for almost every refugee-related service that Bethany Christian provides under contracts from OGM. (*Id.* at ¶ 103, PageID.19.) The RFPs

were unusual in that they were issued off cycle and required that comments and responses be submitted via email rather than using the Statewide Integrated Governmental Management Applications web portal. (*Id.* at ¶ 105, PageID.19.)

OGM ordinarily issues refugee-services grants on a three-year cycle. (*Id.* at ¶ 32, PageID.7.) The first contract year is awarded after a complete bidding process. (*Id.* at ¶ 33, PageID.7.) The second and third years are contract renewals without a full bidding process. (*Id.* at ¶ 34, PageID.7.) OGM's RFPs were issued for contracts that were slated for renewal, not bids. (*Id.* at ¶ 35, PageID.7.) In other words, OGM was deliberately ending the existing three-year cycle early to rebid the contracts.

OGM also utilized an atypical process for these bids. (*Id.* at ¶ 105, PageID.19.) Ordinarily, OGM requires that comments and questions regarding an RFP and responses be submitted through an online portal. (*Id.*) Any comments or questions, and any responses from OGM, are visible to all other bidders. (*Id.*) The portal thus promotes transparency and ensures that all bidders have the same information. (*Id.*) But this year, for the RFPs related to services that Bethany Christian was providing, OGM required that comments and responses be submitted via email. (*Id.* at ¶ 106, PageID.19.) As a result, the questions and responses were not visible to anyone but OGM and the person sending the comment. (*Id.*)

The most significant anomaly from earlier RFPs was the following new language:

> Additionally, OGM requires the following:
>
> a.   When developing and implementing hiring policies, the grantee will create opportunities to employ staff that represent the cultural, national origin, and religions of the newcomer populations being served under this agreement. [*See, e.g.*, Ex. A, RFP No. RSS25-001 at 10.]

This provision had never been included in any earlier contract for refugee services that Bethany Christian was performing for OGM. (Verified Compl. ¶ 107, ECF No. 1, PageID.20.) And

10

because Bethany Christian was the only West Michigan refugee services agency that had a

religious hiring requirement, the effect of the requirement to "create opportunities to employ

staff that represent the . . . religions of the newcomer populations being served" uniquely

affected Bethany Christian.

Bethany Christian requested clarification from OGM on several occasions in mid-July

2024. (*E.g.*, 7/16/2024 Email from T. Nolan to LEO Refugee Servs., ECF No. 1-15,

PageID.236.) Specifically, Bethany Christian asked whether the "employment and hiring

practices" Bethany Christian described in its "January 2024 response" would be "allowed under

the non-discrimination and diversity, equity, and inclusion requirements," and if not "what

changes would be necessary to Bethany Christian's practices to comply with the non-

discrimination and diversity, equity, and inclusion requirements." (*See id.*)

OGM's only response was no response at all:

> In fairness to other bidders, the OGM cannot provide insight into
> an appropriate or acceptable response to the RFP proposal. As
> stated in the RFP, the OGM will be looking for proposals that,
> among other things, ensure compliance with the Elliott-Larsen
> Civil Rights Act, . . . as well as the requirement that the grantee
> create opportunities to employ staff that represent the cultural,
> national origin, and religions of the newcomer populations being
> served under the agreement." [9/23/2024 Email from OGM, ECF
> No. 1-16, PageID.239.]

Bethany Christian submitted responses to the RFPs. (*See* Verified Compl. ¶ 111, ECF

No. 1, PageID.20-21.) Its successes and losses tell an interesting story: OGM denied to Bethany

Christian every contract—except those where it had little choice but Bethany Christian.[2] (*See id.*

¶¶ 127-128, PageID.23.) So, for example, OGM awarded Bethany Christian the URM contracts,

---

[2] Bethany Christian is not capable of precisely identifying decisions regarding all of the contracts
because it has not received decisions on all of the RFPs and because some RFPs were tied to
multiple contracts, and the correlation is not always evident.

but no other agency had the capacity (and physical infrastructure) to provide the necessary
housing and services. (*Id.*) And even though Bethany Christian was selected to provide some
reception and placement services, OGM undercut the efficacy of those services to the recipients
by denying to Bethany Christian the contracts for supplemental services to accompany the
reception and placement services, setting Bethany Christian's clients up to fail because they will
only receive those supplemental services to the extent that CWS or another provider determine
that they have capacity to assist additional clients. (*See id.* at ¶¶ 115-116, PageID.21.)

