## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BETHANY CHRISTIAN SERVICES;
BETHANY CHRISTIAN SERVICES OF
MICHIGAN; and BETHANY CHRISTIAN                    CASE NO. 1:24-cv-00922
SERVICES USA, LLC,

      Plaintiffs,

v.

SUSAN CORBIN, in her official capacity as
Director of the MICHIGAN DEPARTMENT OF
LABOR AND ECONOMIC OPPORTUNITY;
POPPY SIAS HERNANDEZ, in her official
capacity as Executive Director of the OFFICE OF
GLOBAL MICHIGAN; BEN CABANAW, in his
official capacity as Deputy Director of the
OFFICE OF GLOBAL MICHIGAN.

      Defendants.

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Bethany Christian believes that it must hire Christians to carry out its mission of sharing the love and compassion of Jesus Christ with others. Ben Cabanaw's disdain for this religious exercise is so pervasive that he announced a policy—approved by his bosses—that the Office of Global Michigan ("OGM") "would not support" Bethany Christian's hiring practices, which in practice meant that OGM would punish Bethany Christian for its religious exercise. Poppy Hernandez-led OGM and Cabanaw implemented their policy of religious discrimination through the following actions and additional policies:

- Targeting Bethany Christian's contracts with the Susan Corbin-led Department of Labor and Economic Opportunity ("LEO"), *and* Bethany Christian's business relationships with federal agencies, other states, and with other private agencies;

- Disregarding federal law protecting Bethany Christian's right to participate in the federally funded grant programs while maintaining its religious hiring practices;

- Taking the position that Bethany Christian's hiring practices violate the Elliott-Larsen Civil Rights Act ("ELCRA");

- Inserting contract language in requests for proposals ("RFPs") and grant agreements crafted to exclude Bethany Christian, alone among pre-existing LEO refugee-services providers, from various programs, and/or deter Bethany Christian from bidding on those contracts;

- Publishing OGM's hostility to Bethany Christian to the OGM staff;

- Rigging the bid-review process against Bethany Christian by assigning individuals opposed to Bethany Christian's religious hiring practices to review bids for funding;

- Issuing RFPs—for the first time ever—on certain programs performed by Bethany Christian because of Bethany Christian's hiring practices;

- Implementing off-cycle bids on programs performed by Bethany Christian;

- Refusing to respond to Bethany Christian's requests for information;

- Refusing to respond to Bethany Christian's proposed amendments to contract language;

- Encouraging other organizations to open offices and/or expand their operations for the purpose of replacing Bethany Christian; and

- Unlawfully terminating contracts with Bethany Christian before the conclusion of their term.

Through its words and actions Defendants have shown that they will discriminate against a Christian organization that intentionally hires individuals who are committed to its religious mission. This discrimination is simply not allowed under the United States Constitution or Michigan law. Accordingly, Bethany Christian brings this lawsuit to vindicate its right to continue to fulfill its religious mission in the service of the most vulnerable in society.

## **PARTIES**

1.      Bethany Christian Services is a Michigan nonprofit corporation with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan 49503.

2.       Bethany Christian Services of Michigan is a Michigan nonprofit corporation with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan 49503.

3.      Bethany Christian Services USA, LLC is a Delaware limited liability company with its principal place of business located at 901 Eastern Ave., NE., Grand Rapids, Michigan. 49503.[1]

4.      Susan Corbin is the Director of the Michigan Department of Labor and Economic Opportunity. Her office address is 105 W. Allegan St., Lansing, Michigan 48933. She is being sued in her official capacity.

5.      Poppy Sias Hernandez is the Executive Director of the Office of Global Michigan. Her official address is 105 W. Allegan St., Lansing, Michigan 48933. She is being sued in her official capacity.

---

[1] Bethany Christian Services, Bethany Christian Services of Michigan, and Bethany Christian Services USA, LLC are collectively referred to herein as "Bethany Christian."

6. Ben Cabanaw is the Deputy Director of the Office of Global Michigan. His official address is 105 W. Allegan St., Lansing, Michigan 48933. He is being sued in his official capacity.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under 42 U.S.C. § 1983 and other federal law to redress the deprivation of rights guaranteed by the First Amendment to the United States Constitution under color of State law, custom or usage.

8. This Court has personal jurisdiction over the Defendants because all Defendants reside and transact business in the State of Michigan.

9. The declaratory and injunctive relief sought is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Bethany Christian's claims occurred in this judicial district.

## BACKGROUND

### I. Bethany Christian has a long history of serving people in need.

11. Bethany Christian began in 1944 when two Christian women, Marguerite Bonnema and Mary DeBoer, were motivated by their faith to take in a baby girl who needed a home. Bonnema and DeBoer took in five more young children that year before partnering with Andrew VanderMeer to establish Bethany Christian Home as a nonprofit organization.

12. In 1951, Bethany Christian became licensed by the state of Michigan to facilitate adoption, placing 25 infants with Christian families that first year.

13.     Today, Bethany Christian operates in all 50 states and, at any given time, serves tens of thousands of people in need. Its work spans adoption, foster care, family-based care, family strengthening and counseling, and refugee work. In 2023 alone, Bethany Christian served 57,167 clients in 81 locations around the world. In the United States, it served 28,405 vulnerable kids and families.

14.     Bethany Christian served 20,130 refugees in 2023.

15.     Bethany Christian's motivation to continue carrying on this work is an unwavering commitment to Jesus Christ and the Christian faith.

16.     Bethany Christian's mission is to demonstrate the love and compassion of Jesus Christ by protecting children, empowering youth, and strengthening families through quality social services.

17.     This commitment compels Bethany Christian to serve and support the most vulnerable members of our community by demonstrating the love and compassion of Jesus Christ to its clients.

## II.     Bethany Christian and OGM partner to help refugees succeed and thrive in West Michigan.

18.     Bethany Christian has been providing refugee services since the 1970s, and it has partnered with various departments of the state government to provide those services since the early 2000s.

19.     The State of Michigan receives federal funding to finance refugee resettlement and other refugee-related services in Michigan.

20.     LEO administers those funds for the State of Michigan.

21.     OGM is an office within LEO.

22.    OGM selects organizations (like Bethany Christian) to receive federal funding for providing refugee-resettlement and related services.

23.    LEO contracts with private social service organizations to provide refugee resettlement and related services for a specified period paid for with federal funding.

24.    Three categories of refugee resettlement contracts are relevant here.

25.    First, Bethany Christian provides reception and placement services. Under these reception and placement contracts, Bethany Christian provides refugees with initial reception and placement services for up to 90 days after arrival in the United States. These programs are federally funded by the Bureau of Population, Refugees, and Migration ("PRM") within the United States Department of State.

26.    Bethany Christian also provides up to an additional 240 days of services to become economically sufficient pursuant to the Matching Grant Program funded by the Office of Refugee Resettlement ("ORR"), which is part of the U.S. Department of Health and Human Services ("HHS").