**Bethany Christian appeals to OGM regarding various contracts and contract denials.**

Bethany Christian appealed OGM's decision to deny the various contracts. (*See, e.g.*,
8/27/2024 Bethany Christian Appeal for Bid Denial, ECF No. 1-18, PageID.249.) In its appeal,
Bethany Christian explained that it has been the incumbent provider of RSS Employment
Program in Grand Rapids, Michigan, since 2009 and the RSS Post-Resettlement Program since
2017 and that it has consistently met or exceeded performance expectations. (*Id.*) Bethany
Christian also explained that the abrupt transition of these services on September 30, 2024 to
another agency poses significant risks to the stability of services provided to the refugee
population, including disruption of essential client support as well as employment for its staff.
(*Id.*) Lastly, the appeal raised concerns with potential violations of the Grants Policy, the
integrity of the process, and concerns about the negative impact in the service community. (*See
id.*, PageID.249-250.) OGM's response—silence. So after waiting nearly two weeks, Bethany
Christian sent a follow up email inquiring on the status of the appeal and raising concerns
regarding efforts by the replacement provider to schedule transition meetings before the appeal is
resolved. (*See* 9/6/2024 Letter from L. Shirley regarding Appeal Status, ECF No.1-19,

PageID.252.) This time Bethany Christian received a response acknowledging the email, but not action on the appeal. (*See* Verified Compl. ¶ 126, ECF No. 1-1, PageID.23.)

When Bethany Christian received contract documents for three of the six URM contracts that OGM awarded to it, Bethany Christian noted that the contracts contained the provision requiring Bethany Christian to "create opportunities to employ staff that represent the . . . religions of the newcomer populations." (*See* 8/2024 Email Correspondence regarding URM Contract Language Proposed Changes, ECF No.1-20, PageID.255.) Bethany Christian was surprised because that language had not been included in the RFPs for the URM services. (*Id.* at PageID.256.) So Bethany Christian asked OGM to clarify what was meant by this language, including whether Bethany Christian's hiring practices as described in its January 2024 written responses to OGM's requests for "assurances" were compliant with the proposed contract. (*Id.*) And if not, Bethany Christian asked OGM to please explain what changes would be necessary to Bethany Christian's practices to ensure compliance. (*Id.*) Bethany Christian also proposed amendments to the contract language limiting the new employment opportunity language to "the cultures and national origins of the newcomer populations being served." (*Id.* at PageID.257.) Again, despite multiple follow-ups, OGM did not provide a substantive response before the lawsuit commenced. (*See* Follow Up Emails Seeking Response to Proposed Amendments, ECF No.1-21, PageID.261-262.) And it has failed to provide the contracts for the other three URM grants awarded to Bethany Christian. (*See* Verified Compl. ¶ 130, ECF No. 1, PageID.23.) In a final effort to try to identify and resolve any misperceptions and disagreements, Bethany Christian emailed OGM's Director and Assistant Director to set up a meeting with them and their staff. (8/27/2024 Email Requesting Meeting with OGM, ECF No.1-22, PageID.269.) After

briefly summarizing Bethany Christian's efforts to obtain clarity from OGM, Bethany Christian wrote:

> It may be that Bethany Christian and OGM have divergent perspectives on what the law allows and does not allow with regard to hiring co-religionists, and that OGM has decided to reduce or minimize Bethany Christian Services' participation in various programs. Before assuming that OGM has reached that conclusion, our leadership team would like to meet with you and whomever else on your staff that you wish to include to have an open discussion to clear any misperceptions and resolve any disagreements. [(*Id.* at PageID.269.)]

To date, OGM has still not responded. Indeed, Bethany Christian sent communications regarding the issues here to OGM no fewer than a dozen times. (*See* Ex. B, Chart of Bethany Christian's Communications to OGM.) Not once has OGM provided a substantive response.

But OGM has indicated that it plans to move forward with the transition. On September 9, OGM sent Bethany Christian an email indicating that Bethany Christian should "stop taking RCA referrals as of 9/15/2024," and that "All active clients in the DMS should be ended dated 9/30/2024." (Ex. C, 9/9/2024 Email from N. Adams.)

Without any other meaningful recourse, Bethany Christian filed its Verified Complaint in this case on September 9, 2024. (ECF No. 1, Page.ID.1-36.) Bethany Christian now moves on an emergency basis for a preliminary injunction and expedited discovery.

# ARGUMENT

Preliminary injunctive relief is necessary to preserve the status quo and prevent irreparable harm to Bethany Christian. "The purpose of a preliminary injunction is simply to preserve the status quo" until a trial on the merits can be held. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). To obtain a preliminary injunction, Bethany Christian must show: (1) it is likely to succeed on the merits of its constitutional claims; (2) it is likely to

suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in

its favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson*

*Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001). These circumstances satisfy all four elements.