27.    This funding is for Bethany Christian to provide various services for refugees upon arrival, such as welcoming them, providing furnished housing, and connecting them to benefits and supportive services including Social Security cards, healthcare, schools, English classes, and employment opportunities.

28.    In addition to providing funding, the State Department, in collaboration with OGM, allocates a certain number of refugees to a given location. The State Department then provides the funding to support the number of refugees allocated.

29.     Before this year, Bethany provided reception and placement services in Michigan as a sub-contractor to Church World Service ("CWS"), which held direct contracts with the State Department and HHS.

30.     Although the reception and placement contracts are awarded directly from the federal government, OGM's recommendation is typically dispositive.

31.     Second, Bethany Christian provides refugee supplemental services. These supplemental services contracts go hand-in-hand with reception and placement programs. Accordingly, if an agency receives reception and placement funding, it almost always receives supplemental services funding.

32.     The supplemental services funding provides for longer-term assistance and for employment services, vocational training, English language education, social services, medical care, and transportation services to ensure that the agency can position the refugee-clients to succeed in the community.

33.     In Michigan, OGM operates as a pass-through entity to distribute federal funds from ORR under the Administration of Children and Families within HHS.

34.     Bethany Christian has been directly contracting with and partnering with departments of the State of Michigan to administer supplemental services programs since approximately 2003.

35.     Third, Bethany Christian runs Unaccompanied Refugee Minor ("URM") programs.

36.     Here too, OGM operates as a pass-through entity for federal funding from ORR under the Administration of Children and Families within HHS.

37.     Bethany Christian is one of two URM providers in the Grand Rapids, Kalamazoo, and Traverse City areas. For years, Bethany Christian has directly contracted with departments of the State of Michigan to receive funding to support its provision of these programs.

38.     URM services include both the provision of foster care and other residential services, such as group homes. Providers of URM residential services—at a minimum—need to have brick and mortar facilities and the required licenses to operate the group homes. No other provider has sufficient licensed facilities or licensed foster home capacity to offer the URM services Bethany Christian currently partners with OGM to provide.

39.     Accordingly, Bethany Christian is OGM's only current option for continuing the URM services that Bethany Christian has been providing for years.

40.     For each of these three categories of contracts, OGM's general practice is to award the various contracts on a three-year cycle.

41.     OGM conducts a full bidding process for the first year of the contract and then renews the contracts on an annual basis for the next two years given additional funding. OGM might request some new contract terms, but the contracts state that they cover a three-year term.

42.     New contract terms do not require a new bidding process.

43.     Generally, OGM has not re-bid contracts mid-cycle.

**III.    Bethany Christian's Statement of Faith embodies the mission that drives the organization.**

44.    Bethany Christian believes that its employees' Christian faith call them to demonstrate the love and compassion of Jesus Christ in all that Bethany Christian does, including by serving refugees and others in need.

45.    Bethany Christian sincerely believes it can only demonstrate the love and compassion of Jesus Christ if its employees personally experience the love and compassion of Jesus Christ as Christians.

46.    Bethany Christian has had a Statement of Faith for decades.

47.    Although the wording of the Statement of Faith has changed over the years, the meaning has not. Every iteration of the Statement of Faith has affirmed that Bethany is a Christian organization.

48.    Additionally, Bethany Christian has long required employees to affirm in writing their personal agreement with the Statement of Faith.

49.    Bethany Christian's current Statement of Faith is the Apostles' Creed. It states:

Bethany Christian Services is united in our belief of the core tenets
of our faith as outlined in the Apostles' Creed:

I believe in God, the Father almighty,
creator of heaven and earth.

I believe in Jesus Christ,
God's only Son, our Lord,
who was conceived by the Holy Spirit,
born of the virgin Mary,
suffered under Pontius Pilate,
was crucified, died, and was buried.
On the third day he rose again;
he ascended into heaven,
he is seated at the right hand of the Father,
 and he will come to judge the living and the dead.

> I believe in the Holy Spirit,
> the global church,
> the communion of saints,
> the forgiveness of sins,
> the resurrection of the body,
> and the life everlasting.
>
> By signing this Statement of Faith, Bethany board and staff
> members indicate their personal agreement with Bethany's
> Statement of Faith.

(Current Statement of Faith (ECF No. 1-7, PageID.198).)

50.    The Apostles' Creed is one of the oldest and most widely recognized summations of the core tenets of the Christian faith. It is thus generally applicable to virtually all Christian denominations, doctrines, practices, and experiences. Bethany Christian selected the Apostles' Creed as its Statement of Faith to embrace Christian diversity without straying from its mission to embody the love and compassion of Jesus Christ in the service of others.

**IV.    The Christian faith is integral to daily life at Bethany Christian.**

51.    Bethany Christian's faith extends beyond the Statement of Faith itself.

52.    Faith is a regular and integral part of daily life at Bethany Christian. Staff members regularly pray before meetings. Bethany Christian's values affirm the importance of Bethany Christian's faith. And messages from leadership routinely focus on scripture and the need to press forward with bold faith.

53.    Bethany Christian's July 2020 "Employee Satisfaction Survey" included a question about whether the respondents agreed that time for personal and group expressions of faith at work is an important part of my work experience at Bethany. Almost everyone either agreed or strongly agreed.

**V.    Bethany Christian's religious hiring policies are well known.**

54.    Bethany Christian has been open and transparent about its religious hiring practices.

55.    The requirement is included in all job postings.

56.    It is included in the Handbook displayed on Bethany Christian's website (in both English and Spanish) (Bethany Christian Website, available here: https://bethany.org/about-us/careers); and recruiters, who are often the first ones to communicate with applicants, are instructed to inform all applicants of the requirement.

57.    In 2015, Bethany Christian supported H.B. 4118 in Michigan, which amended state law to ensure that faith-based foster care agencies like Bethany Christian were allowed, based on "well settled principles of constitutional law" and "to the fullest extent permitted by state and federal law," to function according to their faith convictions without being punished by the state. *See* Mich. Comp. Laws § 722.124e.

58.    As this Court noted, that law was "designed to ensure" that child-placement agencies could continue to work in the field "and still profess and promote the traditional Catholic [and Christian] belief that marriage as ordained by God is for one man and one woman." *Buck v. Gordon*, 429 F. Supp. 3d 447, 450 (W.D. Mich. 2019).

59.    Contrary to that established law, Michigan government officials met with Bethany Christian leaders in 2019 and told them that if Bethany Christian declined to help LGBTQ couples to obtain foster licensing, the Michigan Department of Health and Human Services would commence a licensing investigation. And if the department found that there was discrimination, the state would reserve the right to revoke or suspend Bethany's Child Placing Agency license.

11

60.    Bethany Christian complied with these government demands and began placing children with same-sex couples, and still does. But let there be no mistake: these government threats were unlawful.

61.    In federal litigation pursued by another religious social services agency related to Michigan's demand that it place children with same-sex couples, the Michigan Department of Health and Human Services stipulated to an entry of judgment against it for violating the First Amendment's Free Exercise Clause.