## I.     Bethany Christian is likely to succeed on the merits of its constitutional claims because Defendants have violated the Free Exercise Clause.

Bethany Christian has a strong likelihood of success on the merits. When a law is

challenged on constitutional grounds, likelihood of success on the merits is usually the

determinative factor in deciding whether to grant a preliminary injunction, as the other factors

are generally met when that factor is met. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.

2012). Here, Bethany Christian is likely to succeed on the merits on its claims that OGM's

policies violated the free exercise clause of the First Amendment.

The First Amendment, applicable to the states through the Fourteenth Amendment,

provides that "Congress shall make no law respecting an establishment of religion, or prohibiting

the free exercise thereof." U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303

(1940). The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly

and secretly. It does perhaps its most important work by protecting the ability of those who hold

religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch.*

*Dist.*, 597 U.S. 507, 524 (2022). The government may not burden the sincere religious practices

of persons (including organizations) pursuant to policies that are not neutral or generally

applicable. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). "At a minimum, the

protections of the Free Exercise Clause pertain if the law [or policy] at issue discriminates

against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for

religious reasons." *Church of Lukumi Babalu, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). Indeed, it was "historical instances of . . . intolerance that gave concern to those who drafted the Free Exercise Clause." *Bowen v. Roy*, 476 U.S. 693, 703 (1986).

As a preliminary matter, Bethany Christian's sincere religious practices are burdened by OGM's demand that it choose between its longstanding practice of requiring its employees to sign its Statement of Faith or participation in OGM-controlled federally funded grants to serve refugees. Bethany Christian's values include that "We are motivated by our faith," and its mission is to "demonstrate the love and compassion of Jesus Christ." (*See* Employee Handbook, ECF No. 1-9, PageID.203.) Thus, its Christian faith is Bethany Christian's principal motivation and the source of its calling to serve refugees and those in need. It believes it is living out its Christian beliefs by demonstrating the love and compassion of Jesus Christ through the service its employees provide to refugees. Bethany Christian sincerely believes that it can only demonstrate the love and compassion of Jesus Christ if its employees know that love and have a relationship with Jesus Christ. (*See* Verified Compl. ¶ 37, ECF No. 1, PageID.7.) Bethany Christian has demonstrated its sincere belief by consistently requiring, through its hiring practices and employee policies, that its employees affirm its statement of faith. (*Id*. ¶ 39, PageID.8.) Demanding that Bethany Christian change this policy is a significant burden on its religious exercise.

Having burdened Bethany Christian's sincere religious practices, OGM's policies and contractual language are subject to strict scrutiny for two reasons. First, OGM's policy of requiring contracting agencies to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement" is not generally applicable. Second, OGM's policy is not neutral, because OGM has persistently targeted

Bethany Christian's religious exercise. Because Defendants cannot demonstrate any compelling state interest for its policies, or that its policies are narrowly tailored to achieve that interest, OGM's policies cannot satisfy this "highest level of review." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). Accordingly, Bethany Christian is likely to succeed on the merits of its free exercise claims.

### A. OGM's conduct is subject to strict scrutiny because it discriminates against Bethany Christian because of its sincerely held religious beliefs and religious practices.

#### 1. *Strict scrutiny applies because OGM's policy is not generally applicable.*

OGM's policy is subject to strict scrutiny because it is not generally applicable. Laws or policies that have the incidental effect of burdening a particular religious practice can only escape strict scrutiny if they are both "neutral and generally applicable" on their face and the government implements them in a neutral and generally applicable manner. *Fulton*, 593 U.S. at 542; *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). In *Fulton*, for example, the U.S. Supreme Court examined Philadelphia's refusal to renew a foster care contract with Catholic Social Services ("CSS") when it refused to agree to certify same-sex couples as foster parents. *Id.* at 526-27 (2021). Philadelphia argued that CSS' practice of refusing to certify same-sex couples violated its standard foster-care contract. *Id.* at 534. The Supreme Court determined that the contractual language in question was not generally applicable given that the provision permitted the government to grant exceptions. *Id.* at 534-35.

The Court explained that a law is not generally applicable if (1) "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" or (2) "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 533-34.

Given that Philadelphia's policy incorporated a system of individual exemptions at the sole discretion of the government, the U.S. Supreme Court concluded that Philadelphia could not "refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* at 535 (cleaned up).