## V.    Bethany Christian stays committed to the Statement of Faith.

62.    Throughout these events, Bethany Christian stayed committed to its Statement of Faith. It maintained its policy that employees are required to personally agree to, and sign, the Statement of Faith.

63.    The only exceptions permitted under Bethany Christian's policy are those granted by its CEO.

64.    Unbeknownst to Bethany Christian's leadership, managers at Bethany Christian's 36th Street office in Grand Rapids had been making exceptions without approval of the CEO.

65.    Those unsanctioned actions came to Bethany Christian's attention in mid-2023 when Bethany Christian closed its 36th Street office and provided space at Bethany Christian's main Grand Rapids location for the staff who had worked in the 36th Street office.

66.    When the 36th Street office staff transitioned to the main Grand Rapids location, Bethany Christian's Chief Operating Officer, Lorita Shirley, welcomed them and addressed the Statement of Faith.

67.    She explained that Bethany Christian had not abandoned its commitment to the Statement of Faith. Nonetheless, Shirley noted that Bethany Christian would not require existing

non-Christian employees (i.e., the non-Christian employees who had been hired by the rogue

leaders of the 36th Street Office) to sign the Statement of Faith.

68.    Shirley also walked through Bethany Christian's Advocacy and Activism policy.

Aware of staff members' diverse views on controversial issues, Bethany Christian adopted a

policy intended to promote a loving and compassionate work environment for all employees.

69.    The current version of the policy, which continues to communicate the same

message and requirements Shirely shared in 2023, states, in relevant part:

> Bethany seeks to create a physical environment that respects our
> diverse clients and employees. At Bethany, we are committed to
> respecting colleagues' differing views and political affiliations.
> Motivated by our faith, we strive to love one another as God loves
> us, even when we are not in agreement on significant issues.
> Bethany is committed to fostering a workplace that respects and
> values diverse perspectives, opinions, and beliefs on public opinion
> issues. It is essential that Bethany maintains a balanced work
> environment that upholds professionalism, mutual respect, and
> integrity. To avoid disrupting business operations or creating an
> uncomfortable or hostile work environment for other employees or
> clients, employees shall refrain from displaying items that can be
> perceived as polarizing or distracting from our mission. This
> includes hanging flags, signs, or other items that display an
> employee's social or political views in the physical workplace.
> [Advocacy & Activism Policy (footnote omitted) (ECF No. 1-10,
> PageID.207).]

70.    Several of the 36th Street staff members did not agree with the Advocacy Policy

or Bethany Christian's dedication to its Statement of Faith.

71.    One of those staff members, Dilli Gautam, told Shirley that he never supported

Bethany Christian's statement of faith, and never would, and that he was only at Bethany

Christian because it was the only group providing refugee services.

72.    Gautam and two other employees who held leadership roles in the Grand Rapids

Refugee & Immigrant Services Division ("RIS"), which had previously been located (almost

13

exclusively) at the 36th Street office, organized an "Interfaith Breakfast" to conflict with Bethany Christian's annual Christmas Breakfast because of their disagreement with Bethany Christian's Statement of Faith and Advocacy Policy.

73.    They invited everyone in the Division except for senior leaders. This was particularly problematic because the three employees organizing the event oversaw and directed the Grand Rapids RIS Division.

74.    Thus, the 278 staff members who received this invitation, were not just asked to choose between the office-wide organization-sponsored Christmas Breakfast and the competing "Interfaith Breakfast," they were asked to choose between their employer and their supervisors.

75.    Bethany Christian met with those three RIS leaders and informed them that their actions were insubordinate.

76.    Gautam and one other leader resigned on December 7, 2023. Bethany Christian ended its employment relationship with the third RIS leader on December 11, 2023.

77.    Gautam now works at OGM as a Community Engagement Specialist. One of the other RIS leaders now works at Christian World Services.

78.    Despite the actions of Gautam and others, Bethany Christian has remained a welcoming place for its employees and the populations it serves.

**VI.    Cabanaw impermissibly seeks to oppress Bethany Christian's religious practice of hiring co-religionists before even meeting with Bethany Christian.**

79.    In late November or early December of 2023, Gautam and at least one of the other RIS leaders complained to Cabanaw about Bethany Christian's requirement that employees affirm its Statement of Faith.

80.    On December 7, 2023, after receiving those complaints, Cabanaw emailed 20 OGM employees telling them that Gautam and others were leaving Bethany Christian, and that

their departure was directly related to the concerns he had raised within OGM regarding Bethany Christian's religious hiring practices.

81. That same day, Cabanaw emailed Bethany Christian to set up a meeting to discuss OGM's concerns regarding Bethany Christian's hiring practices.

82. In his email to Bethany Christian, Cabanaw indicated that he would like to schedule the meeting as soon as possible to ensure Bethany Christian's practices align with LEO's contract requirements.

83. Then, before that meeting occurred and before even talking to Bethany Christian's leadership about the issue, Cabanaw reported to Corbin and Hernandez that Bethany Christian was violating its contracts with LEO through it hiring practices.

84. Cabanaw fired off emails to six federal officials at ORR, stating that OGM believed that Bethany Christian was in direct violation of the non-discrimination clauses in LEO's agreements, and stating that OGM would not support Bethany Christian's hiring practices.

85. Upon information and belief, Cabanaw sent the emails to federal officials with the knowledge and approval of Corbin.

86. Upon information and belief, Cabanaw sent the emails to federal officials with the knowledge and approval of Hernandez.

87. Upon information and belief, Cabanaw sent the emails to federal officials in his role as Deputy Director of OGM.

88. A few days later, Cabanaw forwarded that email to state officials in Colorado and Pennsylvania who worked with Bethany Christian on refugee resettlement in those states.

89. Later, Cabanaw also forwarded the email to Wisconsin and Washington state officials.

90.     Upon information and belief, Cabanaw sent the emails to officials in other states with the knowledge and approval of Hernandez.

91.     Upon information and belief, Cabanaw sent the emails to officials in other states with the knowledge and approval of Corbin.

92.     Upon information and belief, Cabanaw sent the emails to officials in other states in his role as Deputy Director or OGM.

93.     Upon information and belief, OGM shared these concerns with officials within the State Department as well.

94.     Applicable federal law protects non-profit social-services organizations that limit their hiring to co-religionists.

95.     Cabanaw and Hernandez finally spoke to Bethany Christian's leadership about their hiring practices on December 14, 2023. The attendees included: Cabanaw, Hernandez, OGM's Refugee Administrative Manager, and six of Bethany's vice presidents and senior vice presidents.

96.     Cabanaw was only in the meeting for a matter of minutes before experiencing internet issues and having trouble connecting.

97.     Hernandez led the call and did most of the talking. She contended that Bethany Christian had changed its employment policy and eliminated waivers of the Statement of Faith.

98.     She said that Bethany Christian's religious hiring practices were "inconsistent with our state values."

99.     Her statements in this call confirmed that she approved of the policy, first expressed by Cabanaw, that OGM would "not support" Bethany Christian's  exercise of its religious beliefs through its hiring and employment practices.