In addition, the Court rejected Philadelphia's argument that CSS' practice of not certifying same-sex couples as foster parents violated the Fair Practices Ordinances, which forbids denying or interfering with public accommodations opportunities based on someone's race, sex, sexual orientation, and other protected groups. *Id.* at 538. The Court reasoned that Philadelphia could not rely on the ordinance as its basis to exclude CSS because it was not generally applicable, given that Philadelphia allows exceptions for secular reasons despite denying one for CSS' religious exercise. *Id.*

Here, OGM imposes two separate conditions. The first is that proposals must "ensure compliance with the Elliot Larsen Civil Rights Act." (*See, e.g.*, Ex. A, RFP No. RSS25-001 at 10.) Bethany Christian's employment practices comply with the requirements of ELCRA because despite its lack of a specific religious non-profit hiring exception like that found in the analogous Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), it is well established that ELCRA's scope is limited by the religion clauses in the federal and state constitutions, with the latter requiring strict scrutiny for any impairment of religious exercise. *See Champion v. Sec'y of State*, 761 N.W.2d 747, 753 (2008) ("[W]e apply the compelling state interest test (strict scrutiny) to challenges under the free exercise language in Const. 1963, art. 1, § 4, regardless of whether the statute at issue is generally applicable and religion-neutral, which is the case here."); *see also Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 483, 497-98 (2008) (applying federal constitution to limit the scope of ELCRA). Moreover, courts have generally upheld the right of

religious organizations to hire personnel who share their beliefs. *Seattle's Union Gospel Mission v. Wood*, 142 S. Ct. 1094 (2022) (Alito, J, dissenting from denial of cert.). For example, in *Hall v. Baptist Mem. Health Care Corp.*, while affirming the defendant's right to make employment decisions based on its religious beliefs, the Sixth Circuit noted that "the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices." 215 F.3d 618, 622-623, 626 (6th Cir. 2000).

Even if Defendants believe that ELCRA prohibits Bethany Christian's requirement that employees affirm the Statement of Faith, ELCRA, like the law in *Fulton*, is subject to strict scrutiny as applied to Bethany Christian's practices. ELCRA contains both individualized and categorical secular exemptions and therefore is not generally applicable.

ELCRA provides an individualized exemption provision for bona fide occupational qualifications that requires individualized government determinations. Mich. Comp. Laws § 37.2208 provides:

> A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate section of this article. An employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.

Second, ELCRA contains a categorical secular exemption for a bona fide seniority or merit system. Mich. Comp. Laws § 37.2211 provides:

> Notwithstanding any other provision of this article, it shall not be an unlawful employment practice for an employer to apply

> different standards of compensation, or different terms, conditions
> or privileges of employment pursuant to a bona fide seniority or
> merit system.

ELCRA thus treats secular interests—bona fide occupational qualifications and seniority systems—as more favorably than religious exercise. Because ELCRA is not generally applicable, its policies burdening Bethany Christian's First Amendment right to the free exercise of religion must be examined under strict scrutiny.

The second condition imposed by OGM is that agencies create opportunities to hire individuals of the same religion as the population that is being served. This OGM policy is also not generally applicable because whether an agency (like Bethany Christian) has succeeded in creating employment opportunities representative of the newcomer populations being served, depends on OGM's subjective, case-by-case, evaluation of the agency's plan. In its scoring sheet, OGM describes its evaluation of this requirement as follows: "Did the bidder describe a hiring plan of culturally proficient and competent staff that represent the cultural, national origin, and religions of the newcomer populations being served?" (Ex. D, Scoring Sheet.)[3] This is precisely the type of subjective, case-by-case evaluation that triggered strict scrutiny in Fulton. And it does the same here.

Finally, OGM has not *applied* its policy in a generally applicable manner, which also triggers strict scrutiny. The Ninth Circuit recently addressed a similar situation in *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024). There, the Ninth Circuit issued emergency injunctive relief to stop the state from discriminating against 71Five for its practice of hiring co-religionists. "Once the state of Oregon learned of this hiring

---

[3] Notably, the state's diversity and inclusion policies are not limited to this scoring category. They bleed into many others, so that if the state dislikes an agency's hiring practices (as in the case of Bethany Christian), the agency's scoring losses will not be limited to that category alone.

practice, it canceled $410,000 in grants to 71Five, asserting that the group violated the state's

non-discrimination policy." *Id.* at *1. The state, however, had not applied this non-discrimination

policy in a neutral or generally applicable manner: "As evidenced by their websites, many other

participants in the Program discriminate in violation of the [non-discrimination policy]. . . . Yet

the state continues to fund these groups while it has revoked 71Five's grants." *Id.*