100.    Eventually, Cabanaw reconnected to the virtual meeting. He questioned Bethany Christian as to how the RIS leaders could have left Bethany Christian.

101.    Cabanaw claimed that Bethany Christian was discriminating against other religions and was in violation of the ELCRA non-discrimination language in its contracts with LEO. Hernandez agreed with Cabanaw's assertion.

102.    Cabanaw and Hernandez were wrong and took a position that was contrary to federal law and Bethany Christian's constitutional rights.

103.    Upon information and belief, Corbin agreed with and endorsed the policy that Hernandez and Cabanaw advanced during the call.

104.    At the end of the call, Bethany Christian asked if OGM would put its concerns in writing, so that Bethany Christian could submit a written response. Hernandez and Cabanaw agreed to do so.

**VII.    OGM asserts that Bethany Christian's religious hiring practices violate contractual language.**

105.    OGM expressed its written concerns in a letter (submitted on LEO letterhead) on December 18, 2023.

106.    The letter began by noting that LEO contracts contain the following language:

> Non-Discrimination: Under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., Grantee and its subgrantees agree not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability. Breach of this covenant is a material breach of this Grant. [Dec. 18, 2023 Requests from OGM (ECF No. 1-13, PageID.222).]

107.    OGM then asserted that it:

has received multiple pieces of evidence or complaints from prior and existing staff at Bethany Christian Services, indicating that managers have been instructed not to proceed with interviews or hiring of individuals that identify themselves as Muslim or who are not comfortable embracing the BCS Statement of Faith. We were informed that some existing staff who received waivers to signing the Statement of Faith prior to some process changes will be allowed to stay on board, but that no exceptions will be granted moving forward. [*Id.*]

108.    Defendants believed that these practices violated the contract's non-discrimination provision.

109.    OGM then requested:

Request 1: Provide OGM with an assurance of compliance with the above contract language and plan for a hiring exceptions process by Thursday, December 21, 2023. Provide written policy that is in compliance with the above non-discrimination clause, as well as documentation to OGM that the written policy on non-discrimination has been shared with BCS management. . . .

Request 2: Provide OGM with a plan to address the concerns of staff, community members, and clients with regard to the expectations around the statement of faith and the lack of inclusion in current practices and communications. Provide OGM with assurances (or an acknowledgement) that no employees or contractors will be retaliated against for filing complaints. . . .

Request 3: Provide OGM with a plan to replace these individuals, and consistent with Request #1, ensure that hiring practices are both non-discriminatory and ensure that individuals reflect the cultural, linguistic, and demographic characteristics of the populations being served. . . . [*Id.* (PageID.222-223)]

110.    OGM demanded a response within three days.

## VIII.    After Bethany Christian provides complete, thorough responses to each of OGM's requests, OGM never responds.

111.    On December 20, 2023, Bethany Christian sent a preliminary response explaining that it complied with all state and federal laws, that Bethany Christian's management team was aware of the written non-discrimination policy, that Bethany Christian has a policy against

retaliating against whistleblowers, and finally that Bethany Christian needed more time to respond to concerns expressed regarding the Statement of Faith.

112.    Cabanaw responded, stating that Bethany Christian's initial responses were inconsistent with information that OGM had been provided, and responses received during the call with Bethany Christian leadership. He asked for a complete response by January 5, 2024.

113.    Consistent with that timeline, Bethany Christian submitted a complete response on January 5, 2024, that identified its religious mission, its policies, the unauthorized waivers, and the legal support for its practices.

114.    Bethany Christian first explained the importance of the Statement of Faith to its sincerely held beliefs and identity as an organization.

115.    Bethany Christian then explained why its practice of hiring co-religionists does not violate Section 3.6 of the Grant Agreement, the contractual language OGM quoted in its letter.

116.    Bethany Christian specifically explained that Section 3.6 of the Grant Agreement was boilerplate language that has been included in all state contracts for decades requiring compliance with ELCRA, but that the requirements of ELCRA are limited by the state and federal constitutions as has been decided by multiple courts.

117.    Bethany Christian further explained that ELCRA's prohibition against discrimination as applied to a faith-based organization's hiring of coreligionists would not withstand strict scrutiny under applicable precedent.

118.    Bethany Christian also explained that federal law prohibits OGM from imposing a secular hiring requirement on Bethany Christian Services. In particular, the federal regulations

contained in 45 C.F.R. part 87 that protect the equal treatment of faith-based organizations receiving federal funding through HHS apply to Bethany Christian's contracts with LEO.

119.    Having addressed the legality of its hiring practices, Bethany Christian dispelled OGM's claim that Bethany Christian had changed its hiring policy, pointing out that requiring employees to sign the Statement of Faith had been Bethany Christian's policy for decades, and that the granting of waivers was limited to the rare circumstances where hiring coreligionists was not possible.

120.    Bethany Christian also addressed Defendants' concerns expressed in the December 14th call regarding the Advocacy Policy:

> OGM expressed concerns on the December 14 call with an advocacy policy that Bethany Christian Services has adopted. Bethany Christian Services does have an advocacy policy that outlines our principles, values, and guidelines for engaging in policy and advocacy efforts. The purpose of this policy is to guide the organization in advocating for the best interests of children, youth, and families served through Bethany Christian Service's programs in alignment with our values and reflects our recognition of and respect for the significant diversity of both our clients and staff. Considering the divisiveness that can be created in today's political climate and the fact that Bethany Christian is a nondenominational Christian organization with employees who have differing Christian viewpoints on certain issues, the advocacy policy contains requirements aimed at maintaining respect for individual differences in the workplace. [Letter from Bethany Christian (ECF No. 1-14, PageID.229).]

121.    Finally, Bethany Christian reiterated its commitment to its anti-retaliation policy; offered to review any specific situations that had been brought to OGM's attention (other than, of course, requiring employees to sign a statement of faith and otherwise operate as a Christian organization, both of which are lawful); and outlined its plan for replacing the three individuals in program director positions that led refugee programming and had left Bethany Christian.

122.     Neither Defendants nor anyone else at OGM responded to Bethany Christian's correspondence.

123.     Hearing nothing further, Bethany Christian believed that OGM was satisfied.

**IX.    Cabanaw and Hernandez seek legal grounds to terminate Bethany Christian's existing contracts.**

124.     Apparently it was not. Behind the scenes, Cabanaw, with the approval of Hernandez and, upon information and belief, Corbin, attempted to have LEO terminate its existing contracts with Bethany Christian.

125.     These efforts were stymied initially by a LEO auditor who concluded that Bethany Christian's arguments were compelling.

126.     Undeterred, Cabanaw and Hernandez emailed the Attorney General's office, who investigated Bethany Christian's hiring practices.

127.     LEO later terminated several contracts with Bethany Christian effectively September 30, 2024.

**X.    Cabanaw and Hernandez do everything they can to move funding away from Bethany Christian.**

128.     Motivated by their policy that they would "not support" Bethany Christian's religious exercise and that Bethany Christian's hiring practices violated the ELCRA, Cabanaw and Hernandez engaged in a systematic scheme to reduce the number and value of contracts Bethany Christian held for refugee resettlement and related services in Michigan.