So too here. OGM claims that Bethany Christian has violated its non-discrimination

policy, but it allows other groups to receive grants even though they discriminate because of

protected categories in their hiring practices and in the client groups they serve. For instance,

Catholic Charities of Ingham, Eaton & Clinton Counties, St. Vincent Campus, Les Clay, Puertas

Abiertas, the Ukrainian Society of Michigan, Zaman, and the Muslim Foster Care Association all

appear to engage in preferential hiring or service. (*See, e.g.*, About Us, Muslim Foster Care

Association, available at: website https://muslimfostercare.org/ ("At the Muslim Foster Care

Association, we strive to enable Muslim children in the foster care system to thrive, flourish and

be their best as human beings, Muslims, and contributing members of society."); Puertas

Abiertas, available at: https://puertasabiertasgr.org/en ("Empowering Latina women to make

healthy choices and live free from violence."); About Us, Les Clay, available at:

https://www.lesclay.org/about-us ("Les Clay seeks to empower African immigrants to be active

contributors in American Society."); Ukrainian Society of Michigan, available at:

https://www.uasmi.org/ ("Our top priority is to provide physical and psychological assistance to

those Ukrainians who, as a result of the Russian invasion, were forced to flee their homes and

seek refuge in Michigan."); Zaman, available at: https://zamaninternational.org/ ("Zaman

empowers women to break the cycle of intergenerational poverty by providing mothers the

support, training, and employment needed to lift their families out of poverty.").)

Indeed, OGM has not even applied its policy in a generally applicable manner to Bethany Christian itself. When OGM really needed Bethany Christian to continue serving—e.g,, unaccompanied refugee minors under the URM contracts—it awarded the grants last month. When OGM has other options, it rejects Bethany Christian's bid. For example, it rejected Bethany Christian's bid for the Supplemental Services grants, and it is actively replacing Bethany Christian with CWS in providing reception and placement services.

2.    *Strict scrutiny applies because OGM's policy is a thinly veiled targeting of Bethany Christian's faith-based practice.*

OGM's policy is subject to strict scrutiny because it is a veiled cover for targeting Bethany Christian's faith-based practice. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534 (cleaned up). As a result, where a policy is a "veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it advances interests of the highest order and is narrowly tailored in pursuit of those interests." *Ward*, 667 F.3d at 738 (cleaned up). As the Supreme Court put it, "a government policy will not qualify as neutral if it is specifically directed at religious practice." *Kennedy*, 597 U.S. at 526 (emphasis added; cleaned up). Factors relevant to determining whether a policy is directed at religious practice include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

In *Lukumi*, the plaintiff Santeria church announced plans to establish a house of worship school, cultural center, and museum with the goal of bringing the practice of the Santeria faith, including its ritual of animal sacrifice, into the open. 508 U.S. at 525-26. The defendant city

22

council reacted by enacting a series of ordinances prohibiting the slaughter of animals but exempting slaughter by licensed establishments of animals and specifically raised for food purposes. *Id*. at 527-28. The Supreme Court found that the burden of these ordinances fell on Santeria adherents but almost no others. *Id.* at 536. This was akin to singling out a religious practice for discriminatory treatment, and therefore requires the law or policy to overcome strict scrutiny. *Id.*

Here, the historical background, specific events leading to the addition of the "opportunity to hire" provision, and the statements by OGM leaders, all demonstrate the Bethany Christian is likely to prevail on its targeting claim.

The State of Michigan has a recent history of violating the free exercise rights of religious social services organizations. In *Buck v. Gordon*, this Court concluded that St. Vincent Catholic Charities was likely to prevail against the Michigan Department of Health and Human Services ("MDHHS") because there was substantial evidence that the State, up to and including a statewide elected official, targeted St. Vincent and other religious organizations for their religious beliefs. *Buck v. Gordon*, 429 F. Supp. 3d 447, 461-65 (W.D. Mich. 2019). After *Fulton*, MDHHS agreed to entry of judgment against it for violating St. Vincent's Free Exercise rights. *Buck v. Gordon*, W.D. Mich. Case No. 1:19-cv-00286, Stipulation (ECF No.112) at 4. Bethany Christian was another victim of the State's civil rights violations, but it chose not to pursue litigation to vindicate its rights at that time.