129.     Upon information and belief, Cabanaw and Hernandez pursued their scheme to discriminate and retaliate against Bethany Christian with the knowledge, approval, and ratification of Corbin.

> a. **Cabanaw and Hernandez seek to develop providers who can replace Bethany Christian.**

130.    First, Cabanaw and Hernandez sought to develop replacement providers for services that Bethany Christian was providing at the beginning of 2024.

131.    Until early 2024, Bethany Christian and Samaritas were the only providers of reception and placement services funded by the federal government in the Grand Rapids area.

132.    Just a few weeks after Bethany Christian submitted its January 5, 2024 response to OGM, CWS, the prime contractor with PRM for the reception and placement contracts for which Bethany Christian had been providing services as a subcontractor for years, informed Bethany Christian for the first time that it intended to provide those services in Michigan itself instead of contracting with Bethany Christian.

133.    Upon information and belief, CWS's decision to provide these services itself was the direct result of Cabanaw and Hernandez's efforts to recruit organizations to replace Bethany Christian.

134.    That conclusion is confirmed by what happened next. CWS's decision to become a direct provider meant there would now be three—rather than two—agencies capable of providing reception-and-replacement services in the Grand Rapids area. That, in turn, created greater capacity and opened the door for helping more refugees.

135.    But OGM *did not* request a larger allocation of refugees for Grand Rapids from the Department of State. Instead of using the increase in capacity to help more refugees, it pushed Bethany Christian out.

136.    In mid-June 2024, Cabanaw held a telephone call with representatives from Bethany Christian and CWS.

137.    During this call, Cabanaw stated that OGM did not want three providers. He indicated that instead of requesting an increase in the number of refugees from the State Department, OGM was requesting a *reduction* in numbers.

138.    Cabanaw further explained that OGM would continue supporting Bethany Christian's existing program for the remainder of this fiscal year after which OGM intended to work with CWS rather than Bethany Christian.

139.    In other words, OGM would support Bethany Christian just long enough for CWS to develop the infrastructure needed to replace Bethany Christian.

140.    Cabanaw purported to justify this decision because of Bethany Christian's staff turnover in Grand Rapids and Kalamazoo.

141.    Bethany Christian, however, had not experienced any unusual staff turnover in Kalamazoo. And it had replaced the staff who left the Grand Rapids RIS Division, and there had been no effect on Bethany's provision of services under its contracts.

142.    Ultimately, Cabanaw asserted that OGM had "discretion" to choose the "best partner" and to "choose who we want to work with."

143.    OGM and LEO's true reason for replacing Bethany Christian was Defendants' unlawful policies that OGM and LEO will "not support" religious hiring practices like Bethany Christian's, that these practices violate anti-discrimination laws including ELCRA and that these practices are contrary to state values.

144.    Cabanaw and Hernandez told the State Department that OGM supported establishing a new CWS field office in Grand Rapids based on changes and diversity, equity, and inclusion practices at Bethany Christian.

145.    Similarly, with the URM contracts, Cabanaw and Hernandez sought to develop replacements by issuing RFPs on the URM programs Bethany Christian performed.

146.    Before 2024, OGM had *never* issued RFPs on these URM programs.

147.    Cabanaw and Hernandez communicated that OGM was releasing an RFP for URM services due to the challenges OGM was experiencing with Bethany Christian's hiring practices.

**b.    Cabanaw and Hernandez cause LEO and OGM to issue off-cycle RFPs.**

148.    Cabanaw and Hernandez issued RFPs for all of OGM's supplemental services contracts with Bethany Christian.

149.    Three of those RFPs, however, were for contracts that were not set to end until September 2025 or September 2026.

150.    Those three RFPs were issued contrary to the plain language of the existing contracts with LEO, because they prematurely opened those contracts for bids.

151.    As the Director of LEO, Corbin has final approval over LEO actions, including early termination of these LEO contracts. She approved Cabanaw and Hernandez's early termination of Bethany Christian's contracts.

152.    Upon information and belief, she also approved of Cabanaw and Hernandez's plan to move contracts away from Bethany Christian.

**c.    Defendants cause LEO and OGM to include language in the RFPs designed to exclude Bethany Christian alone.**

153.    Defendants caused LEO to insert new language into RFPs that they knew Bethany Christian could not accept and did so with the intent of excluding Bethany Christian from entering the contracts and deterring Bethany Christian from competing for the contracts.

154.    The new contract language required the contracting agency (e.g., Bethany Christian) to create opportunities to employ staff that represent the cultural, national origin, and religions of the newcomer populations being served under the agreement.

155.    Bethany Christian cannot comply with that language because its religious beliefs and practices prevent it from hiring non-Christians and Bethany Christian regularly provides services to non-Christians.

156.    LEO attempts to justify this language by pointing to a policy letter from ORR recommending that grant recipients, *inter alia*, recruit staff with lived experiences representative of the population being served.

157.    The ORR letter does not require, or even justify, the language LEO included. In fact, the letter never even mentions the religion of populations being served.

158.    The ORR letter instead, focuses on lived experience of being a refugee, i.e. leaving one's homeland and resettling in a new country with a new language and culture. (*See* ORR Policy Letter 24-02 (ECF No. 39-16, Page ID.730-734); *see also Gen Z Refugees Share their Lived Experiences and Create Lasting Connections*, Ken Tota, Refugee Program Bureau Chief, Office of Refugee Resettlement (available at: https://www.acf.hhs.gov/blog/2024/10/gen-z-refugees-share-lived-experiences-and-create-lasting-connections).)

159.    Bethany Christian does what ORR recommends—it recruits and hires staff and volunteers with lived experiences similar to the populations being served.

160.    In the end, LEO added this language to discriminate against Bethany Christian. With the new language, Bethany Christian would either forgo its religious beliefs and hire non-Christian staff, or OGM would have a way for LEO to terminate future contracts with Bethany Christian by stating that Bethany Christian is in violation of its contracts.

161.    LEO does not believe that the new contract language is required by ORR.

**d.    Cabanaw and Hernandez poison OGM's bid-review process against Bethany Christian.**

162.    Cabanaw and Hernandez placed employees with known conflicts of interest on the bid-review panel.

163.    Gautam, whose disdain for Bethany Christian's hiring practices was so strong that it led him to be insubordinate, was placed on the review panel and scored bids Bethany Christian was denied.

164.    So too was another former Bethany Christian employee who had verbalized disdain for Bethany Christian's religious practice.

165.    But the poisoned process was not limited to those two former employees. As confirmed by his emails, Cabanaw had been telling OGM employees (for months) that OGM would not support Bethany Christian's hiring practices.

166.    Cabanaw and Hernandez fostered a culture within OGM that was hostile to Bethany Christian because of its religious hiring practices.

167.    Every OGM employee who reviewed Bethany Christian's bids had been encouraged to discriminate against Bethany Christian.