Like in *Buck v. Gordon*, the historical background and the policy itself point to religious targeting. Until a few months ago, OGM had never required a social services provider to create opportunities to hire individuals of the same religion as the population being served. OGM only implemented this policy *after* it claims to have learned about Bethany Christian's religious

practice of hiring Christians and after a former Bethany employee who objected to the Statement of Faith left Bethany Christian and went to work for OGM. Indeed, OGM's entire course of action since allegedly "learning" of Bethany Christian's practice displays one thing: OGM will not contract with a Christian organization that hires Christians unless it has no alternative.

During the December 2023 meeting, OGM told Bethany Christian that its religious hiring practice was inconsistent with the state's "values," and was inconsistent with state and federal law. The federal regulations, however, do not require Bethany Christian to abandon its practices. On the contrary, they protect Bethany Christian's practice of hiring co-religionists. *See* 45 C.F.R. 87.3. Similarly, Bethany Christian's conduct does not violate ELCRA, because ELCRA has been limited by the federal constitution. *See Weishuhn*, 756 N.W.2d at 497-98 (applying federal constitution to limit the scope of ELCRA); *Porth v. Roman Catholic Diocese of Kalamazoo*, 536 N.W.2d 195 (Mich. Ct. App. 1995) (stating that "Michigan courts have always applied a strict scrutiny test to state regulation of religious freedom).

Moreover, Bethany Christian's policy has not caused harm to refugees. In fact, Bethany Christian has partnerships in place with religious institutions from other faiths to aid refugees who are not Christians. (*See* Refugee Social Services Bid at 9-10, ECF No. 1-4, PageID.172-173. (noting Bethany Christian's partnership with "two local Mosques [to] allow for participation of religious services for youth and newly arrived families who are Muslim.").)

Bethany Christian pointed all of this out to OGM in its response and its bids. But instead of admitting its error, OGM issued off-cycle RFPs; added language to RFPs and contracts that is crafted to exclude Bethany Christian;[4] denied Bethany Christian's bid for the supplemental

---

[4] As OGM is well aware, Bethany Christian cannot agree to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served under this agreement,"

services it has provided for decades and that always accompany an Reception and Placement award; and told Bethany Christian that OGM has "discretion" to choose the "best partner" and that it intended to work with CWS. (Verified Compl. ¶¶ 98, 102, ECF No. 1, PageID.18-19.)

OGM's repeated inclusion of language that excludes Bethany Christian alone is particularly relevant under the Supreme Court's precedent. *Lukumi*, 508 U.S. at 535 ("[T]he effect of a law in its real operation is strong evidence of its object."). Like in *Lukumi*, OGM's policy excludes Bethany Christian alone. That is strong—perhaps dispositive—evidence of targeting.

OGM also denied Bethany Christian's repeated, good-faith efforts to engage OGM on this issue. Bethany Christian expressed concern and repeatedly asked for clarification regarding the new non-discrimination language in the RFPs and contracts. (*See* Ex. B, Chart of OGM's Refusal to Respond to Bethany Christian.) OGM never responded. OGM's persistent refusal to respond, or otherwise engage Bethany Christian on this issue, confirms that OGM's actions are not motivated by providing the best service to refugees.

Because this entire background points to non-neutral targeting, OGM's policy is subject to strict scrutiny.

### B.      Defendants cannot satisfy strict scrutiny.

OGM's policy cannot withstand strict scrutiny because it does not serve a compelling government interest and is not narrowly tailored to serve that interest. "Laws subject to strict scrutiny are presumptively unconstitutional and can only survive if they (1) serve a compelling state interest and (2) are narrowly tailored to achieve that interest." *Susan B. Anthony List*, 814

---

because that would require Bethany Christian to abandon its sincere belief that it must hire Christians to accomplish its mission.

F.3d at 473; see also *Lukumi*, 508 U.S. at 546 ("A policy satisfied strict scrutiny only if it "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." (cleaned up)). This is a demanding inquiry, as "[a] law that targets religious conduct . . . will survive strict scrutiny only in rare cases." *Lukumi,* 508 U.S. at 546. And with the First Amendment in particular, "broadly formulated interests" are insufficient; instead, a "more precise analysis" and scrutiny are required. *Fulton*, 593 U.S. at 541.

A compelling interest is an interest "of the highest order," of the type that would justify the most serious government infringements upon constitutional rights." *Id.*; *see also Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). When considering a claim of compelling interest, courts must "scrutiniz[e] the asserted harm of granting specific exemption to particular religious claimants — in other words, to look to the marginal interest in enforcing the [policy] in these cases." *Burwell v. Hobby Lobby Stores, Inc.* 573 U.S. 682, 726-27 (2014) (cleaned up).