**e.    OGM denies Bethany Christian's bids for programs it had provided for years.**

168.    In the summer and autumn of 2024, OGM denied Bethany Christian's bid in every instance where it had a viable alternative service provider.

169.    OGM denied contracts to Bethany Christian for three types of supplemental services (post-resettlement services, employment services, and transportation services) for which

Bethany was the incumbent service provider and for which OGM issued off-cycle requests for proposals.

170.    In fact, Bethany Christian received a score on two supplemental services contract bids that were so low that it was disqualified from participating in the programs altogether, even though it is currently providing those same services under pending contracts without complaint from OGM.

171.    Bethany Christian's score on the bids it lost was caused by the poisoned process that had been choreographed by Cabanaw and Hernandez as part of a policy to exclude Bethany Christian from refugee-resettlement-related contracts because of its religious hiring practices.

172.    By denying Bethany Christian's bids for supplemental services funding, OGM hamstrung Bethany Christian's ability to provide a successful transition for the refugees in its care under the reception and placement contracts discussed above.

173.    As noted, supplemental services funding is typically awarded hand-in-hand with reception and placement funding.

174.    By awarding Bethany Christian reception and placement funding (because CWS does not currently have the capacity to fully replace Bethany Christian) but withholding the supplemental services funding that typically goes with it, Bethany Christian will be unable to provide the requisite supplemental social services.

175.    The refugees in its care will be harmed as a result (i.e., the agencies that did receive the supplemental services funding will only provide those services to refugee families served by Bethany Christian *if* those other agencies have surplus capacity).

176.    Defendants' Bethany Christian's reputation and standing in the community will be harmed as well.

**f.  Cabanaw and Hernandez confirm their discriminatory intent by refusing to respond to Bethany Christian's inquiries.**

177.    Bethany Christian repeatedly asked OGM for clarification regarding the language requiring Bethany Christian to "create opportunities to employ staff that represent the cultural, national origin, and religions of the newcomer populations being served under this agreement."

178.    The only response Bethany Christian ever received was: "In fairness to other bidders, the OGM cannot provide insight into an appropriate or acceptable response to the RFP proposal.  As stated in the RFP, the OGM will be looking for proposals that, among other things, ensure compliance with the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., as well as the requirement that the grantee create opportunities to employ staff that represent the cultural, national origin, and religions of the newcomer populations being served under the agreement."

179.    Having received that response (which confirmed that Hernandez and Cabanaw-led OGM had adopted a policy that Bethany Christian's religious exercise violated ELCRA), Bethany Christian submitted an attachment to each RFP response (except with regard to the URM contracts because those RFPs did not contain the religious-hiring language) with proposed contract-language changes to ensure that there was no question that Bethany's religious hiring practices were in accord with each party's understanding of what any contract required.

180.    OGM never substantively responded to Bethany Christian's contract-revision requests.

181.    OGM consistently failed to respond to communications from Bethany Christian regarding its religious hiring practices, ELCRA, and the contract requirements.

182.    On January 5, 2024, Bethany Christian sent OGM the detailed, 10-page letter described above.

183.    OGM did not respond.

184.    On July 12, 2024, Bethany Christian requested clarification regarding the new contract language in the RFPs.

185.    OGM did not respond.

186.    On July 16, 2024, Bethany Christian again requested clarification via email on the new contract language and whether the "employment and hiring practices" Bethany Christian described in its "January 2024 response" would be "allowed under the non-discrimination and diversity, equity, and inclusion requirements," and "[i]f not . . . what changes would be necessary to Bethany Christian's practices to comply with the non-discrimination and diversity, equity, and inclusion requirements."

187.    OGM provided no substantive response. It merely noted that it could not provide insight into an appropriate or acceptable response to the RFP proposal.

188.    On July 19, 2024, Bethany Christian submitted an attachment to its responses with proposed contract language changes.

189.    OGM provided no substantive response.

190.    On July 26, 2024, Bethany Christian submitted an RFP response with a proposal for changes to the contract terms.

191.    OGM did not respond.

192.    On July 31, 2024, Bethany Christian submitted an RFP response with a proposal for changes to the contract terms.

193.    OGM did not respond.

194.    On August 7, 2024, Bethany Christian asked for clarification and amendment of the new religion-focused contract language included in the URM contracts and explained it was

seeking a transparent conversation with OGM to ensure that we can work together in a manner that ensures the highest standard of service to the newcomer populations.

195.    OGM did not respond.

196.    On August 22, 2024, Bethany Christian followed up on its August 7, 2024 request.

197.    OGM did not respond, other than to acknowledge receipt of the email.

198.    On August 27, 2024, Bethany Christian's general counsel requested a meeting with OGM and Hernandez "to have an open discussion to clear any misperceptions and resolve any disagreements."

199.    Neither OGM nor Hernandez responded.

200.    On August 27, 2024, Bethany Christian appealed the denial of an RFP for Grand Rapids.

201.    OGM did not respond to the appeal or acknowledge that the appeal had been received.

202.    The same day, Bethany Christian appealed OGM's decision to deny the supplemental services contracts in Kalamazoo.

203.    OGM did not respond to the appeal or acknowledge that the appeal had been received.

204.    On August 29, 2024, Bethany Christian again followed up on the August 7, 2024 request.

205.    OGM did not respond.

206.    On August 30, 2024, Bethany Christian submitted a bid under the RFP for the refugee health promotion program that contained a proposal for changes to the contract terms.

207.    OGM did not respond.

208.    On September 6, 2024, Bethany Christian sent a follow up email inquiring about the status of its appeal, requesting a formal response outlining the next steps of the appeal process, and raising concerns with the legality of moving forward without first receiving a final decision and noting that moving forward with the transition at this stage could lead to significant disruption in services for the vulnerable refugee populations and unnecessary displacement of staff.

209.    OGM did not respond, other than to acknowledge receipt.

210.    It took Bethany Christian filing this lawsuit for OGM to engage in any discussion on these topics. Only then did OGM agree to remove the offending religion-focused language.

211.    OGM's non-responsiveness was inconsistent with Bethany Christian's past experience with OGM's responsiveness to questions and inquiries.

212.    Behind the scenes, Cabanaw and others were mocking Bethany Christian's requests.

213.    For example, in early July 2024, a Bethany Christian senior vice president reached out to Cabanaw to connect about our programs and discuss how Bethany Christian can continue to partner and work together with OGM.  Cabanaw forwarded her email to Gautam with one word: "ugh," to which Gautam responded, "I would love to be part of this call lol."

214.    That exchange confirms what was becoming apparent to Bethany Christian. OGM did not respond to any of Bethany Christian's requests because there was no legitimate explanation for its actions. Its actions were motivated by a policy of animus against Bethany Christian's religious hiring.

**XI.    Defendants continue to target Bethany Christian by causing LEO to include the language designed to exclude Bethany Christian in the URM contracts it awarded to Bethany Christian.**

215.    As noted, Bethany Christian is one of two providers of URM services in the Kalamazoo and Grand Rapids service areas. No other agency has the licenses, capacity and infrastructure to provide the URM services that Bethany Christian provided in 2024.