Here, Defendants do not have a compelling interest. First, OGM cannot ground its interest in preventing religious discrimination. Such a justification is not tenable where a plaintiff has demonstrated a likelihood of success on the issue of religious targeting. One does not stamp out religious discrimination by discriminating based on religion.

Moreover, Defendants lack any compelling interest in requiring Bethany Christian to hire staff that represent the religions of the newcomer populations. OGM's website states that its goal "is to strengthen communities by ensuring state programs and opportunities are accessible, inclusive, and positioned to have the best possible impact." See Office of Global Michigan, available at https://www.michigan.gov/ogm. To this end, regarding refugee resettlement, Defendants assert that its "programs facilitate the smooth integration of newcomers, ensuring a welcoming environment." *Id.*

However, like in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,* while "these are commendable goals, they are not sufficiently coherent for purposes of strict scrutiny." 600 U.S. 181, 214 (2023). There, the defendant university identified several education benefits it was pursuing through its affirmative action programs, including "preparing graduates to adapt to an increasingly pluralistic society; better educating its students through diversity; and producing new knowledge stemming from diverse outlooks," *Id.* The Supreme Court found that those these goals were "commendable" they were not "sufficiently coherent for the purposes of strict scrutiny." The Court noted that it was unclear how courts are supposed to measure any of these goals, making the interests "inescapably imponderable." *Id.* at 214-15. The Court also found that the policy "fail[ed] to articulate a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215. Accordingly, the Court found that the defendant university could not overcome strict scrutiny. *Id.* at 217-18.

Here, like in *Fair Admissions*, OGM's policy of requiring Bethany Christian to hire staff whose faith practices reflect the religions of refugee populations to facilitate the smooth integration of newcomers or ensure a welcoming environment are commendable, but not sufficiently coherent, nor is there a meaningfully connection between the goal and the means. First, as in *Students for Fair Admissions*, it is not clear how the goals of smooth integration or ensuring a welcoming environment is measurable. Second, there is absolutely no evidence that a Christian employee from Bethany Christian is unable to ensure smooth integration or a welcoming environment for a refugee of a different faith. Indeed, OGM's longstanding partnership with Bethany Christian confirms that Bethany Christian has been successful in doing so.

Moreover, as in *Fulton*, Defendants cannot show that granting an exception to its policy would harm its asserted interest. In *Fulton*, the Supreme Court determined the defendant City could not demonstrate that its asserted interests of maximizing the number of foster parents and ensuring equal treatment of foster parents and children could be achieved through its policies because it could not show how this asserted interest would be harmed by granting an exception. 593 U.S. at 541. Here, similarly, Defendants cannot show that granting an exception to Bethany Christian will affect detrimentally the services Bethany Christian offers to refugees. Defendants speculate that a service worker of a different religion than a refugee would change the quality of the services provided. "Such speculation is insufficient to satisfy strict scrutiny." *Id.* (citing *Brown v. Entm't Merch. Assn.*, 564 U.S. 786, 799–800 (2011)).

Second, Defendants have not applied the least restrictive means to achieve its goal. The least-restrictive-means standard is "exceptionally demanding," and requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id.* at 728. "[I]f the less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000). A policy flunks this prong if "[the proffered] interest could be achieved by narrower [policies] that burde[n] [the right] to a far lesser degree." *Lukumi*, 508 U.S. at 546.

Here, there are less restrictive means to accomplish the goals of smooth integration and ensuring a welcoming environment to newcomers. Indeed, OGM already imposes various other means to achieve the same purposes. For example, OGM already requires the following:

- Provide DEI training opportunities for staff, volunteers, contractors, and subgrantees, and at minimum require every staff to complete the State of Michigan's Implicit Bias Training or comparable training approved by OGM.

- When developing new programming, ensure that all ORR-eligible populations, regardless of race, religion, gender identity, sexual orientation, disability, or other characteristic(s), receive fair treatment, access, and opportunity under this agreement.

- Review existing programming to identify and eliminate barriers that may prevent full participation in services under this agreement.

- Practice inclusion through purposeful collaboration and engagement with ethnic communities and stakeholders to create best practices and service design and delivery, through language, visual art, symbols, or any other methods of communication to ORR-eligible populations. [Ex. A, RFP No. RSS25-001 at 10.]

The Defendants cannot show that requiring contracted agencies to create opportunities to hire individuals based on the religion of the community being served is essential to whatever purportedly compelling government interest is at stake here.

For these reasons, OGM's policy cannot withstand strict scrutiny.