216.    OGM had awarded URM services grants to Bethany Christian because it lacked any alternative to doing so.

217.    On July 31, 2024, OGM informed Bethany Christian that it won six URM contracts.

218.    Initially, however, OGM only sent Bethany Christian the contract documents for three of those contracts.

219.    The three contracts that OGM sent contained the religion-focused language from the supplemental services RFPs requiring Bethany Christian to agree to create opportunities to employ staff that represent the religions of the newcomer populations being served under this agreement.

220.    That language was not included in the respective requests for proposals.

221.    Upon information and belief, LEO, at the direction of Defendants, inserted this language into the URM contracts to allow LEO to prematurely terminate the URM contracts because of Bethany Christian's hiring practices.

## CLAIMS

### Count I (42 U.S.C. § 1983)
### Targeting in Violation of the First Amendment Free Exercise Clause

222.    Bethany Christian incorporates by reference all the preceding paragraphs.

223.    "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993) (cleaned up).

224.    Where a neutral and generally applicable policy is a "veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it advances interests of the highest order and is narrowly tailored in pursuit of those interests." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (cleaned up).

225.    As the Supreme Court put it, "a government policy will not qualify as neutral if it is specifically directed at religious practice." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (emphasis added; cleaned up). A policy can fail this test if "a religious exercise is its object." *Id.* (cleaned up).

226.    Factors relevant to this inquiry include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

227.    Here, Bethany Christian's religious exercise is the target of OGM's policy and actions.

228.    Cabanaw, with the approval of Hernandez and Corbin, targeted Bethany Christian.

229.    From at least December 2023, Cabanaw adopted the policy (confirmed by his own emails) that OGM would not support Bethany Christian's religious hiring practices.

230.    Before even speaking with Bethany Christian leadership about the issue, Cabanaw emailed LEO leadership, federal officials, and other state officials to allege that Bethany Christian was in violation of its refugee services contracts.

231.    Cabanaw communicated with officials in the federal government and in other states for the purpose of causing them to take adverse action against Bethany Christian because of its religious hiring practices.

232.    Cabanaw and Hernandez sought to have LEO conclude that Bethany Christian breached its contracts with LEO by maintaining its religious hiring practices.

233.    Cabanaw reached out to the Attorney General's office to solicit an investigation of Bethany Christian because of Bethany Christian's hiring practices.

234.    Cabanaw and Hernandez—with, upon information and belief, the approval of Corbin—took steps to replace Bethany Christian wherever they could.

235.    Cabanaw and Hernandez communicated that OGM issued RFPs for URM services that Bethany Christian was providing because of Bethany Christian's religious hiring practices.

236.    Defendants then caused LEO to terminate Bethany Christian's supplemental services contracts before their expiration date.

237.    Defendants caused LEO to include language in RFPs crafted to exclude Bethany Christian.

238.    Cabanaw and Hernandez caused OGM to ignore Bethany Christian's repeated requests for clarification.

239.    Cabanaw and Hernandez mocked Bethany Christian behind the scenes.

240.    And Cabanaw and Hernandez stacked the deck against Bethany Christian by disparaging Bethany Christian to OGM and LEO staff, and by placing known opponents of Bethany Christian on the bid-review panel.

241.    As Cabanaw's own emails confirm, these actions were intended to target Bethany Christian. They are the direct result of OGM's policy that it will "not support" Bethany Christian's religious hiring practices.

242.    Defendants' policy that OGM and LEO will not support Bethany Christian's religious hiring practices, and the actions they took to implement that policy (which include the adoption of the other policies noted above), have injured Bethany Christian.

243.    Defendants' policies and actions have burdened Bethany Christian's religious exercise by making Bethany Christian choose between its religious exercise and federal funding.

244.    Defendants' actions have cost Bethany Christian millions of dollars in funding, including the funding Bethany Christian lost from OGM's unlawful early termination of contracts, the bids that OGM denied, and the funding OGM is now giving to the groups it recruited to replace Bethany Christian.

245.    Indeed, the poisoned bid process is itself an injury. As explained above, the entire process was rigged to deny Bethany Christian's bids and award Bethany Christian the lowest scores possible.

246.    Absent judicial intervention, Bethany Christian will have to face that same poisoned process (and same injury) again in the next bid cycle.

247.    Defendants' policies are therefore subject to strict scrutiny.

248.    Defendants' policies cannot survive strict scrutiny, because they do not serve a compelling interest of the "highest order and" are not "narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up).

**Count II (42 U.S.C. § 1983)**
**Violation of the First Amendment Free Exercise Clause**
**Not Neutral and Generally Applicable**

249.    Bethany Christian incorporates by reference all the preceding paragraphs.

250.    Government practices that burden religion are subject to strict scrutiny if they are not neutral and generally applicable. *Fulton v. City of Philadelphia, Penn.*, 593 U.S. 522, 542 (2021).

251.    To avoid strict scrutiny, policies must be neutral and generally applicable on their face, and the government must implement them in a neutral and generally applicable manner. *See Ward*, 667 F.3d at 738 (cleaned up).

252.    Here, Defendants have adopted a policy that they will not support a religious organization that hires co-religionists as a matter of religious belief and thus will not contract with that organization unless that organization is the only option.

253.    Defendants have taken the position that this policy is required and supported by ELCRA.

254.    Their policy is not neutral and generally applicable.

255.    Government policies are not neutral "whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

256.    Hiring co-religionists is Bethany Christian's religious exercise and OGM's policy through Defendants is to treat organizations that do not hire co-religionists more favorably.

257.    Even if this policy was supported or required by ELCRA, ELCRA itself is not neutral and generally applicable.

258.    ELCRA contains an exception allowing the consideration of "religion" as part of an affirmative action plan.

259.    ELCRA also allows discrimination in compensation, terms, conditions, and privileges of employment if based on seniority.

260.     Government policies are not "generally applicable if" they "invite the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up).

261.     ELCRA provides for individual exemptions that invite the government to consider the particular reasons for a person's conduct.

262.     Defendants' actions are also subject to strict scrutiny because their policy of favoring organizations with secular hiring is not neutral or generally applicable and Defendants have not applied ELCRA or the federal regulations in a faith-neutral manner.

263.     LEO and OGM had not previously required that Bethany Christian forgo its religious exercise of hiring co-religionists.

264.     No law or regulation requires OGM to do so.

265.     Instead, Defendants' actions were taken purely as a matter of discretion, and only after telling Bethany Christian that its religious practice was inconsistent with State "values."

266.     Each of these reasons is individually sufficient to subject Defendants' policy to strict scrutiny.

267.     Finally, Defendants' policy is subject to strict scrutiny because they have a practice of selectively enforcing ELCRA. They allow other groups to receive grants even though the latter discriminate because of protected categories in their hiring practices and in the client groups they serve.