## II.  Bethany Christian will suffer irreparable harm without a preliminary injunction.

Courts have recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *see also Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even a minimal infringement on First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." (cleaned up)). It is enough that Defendant has violated Bethany Christian's constitutional rights by "putting it to the choice" of violating its religious beliefs for the fear of losing access to an otherwise-available grant program. *Fulton*, 593 U.S. at 532. This in-and-of itself constitutes an irreparable harm to Bethany Christian.

Bethany Christian, however, is also on the verge of suffering irreparable harm in other ways. OGM has begun the process of moving Bethany Christian's Supplemental Service contracts to another social services provider. (9/6/2024 Letter from L. Shirley Regarding Appeal Status, ECF No. 1-19, PageID.252.) Defendants have scheduled this program to be transferred to Samaritas on September 30, 2024, despite Bethany Christian being the incumbent provider in Grand Rapids, Michigan since 2009 and the RSS Post-Resettlement Program since 2017, and the supplemental services program grant being essential for Bethany Christian to carry out its duties under the reception and placement program. (8/27/2024 Appeal Letter for Bid Denial RFP No. RSS25-001, ECF No. 1-18, PageID.249-50.) This abrupt transition poses significant risks to the stability of services provided to the refugee population, including disruption of essential client support and employment for our staff. (*Id.*) Indeed, absent court involvement, Bethany Christian will have to terminate dozens of employees by the end of the month.

Defendant's unconstitutional actions have also set Bethany Christian up for failure in its performance of its reception and placement contract. As explained, Supplemental Services funding is critical to providing complete assistance to refugees. Supplemental Services funding always—as a matter of practice—accompanies Reception and Placement funding. By depriving Bethany Christian of the Supplemental Services funding, OGM has set Bethany Christian up to fail in reception and placement programming. Bethany Christian will be unable to provide critical services to the refugees it takes on under the reception and placement contract. For example, it will be unable to help these employees find employment opportunities. As a result, Bethany Christian's standing and reputation in the refugee community will be harmed, as will its ability to obtain reception and placement grants in the future because it will be unable to meet the benchmarks on its current contract.

In short, irreparable harm is imminent.

## III.   The balance of equities tips in Bethany Christian's favor and an injunction is in the public interest.

Where "the Government is the opposing party," the "harm to the opposing party and the public interest" factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, it is in the best interest of the public to enjoin Defendants from removing Bethany Christian's contracts.

"The Sixth Circuit has found that 'it is always in the public interest to prevent violation of a party's constitutional rights.' " *Mattia v. City of Ctr. Line, Michigan*, 2017 WL 6422069, at *10 (E.D. Mich. Dec. 18, 2017) (quoting *Deja Vu of Nashville, Inc.*, 274 F.3d at 400 (cleaned up)). Indeed, "the public as a whole has a significant interest in . . . protection of First Amendment liberties." *Libertarian Party of Ohio*, 751 F.3d at 412 (cleaned up)).

Compared to the irreparable harm suffered by Bethany Christian, Defendants and the third-parties to whom the supplemental services contracts are being transitioned will not suffer harm were this Court to maintain the *status quo* pending disposition of this case on the merits. Like the proverbial toothpaste once it is out of the tube, transition of the contracts will be nigh impossible to reverse once it occurs because Bethany Christian will lose its experienced staff who are essential to provide the services at issue here. However, since these third-parties did not manage these contracts before, they will not be harmed by pressing pause on the abrupt transition while this Court determines if Defendants unconstitutionally violated Bethany Christian's First Amendment rights.

## CONCLUSION

For all the foregoing reasons, Bethany Christian respectfully requests that the Court enter a preliminary injunction that requires Defendants to preserve the status quo regarding Bethany

Christian's provision of refugee-related services in the Grand Rapids, Kalamazoo, and Traverse City areas under the contracts in effect on September 9, 2024, and enjoins Defendants from transitioning services to other providers from Bethany Christian pending final judgment in this action.

Date: September 11, 2024

/s/ Matthew T. Nelson
Jonathan E. Lauderbach (P51313)
Matthew T. Nelson (P64768)
Katherine G. Boothroyd (P85881)
Daniel S. Brookins (P86665)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave NW, Ste. 1500
Grand Rapids, MI 49503
616.752.2000
jlauderbach@wnj.com
mnelson@wnj.com
kboothroyd@wnj.com
dbrookins@wnj.com

Lori D. Kepner*
Steven T. McFarland*
Center For Law & Religious Freedom
CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Suite 302
Springfield, VA 22151

*Application for admission pending

*Attorneys for Plaintiffs Bethany Christian Services, Bethany Christian Services of Michigan, and Bethany Christian Services USA, LLC*