268.     OGM's policy does not survive strict scrutiny, because it does not serve a compelling interest of the "highest order and is" not "narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up).

269.    Even if Defendants' actions are not subject to strict scrutiny, Bethany Christian's Free Exercise rights have still been violated, because neither OGM nor LEO has a legitimate interest in impairing Bethany Christian's exercise of its religious beliefs by requiring it to hire or create opportunities to hire individuals who do not affirm Bethany Christian's religious mission.

### Count III (42 U.S.C. § 1983)
### Violation of the First Amendment Free Exercise Clause
### Exclusion from Otherwise Available Government Benefits

270.    Bethany Christian incorporates by reference all the preceding paragraphs.

271.    "The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson v. Makin*, 596 U.S. 767, 778 (2022).

272.    Accordingly, "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

273.    Likewise, government action must pass strict scrutiny where it "operates to identify and exclude otherwise eligible" entities "on the basis of their religious exercise," "[r]egardless of how the benefits and restrictions are described." *Carson*, 596 U.S. at 789.

274.    Here, by implementing their policy described above, Defendants are causing LEO to condition Bethany Christian's receipt of funding for refugee programs on whether Bethany Christian abandons its religious practice of hiring other Christians.

275.    Defendants are thus excluding Bethany Christian from an otherwise available government benefit because of Bethany Christian's religious identity, beliefs and exercise.

276.    Defendants' actions therefore trigger strict scrutiny.

277.    Defendants' actions do not serve a compelling government interest, are not narrowly tailored, and thus violate the Free Exercise Clause rights of Bethany Christian.

**Count IV (42 U.S.C. § 1983)**
**Violation of the First Amendment Free Speech and Assembly Clauses**
**Expressive Association**

278.    Bethany Christian incorporates by reference all the preceding paragraphs.

279.    "Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up).

280.    By conditioning contracts and grants on Bethany Christian abandoning its religious hiring practices, Defendants have forced Bethany Christian to choose between its religious exercise and its access to significant federal financial resources needed to continue to provide refugee services in West Michigan.

281.    Bethany Christian's association has a communicative purpose—to demonstrate the love and compassion of Jesus Christ.

282.    Bethany Christian sincerely believes that only Christians can demonstrate the love and compassion of Jesus Christ because Christians personally believe in Jesus and personally experience that love and compassion.

283.    Defendants' actions unconstitutionally force Bethany Christian to expressively associate with people who do not hold the same religious views and therefore cannot pursue the mission with the united purpose and messaging.

284.    Defendants' actions therefore trigger strict scrutiny.

285.    Defendants' actions do not serve a compelling government interest, are not narrowly tailored, and thus violate the Free Speech and Assembly Clause rights of Bethany Christian.

286.    Indeed, Defendants' actions lack even a rational basis and therefore violate the Constitution for this additional reason.

### Count V (42 U.S.C. § 1983)
### Violation of the Religion Clauses in the First Amendment
### Church Autonomy

287.    Bethany Christian incorporates by reference all the preceding paragraphs.

288.    The First Amendment protects the right of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

289.    This right to autonomy protects religious organizations—like Bethany Christian— from government interference when choosing those who are best suited to carry out their mission.

290.    Bethany Christian thus has a First Amendment right to hire coreligionists. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

291.    Additionally, an essential exercise of church autonomy under the First Amendment is the right of a religious organization to determine the religious qualifications of its ministers. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

292.    Here, Bethany Christian's social workers who work with refugees are, in Bethany Christian's theology, the hands and feet of Jesus, His ministers, who must therefore be Christ-followers.

293.    Defendants have implemented a policy that OGM and LEO "will not support" Bethany Christian's exercise of this constitutional right, and that Bethany Christian will be punished for hiring coreligionists.

294.    Defendants' actions, described more fully above, have violated Bethany Christian's right to hire coreligionists and the right to choose its ministers. They are thus *per se* unconstitutional.

## PRAYER FOR RELIEF

Wherefore, Bethany Christian asks the Court to:

1.    Declare that Defendants' policies and actions violated the First Amendment.

2.    Declare that Defendants' policies and actions caused LEO and OGM to violate the First Amendment.

3.    Declare that Defendants may not penalize—in any way—Bethany Christian for limiting its hiring to individuals who adhere to Bethany Christian's statement of faith as a result of its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission;

4.    Declare that the exclusion of Bethany Christian from otherwise available grant funding is an unconstitutional violation of the latter's rights under the First Amendment's Free Exercise Clause;

5.    Declare that Defendants' policy of requiring and/or pressuring Bethany Christian to abandon its sincerely held religious belief violates Bethany Christian's rights under the First Amendment's Free Exercise Clause;

6.    Declare that any contract requirement restricting or prohibiting Bethany Christian from continuing to exercise its sincerely held religious belief that hiring co-religionists is

essential to carrying out Bethany Christian's religious mission, including the language requiring Bethany Christian to "create opportunities to employ staff that represent the ... religions of the newcomer populations being served under this agreement," is unconstitutional and may not be included in any RFPs, contracts, or any other documents which in any way affect the distribution of funding;

7.      Enter injunctive relief ordering:

a.      Defendants to preserve the status quo regarding Bethany Christian's provision of refugee-related services in the Grand Rapids, Kalamazoo, and Traverse City areas through the dates of the contracts for those services;

b.      Defendants to cause the contracts for refugee services subject to RFPs in 2024 to be re-bid without penalizing, or including any contractual requirement that has the effect of penalizing, Bethany Christian for its sincerely held religious belief that hiring co-religionists is essential to carrying out Bethany Christian's religious mission;

c.      That Defendants are prohibited from employing any process, or including any language or requirement in any RFPs, contracts, or other grant-related documents, that interfere with its obligation not to discriminate against Bethany Christian on the basis of religion or its expressive association;

d.      That Defendants, OGM, and LEO are enjoined from refusing to enter into grant agreements with Bethany Christian because of its religious hiring practices; and

e.      That Defendants, OGM, and LEO are enjoined from withholding public funds from Bethany Christian because of its religious hiring practices.

8.      Award compensatory and/or nominal damages, reasonable attorneys' fees, costs,

and any equitable or other relief that is just and proper, including under 42 U.S.C. § 1988.

Date: December 17, 2024

*/s/ Matthew T. Nelson*
Matthew T. Nelson (P64768)
Daniel S. Brookins (P86665)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave NW, Ste. 1500
Grand Rapids, MI 49503
616.752.2000
mnelson@wnj.com
dbrookins@wnj.com

Jonathan E. Lauderbach (P51313)
Katherine G. Boothroyd (P85881)
WARNER NORCROSS + JUDD LLP
715 East Main Street, Suite 110
Midland, MI 48640
989.698.3700
jlauderbach@wnj.com
kboothroyd@wnj.com

Lori D. Kepner
Steven T. McFarland
Center For Law & Religious Freedom
CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Suite 302
Springfield, VA 22151

*Attorneys for Plaintiffs Bethany Christian Services, Bethany Christian Services of Michigan, and Bethany Christian Services USA, LLC*