UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETHANY CHRISTIAN SERVICES; BETHANY CHRISTIAN SERVICES OF MICHIGAN; and BETHANY CHRISTIAN SERVICES USA, LLC,

Plaintiffs,

v.

SUSAN CORBIN, in her official capacity as director of the MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC OPPORTUNITY; POPPY SIAS HERNANDEZ, in her official capacity as Executive Director of the OFFICE OF GLOBAL MICHIGAN, and BEN CABANAW, in his official capacity as Deputy Director of the OFFICE OF GLOBAL MICHIGAN.

Defendants.

Case No. 1:24-cv-0922-JMB-PJG

HON. JANE M. BECKERING

MAG. PHILLIP J. GREEN

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Kyla L. Barranco (P81082)
Assistant Solicitor General
Neil Giovanatti (P82305)
Marla Linderman Richelew (P55759)
Ryan Wier (P83886)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30212
Lansing, MI 48909
(517) 335-7628
Barrancok@michigan.gov

Dated: October 9, 2026

# TABLE OF CONTENTS

Page


Table of Contents ..... i

Index of Authorities ..... iii

Concise Statement of Issues Presented ..... viii

Controlling or Most Appropriate Authority ..... viii

Introduction ..... 1

Statement of Facts ..... 3

Argument ..... 16

I. BCS and BCS USA lack standing because every alleged injury belongs to BCSM alone. ..... 16

A. BCSM bid for and holds the grants at issue. ..... 17

B. BCS and BCS USA suffer, at most, a derivative injury and have no interest of their own in the grants at issue. ..... 17

II. Most of the relief Plaintiffs seek is moot or barred by the Eleventh Amendment. ..... 18

A. Relief barred by *Ex parte Young* has already been dismissed. ..... 19

B. Plaintiffs' requests directed at completed cycles and superseded RFP practices are moot. ..... 21

1. Plaintiffs' requests tied to expired contract cycles are moot. ..... 21

2. Plaintiffs' requests directed at the superseded RFP process and discontinued contract language are moot. ..... 22

3. Count VI identifies no ongoing or threatened retaliation. ..... 24

III. Plaintiffs' Free Exercise claims (Counts I–III) fail as a matter of law. ..... 26

A. There is no First Amendment right to hire co-religionists for non-ministerial positions. ..... 26

B. The ELCRA's nondiscrimination language is neutral and generally applicable (Count II). .... 29

1. The nondiscrimination requirement is neutral. .... 29

2. The nondiscrimination language is generally applicable. .... 31

C. Defendants applied the nondiscrimination requirement neutrally (Count I). .... 33

1. Defendants' inquiry into Plaintiffs' hiring practices followed BCSM's own change in policy and focused on contract compliance. .... 34

2. The RFPs Plaintiffs challenge applied the same rules to every bidder. .... 39

3. No decisionmaker expressed hostility toward Plaintiffs' faith. .... 42

4. Defendants' later conduct confirms the absence of hostility. .... 45

D. Defendants have not excluded BCSM from any public benefit because of religion (Count III). .... 46

E. Even if strict scrutiny applied, Defendants would satisfy it. .... 47

IV. Plaintiffs' expressive association claim fails (Count IV). .... 49

V. Plaintiffs cannot establish their retaliation claim (Count VI). .... 51

A. The relief available in this case cannot redress the alleged actions Plaintiffs challenge. .... 51

B. Plaintiffs cannot show that the lawsuit caused any decision they challenge. .... 51

Conclusion and Relief Requested .... 55

## INDEX OF AUTHORITIES

Page

**Cases**

*Alexander v. CareSource*,
576 F.3d 551 (6th Cir. 2009) ........ 43

*Blick v. Ann Arbor Pub. Sch. Dist.*,
105 F.4th 868 (6th Cir. 2024) ........ 49

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ........ 49, 50

*Boyajian v. Gatzunis*,
212 F.3d 1 (1st Cir. 2000) ........ 30

*Buck v. Gordon*.
429 F. Supp. 3d 447(W.D. Mich. 2019) ........ 37

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
479 U.S. 272 (1987) ........ 48

*Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*,
862 F.2d 597 (6th Cir. 1988) ........ 17

*Carson v. Makin*,
596 U.S. 767 (2022) ........ 46, 47

*Cf. Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ........ 33, 40

*Christian Healthcare Centers, Inc. v. Nessel*,
No. 1:22-cv-787, 2026 WL 2542702 (W.D. Mich. Aug. 5, 2026) ...2, 27, 28, 31, 48, 49

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 29, 33

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........ 16, 24

*Corporation of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ........ 28

*Dale* ........ 49

*Diaz v. Mich. Dep't of Corr.*,
703 F.3d 956 (6th Cir. 2013) ........ 18

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
494 U.S. 872 (1990) ........ 29, 33

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ........ 46

*Ex parte Young*,
209 U.S. 123 (1908) ........ 18, 19, 20

*Franchise Tax Bd. v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990) ........ 17

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 21

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ........ 29, 30, 31, 46, 47

*Green v. Mansour*,
474 U.S. 64 (1985) ........ 19, 51

*Hall v. Baptist Memorial Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) ........ 27

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ........ 26

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........ 32, 40

*Kentucky v. Graham*,
473 U.S. 159 (1985) ........ 18

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ........ 21, 51

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 16, 18

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018) ........ 33

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ........ 34

*Mickey v. Zeidler Tool & Die Co.*,
516 F.3d 516 (6th Cir. 2008) .......... 54

*Mt. Healthy City School District v. Doyle*,
429 U.S. 274 (1977) .......... 51, 54

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 16

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 51

*Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*,
477 U.S. 619 (1986) .......... 35, 36

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) .......... 26

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993) .......... 19

*Papasan v. Allain*,
478 U.S. 265 (1986) .......... 20

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .......... 18

*Pepsico, Inc. v. NLRB*,
382 F.2d 265 (6th Cir. 1967) .......... 17

*Preiser v. Newkirk*,
422 U.S. 395 (1975) .......... 23

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 47, 49, 50

*Sacred Heart of Jesus Parish v. Nessel*,
No. 1:22-cv-1214, 2026 WL 2546217 (W.D. Mich. Aug. 5, 2026) .......... 2, 27, 31, 48, 49

*Schenley Distillers Corp. v. United States*,
326 U.S. 432 (1946) .......... 17

*Seasword v. Hilti, Inc.*,
537 N.W.2d 221 (Mich. 1995) .......... 16

*Seattle's Union Gospel Mission v. Woods*,
142 S. Ct. 1094 (2022) .......... 27

*Shelby Advocates for Valid Elections v. Hargett*,
947 F.3d 977 (6th Cir. 2020) .......... 19

*St. Dominic Acad. v. Makin*,
181 F.4th 11, 42–44 (1st Cir. 2026) .......... 2, 30, 42

*St. Mary Cath. Par. in Littleton v. Roy*,
154 F.4th 752 (10th Cir. 2025) .......... 30

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) .......... 33

*Thaddeus-X v. Blatter*,
175 F.3d 378 (6th Cir. 1999) .......... 51

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .......... 46, 47

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012) .......... 33

*Warth v. Seldin*,
422 U.S. 490 (1975) .......... 16

*Youth 71Five Ministries v. Williams*,
160 F.4th 964 (9th Cir. 2025) .......... 28, 30, 31, 34

**Statutes**

42 U.S.C. § 2000e-7 .......... 48

6 Del. C. § 18-201(b) .......... 16

Mich. Comp. Laws § 37.2209 .......... 1, 3, 29, 30, 33, 43, 44, 48

Mich. Comp. Laws § 37.2210 .......... 31

Mich. Comp. Laws § 37.2211 .......... 31

Mich. Comp. Laws § 37.2801 .......... 33

**Rules**

Fed. R. Civ. P. 56(c)(2) .......... 43

Fed. R. Evid. 805 .......... 43

**Regulations**

45 C.F.R. § 400.118(b)(6) .......... 4

45 C.F.R. § 400.156(e) .......... 4

45 C.F.R. § 87.3(f) .......... 48

**Constitutional Provisions**

Mich. Const. 1963, art. 5, § 29 .......... 33

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Should the Court dismiss the claims of BCS and BCS USA for lack of standing where BCSM alone bid for and holds the grants at issue and neither a shareholder nor an affiliate may sue for a separate corporation's injury?

2. Should the Court grant summary judgment regarding Plaintiffs' requests for relief directed at past conduct, completed RFP processes, expired contracts, and superseded practices where that relief is barred by the Eleventh Amendment or moot?

3. Should the Court grant summary judgment on Counts I through III where the First Amendment does not protect co-religionist hiring for non-ministerial positions and the ELCRA's nondiscrimination language is neutral and generally applicable and was applied without hostility toward Plaintiffs' faith?

4. Should the Court grant summary judgment on Count IV where the right of expressive association does not extend to hiring decisions and Plaintiffs worked for years alongside employees of other faiths?

5. Should the Court grant summary judgment on Count VI where the FY2026 awards Plaintiffs challenge came nearly a year after suit and turned on criteria that applied to every bidder?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Authority: *Warth v. Seldin*, 422 U.S. 490 (1975);
*Green v. Mansour*, 474 U.S. 64 (1985);
*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021);
*Christian Healthcare Ctrs., Inc. v. Nessel*, No. 1:22-cv-787, 2026 WL 2542702 (W.D. Mich. Aug. 5, 2026);
*Sacred Heart of Jesus Parish v. Nessel*, No. 1:22-cv-1214, 2026 WL 2546217 (W.D. Mich. Aug. 5, 2026);
*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000);
*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc);
*Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274 (1977).

## INTRODUCTION

Since 1977, Michigan law has required every state contract to include a covenant that the contractor will not discriminate in employment "because of religion" or other protected characteristics. Mich. Comp. Laws § 37.2209. Every refugee-services agreement that Bethany Christian Services of Michigan (BCSM) signed with the Department of Labor and Economic Opportunity (LEO) contained that covenant. In 2023, Bethany announced two changes to its refugee staff. It would stop granting the exceptions to its Statement of Faith that had allowed employees of other faiths to work on state-funded programs, and it would restrict workplace advocacy and activism. Staff on those programs, including the directors who ran them, began to leave. The Office of Global Michigan (OGM) then asked BCSM to confirm that its hiring would comply with the covenant it had signed. It also asked how BCSM would replace departed program directors, address concerns from staff, partners, and clients, and continue providing services that are culturally compatible with the refugees it serves.

OGM's conduct since then shows that those questions concerned compliance and service, not BCSM's faith. It never issued a corrective action plan or terminated an agreement for cause. Its February 2024 monitoring visit required no corrective action and called BCSM "an exceptional refugee service provider." That summer, Ben Cabanaw, the former official at the center of Plaintiffs' targeting allegations, wrote the letter BCSM needed to apply as a direct federal resettlement provider. OGM awarded BCSM seven agreements in its first competitive solicitation for unaccompanied refugee minor services, renewed all seven for

FY2026, and is renewing them for FY2027 at up to $19.56 million. BCSM remains the State's largest provider of those services.

Against that record, Plaintiffs' claims depend on the premise that the State could not raise Bethany's hiring in the first place. The law does not support that premise. As this Court held in *Christian Healthcare Centers, Inc. v. Nessel* and *Sacred Heart of Jesus Parish v. Nessel*, the First Amendment does not give a religious employer a right to hire only co-religionists for non-ministerial positions, and the Court has already held that the positions here are not ministerial. Nor does raising the question show hostility toward religion. The officials who questioned BCSM's hiring objected to a practice they understood the grant to prohibit, not to the faith behind it. As the First Circuit recently explained, disapproval of a practice is not animus toward the religious group that engages in it. *St. Dominic Acad. v. Makin*, 181 F.4th 11, 42–44 (1st Cir. 2026).

Plaintiffs' other theories also fail. The two Bethany entities that never held a grant lack standing, and most of the relief Plaintiffs seek is barred by the Eleventh Amendment or moot. The right of expressive association does not reach hiring decisions. And the FY2026 awards Plaintiffs call retaliatory turned on criteria that applied to every bidder.

For these reasons, the Court should grant Defendants' motion.

## STATEMENT OF FACTS

**OGM's refugee grants and the ELCRA's nondiscrimination requirement**

OGM, an office within LEO, distributes federal refugee services funding through grants awarded by request for proposals (RFP). The federal Office of Refugee Resettlement (ORR) provides the funding, and OGM administers it. (2d Am. Compl., ECF No. 71, PageID.1379, ¶¶19–23, 33.) Although the grants run on multiyear cycles, they are, as Plaintiffs' designee explained, "three individual one-year contracts." (JS-1, DeVries Dep. 72:2–3.) OGM's refugee administrative manager, Nicole Gorski, likewise explained that RFPs "always commit to one-year contracts," with "subsequent years . . . only based on available Federal funding." (JS-5, Gorski Dep. 60:11–13.)

The services performed under the agreements must comply with both state and federal law. To that end, § 209 of the Elliott-Larsen Civil Rights Act (ELCRA) provides as follows:

> A contract to which this state, a political subdivision, or an agency of this state or of a political subdivision is a party must contain a covenant by the contractor and the contractor's subcontractors not to discriminate against an employee or applicant for employment . . . because of race, color, religion, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, or marital status. Breach of this covenant may be regarded as a material breach of the contract. [Mich. Comp. Laws § 37.2209.]

LEO's agreements implement that requirement. The grantee and its subgrantees "agree not to discriminate against an employee or applicant for employment . . . because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability," and any breach is a material breach of the

grant. (*See, e.g.*, Ex. J, RTS 25-0002, § 2.16.) Every refugee-services agreement BCSM signed contained that covenant, and Plaintiffs describe it as "boilerplate language that has been included in all state contracts for decades." (ECF No. 71, PageID.1392, ¶116.)

Federal law, in turn, provides that "[s]ervices . . . must be provided to the maximum extent feasible in a manner that is culturally and linguistically compatible with a refugee's language and cultural background." 45 C.F.R. § 400.156(e). LEO's agreements incorporate that requirement nearly word for word. They also require case managers to be "bilingual/multilingual" and services to be "delivered in a culturally and linguistically sensitive manner to refugees." (Ex. J, Attach. A § 1.2(2).)

Individual refugee programs carry additional federal requirements. The unaccompanied refugee minors (URM) program requires each child's case plan to address the "[p]reservation of the child's ethnic and religious heritage." 45 C.F.R. § 400.118(b)(6). ORR monitors compliance with these requirements, and corrective action flows through OGM. For example, in June 2023, ORR reviewed five cases in BCSM's Kalamazoo URM program. (Ex. L.) It found that in each one, BCSM had not adequately preserved the ethnic and religious heritage of the Muslim youth in its care or connected them with their ethnic and religious communities. (*Id.*, pp 1, 12–13.) ORR directed OGM to require BCSM to correct the deficiencies. (*Id.*, pp 16, 23.)

**The Plaintiffs**

Three Plaintiffs bring this suit. BCSM, a Michigan nonprofit corporation, is the only Plaintiff that has contracted with LEO or bid for the grants at issue. (JS-1, 19:4–8, 28:13–15, 31:22, 77:1–6; JS-2, Nolan/Biemers Dep. 98:8–19, 156:10–157:4.) Bethany Christian Services, Inc. (BCS), also a Michigan nonprofit corporation, is BCSM's shareholder, but the two have separate boards. (JS-1, 27:15–23, 76:24–77:3.) Bethany Christian Services USA, LLC (BCS USA) is a Delaware limited liability company. (*Id.*, 16:4–12, 32:10–17.) Plaintiffs designed this structure themselves. (*Id.*, 76:10–19.)

BCSM has no employees. (*Id.*, 26:21–25, 72:13–15; Ex. E, RTA 33.) BCS USA employs nearly all of the staff who perform BCSM's grants and leases them to BCSM, and BCS provides BCSM's accounting, administrative, and management services. (JS-1, 29:13–15, 31:18–19; Ex. F, ¶¶1–2; Ex. F, ¶¶1–2; Ex. G, ¶2.) No BCSM bid identified BCS or BCS USA as a subcontractor, and BCSM never sought the State's approval to delegate any grant obligation to either. (*See, e.g.*, Ex. P, p 21.)

BCSM has held various refugee-services agreements with the State, some starting dating to the early 2000s and others to 2023. In fiscal year 2024, OGM administered 18 agreements with BCSM. (ECF No. 71, ¶34; JS-5, 94:10–19.) Two kinds of services are at issue. The first is refugee support services (RSS), which include employment, post-resettlement, and transportation services. (ECF No. 71, ¶¶31–32.) The second is URM services. OGM historically awarded URM

agreements to BCSM and Samaritas without competitive bidding. (*Id.*, ¶¶35–39; JS-5, 90:20–91:12.)

**Bethany ends its Statement of Faith exceptions practice**

Bethany has required its employees to sign a Statement of Faith—currently the Apostles' Creed—for decades. (ECF No. 71, PageID.1382–1383, ¶¶48–49; Compl. Ex. G, ECF No. 1-7, PageID.198.) Until summer 2023, it also granted exceptions, both formally and informally. Through the formal process, a hiring manager could request an exception on a form that described the position's duties and attested that the applicant was the strongest available candidate, and the CEO made the decision. (JS-7, 70:18–72:7, 100:16–18.) Informal exceptions were also common. Hiring managers in the Grand Rapids branch told applicants that the Statement of Faith reflected Bethany's beliefs and did not have to be their own, and Bethany accepted an electronic "acknowledgment" in place of a signature from roughly 109 employees. (*Id.*, 74:4–22, 91:23–92:6, 93:13–19, 101:5–7, 121:16–23, 124:21–125:10; JS-9, 40:18–22.) Bethany's COO, Loreta Shirley, testified that staff not following the protocol "was prevalent." (*Id.*, 242:14–21.) Bethany's branch leader, Emily Schab, likewise knew that non-Christians were working in the OGM-funded refugee programs. (JS-9, 32:9–17.)

That changed when Keith Cureton became CEO. (JS-7, 101:8–10.) On July 18, 2023, Cureton wrote to the interim Head of People & Culture, Nathalie Davis, that Bethany had "the right to require an individual who desires to work at Bethany to sign their statement of faith and be accountable to it." (JS-6, 17:2–13.)

Bethany's executive team then stopped granting exceptions. (JS-8, 61:6–19.) Cureton retains the authority to grant them, but has not granted any and could not think of a circumstance that would warrant one. (JS-6, 23:25–24:19, 27:9–14, 58:2–10.) He testified that for roles requiring particular language skills, Bethany would use temporary contractors, who do not sign the Statement of Faith. (*Id.*, 58:12–15.) Bethany likewise does not require interns to sign it, and it uses third-party interpreters. (JS-7, 58:24–59:7, 99:4–6.)

Bethany announced the change to its Grand Rapids refugee staff on July 28, 2023, along with restrictions on workplace advocacy and activism. That day, Shirley met with more than 100 refugee staff who were moving from Bethany's 36th Street office to its headquarters campus. (JS-7, 73:19–74:3, 90:3–6, 174:2–7.) She told them that social and political displays, from LGBTQ+ and Black Lives Matter flags to anti-abortion sign, would no longer be allowed. Bethany put that directive in writing in August 2023 and adopted it as a formal advocacy policy in January 2024. (*Id.*, 169:22–171:5, 177:11–178:25, 203:7–10; ECF No. 1-10, PageID.207.) Shirley also told staff that "although it has been our practice in the past to make an exception to the statement of faith, it is not our intent moving forward to employ staff who are unwilling to embrace our mission." (JS-7, 90:23–91:16.) Existing employees would not have to sign, and if the change "created challenges in meeting the needs of our clients, Bethany would be open to hiring a case manager as an independent contractor." (*Id.*, 91:10–14, 103:16–25; JS-9, 60:18–21; see also Ex. Y.)

**OGM's response**

Ben Cabanaw, OGM's former Deputy Director, learned about these changes in November 2023 after several Bethany employees raised concerns with him at a conference. (JS-4, 45:3–46:5.) They later asked him to reach out to BCSM's "contract signer to discuss concerns [he] ha[d] or contract requirements that are related to Bethany's implementation of the statement of faith," (Ex. X, 11/30/2023 Email). One week later, Cabanaw asked BCSM to meet "to discuss these changes and ensure any hiring practices align with our contract requirements." (ECF No. 1-11, PageID.212; Ex. Z.) After a December 14 meeting, OGM sent a letter asking for an assurance of compliance and related staffing plans, and BCSM formally responded in January 2024. (ECF No. 1-13, PageID.222–223; ECF No. 1-14, PageID.225–234.) Part III.C.1 describes those exchanges.

Following BCSM's formal response, OGM continued BCSM's agreements pending further review. Ultimately, OGM never issued a corrective action plan or terminated a BCSM agreement for cause. (JS-4, 201:15–18, 213:17–20.)

**The 2024 procurements**

In 2024, OGM issued RFPs for two kinds of services: (1) an RFP for refugee employment and post-resettlement services, and (2) an RFP for URM services.[1]

[1] Reception and placement was not part of either solicitation. The federal government awards those contracts, and BCSM had provided the services as a subcontractor to Church World Service (CWS). (ECF No. 71, PageID.1380, ¶¶25, 29–30.)

*1. Refugee support services*

OGM decided not to continue any refugee employment or post-resettlement agreement statewide past September 30, 2024. It consolidated and bid those services under RSS25-0001, and, for remote services, RSS25-0002. (JS-5, 160:11–13, 181:13–15; JS-2, 91:17–21.)

The decision grew out of the prior cycle. In 2023, OGM had split a single integration agreement into separate employment and post-resettlement programs to attract specialized employment providers. The pilot did not work: the same grantees won both agreements, the split doubled the invoices, data files, and monitoring reports OGM handled, and it dropped English instruction. (JS-5, 84:16–87:3; JS-14, 43:12–44:1.) Gorski proposed recombining the programs to fix those problems and testified that the decision had nothing to do with BCSM. (JS-5, 84:6–14, 86:11–23, 181:16–20.) On July 1, 2024, OGM notified every provider that the agreements would end on September 30, 2024. (*Id.*, 246:18–248:20.) Plaintiffs' designees agreed that the decision "wasn't targeted" at BCSM but applied to "everyone across the board." (JS-2, 93:25–94:10.) BCSM kept its youth-mentoring and transportation agreements, which were not bid in 2024. (JS-5,160:18–20, 162:7–10.)

The new refugee social services (RSS) RFP also added a scored item on hiring. It asked whether the bidder described a hiring plan of staff who "represent the cultural, national origin, and religions of the newcomer populations being served." (ECF No. 1-4, PageID.164–192.) The item grew out of ORR Policy Letter

24-02, which encouraged grantees to recruit staff whose lived experience reflects the populations they serve. (ECF No. 18-5, PageID.470–474; JS-14, 49:17–50:5.) Gorski explained that the criterion was meant to ensure that providers met the federal requirement for culturally competent staff. (JS-5, 248:21–249:5.) It was not an eligibility requirement, and bidders could satisfy it through subcontracted staff. (JS-14, 20:21–21:7, 30:8–19.)

Four OGM staff, drawn from volunteers across the office, scored the RSS proposals. (JS-14, 22:4–9; JS-11, 123:6–16.) Each reviewer first scored assigned proposals independently against the RFP's criteria. The committee then met, agreed on final scores, and recorded a written reason for every deduction. (JS-14, 16:4–12, 19:10–17; JS-5, 206:20–207:4; JS-3, 39:15–40:1; JS-11, 123:17–124:13.) A proposal needed 80 points to qualify, and when qualifying proposals competed for the same region, the highest score generally won. OGM considered best value, including cost per client, only to break ties or near-ties. (JS-5, 196:9–16, 197:15–198:4, 212:5–9.)

Results on the hiring criterion varied across bidders. Of the nineteen proposals submitted under RSS25-0001, seven received full credit and four received none. The proposals receiving no credit were BCSM Kalamazoo, BCSM Grand Rapids (BCSM-GR), African Community Kalamazoo, and Zaman International. (Ex. FF, ¶47.) Further, the Hispanic Center of Western Michigan lost a point for addressing language but not the religions of the populations served, and the Islamic Center of Detroit also lost a point. (ECF No. 9-4, PageID.352–354; Ex. FF, ¶¶46–

52.) Emily Schab, who submitted BCSM-GR's bid, agreed that it did not mention that BCSM could use contractors or interns who do not sign the Statement of Faith, and that including such information "possibly" could have regained lost points. (JS-9, 160:9–18, 172:18–175:5.)

BCSM submitted three RSS proposals. Its Kalamazoo proposal scored 93, tying Samaritas-Southwest, another faith-based organization, for the region's highest score, and OGM awarded the grant to Samaritas-Southwest after comparing the proposals' scope and cost. (ECF No. 18-10, PageID.501–503; JS-5, 210:2–212:2; JS-11, 127:22–128:6, 154:5–11; see Ex. P, Ex. R.) BCSM-GR's and remote proposals scored below the 80-point threshold. (ECF No. 18-9, PageID.496–497; ECF No. 18-10, PageID.501–504; ECF No. 18-11, PageID.513–514.) Part III.C.2 discusses those scores.

Two OGM staff involved in the RSS review had previously worked for Bethany. Dilli Gautam left Bethany in December 2023, joined OGM in May 2024, and scored BCSM's Kalamazoo proposal. (JS-12, 44:9–11, 75:24–76:1, 80:2–23.) Simone Halilovic resigned from Bethany in March 2024 and joined OGM the next month as grant administrator for the integration programs. (JS-11, 102:7–103:21, 117:1–15, 122:6–126:18.) She led the review but did not score any BCSM proposal, stayed out of the committee's discussion of them, and told reviewers to deduct points based only on what the bids said. (*Id.*, 122:8–126:18.)

Both Halilovic and Gautam expressed strong views about Bethany. In late May 2024, before the RFPs issued, Halilovic sent a screenshot of a draft of OGM's

new nondiscrimination language to former colleagues. (JS-11, 139:11–141:18, 143:4–145:5, 159:1–19.) She told one that she was "ready to fight the good fight" because "the beast is at our front door." (*Id.*, 139:11–141:18, 143:4–160:20.) In June 2024, she told Gautam that she had proposed wording to bar funding for staff training unrelated to the program, "like required religious activities. Cough. Cough. Day of prayer." (*Id.*, 164:9–166:11.) She also told him she hoped to require job descriptions "to weed out discriminating practices." (*Id.*) In notes created when first reading the RSS submissions, she wrote that "BCS should be disqualified due to not adhering to the non-discrimination and diversity equity and inclusion practices requirements." (*Id.*, 131:13–133:7.) The same notes recommended funding the Islamic Center of Detroit. Halilovic explained that she had no concern with a faith-based organization serving people through its faith, so long as it served all eligible refugees. (*Id.*, 134:13–138:6.)

On August 1, 2024, Halilovic also texted Gorski to ask whether a document BCSM had submitted with its remote bid, proposing changes to the RFP's nondiscrimination terms, should be considered with all of BCSM's bids. Gorski replied: "I'm not sure where it fits in, but that should be grounds for docking points on their proposal. They are not meeting the requirements." (JS-5, 192:11–194:13; JS-11, 169:25–170:6.) Gorski later explained that a bidder unable to provide culturally appropriate staff could not receive full points on the hiring item but was not disqualified. (JS-5, 195:4–12, 196:4–16.)

On August 12, 2024, Gautam texted Halilovic that the "BCS Kazoo proposal is pretty good." She replied, "Yeah. They all are. Except the attachment they had that states they discriminate." Gautam answered, "Yes, I did. I was so pissed once I read the whole thing," and Halilovic replied, "Same, cringe." (JS-12, 66:22–68:21, 72:1; JS-5, 208:19–209:4; JS-11, 169:7–15.) Gautam testified that the decision to end exceptions to its Statement of Faith angered him, but that he believed it still received a fair review. (JS-12, 68:22–72:25.) His committee scored the Kalamazoo proposal at 93, tying for the region's highest score. (ECF No. 18-10, PageID.501–503; JS-5, 210:2–211:2.) Later in August 2024, Halilovic texted Beth Caldwell, a former colleague, "fuck these discriminating assholes." (JS-11, 168:24–169:6.)

Gorski did not learn of the Gautam–Halilovic texts until after the lawsuit was filed. She testified that OGM "would have had an issue had they seen those text messages during the scoring" and would not have wanted Halilovic or Gautam to participate, and that the texts warranted follow-up on the scoring process. (JS-14, 23:8–10, 24:8–25:17; JS-5, 209:8–10.) LEO's designee agreed that a staff member who had expressed that kind of hostility should not have reviewed the bidder's proposal and explained that a problem discovered after scoring would normally prompt a review of the process. (JS-3, 26:18–27:7, 72:1–13.)

*2. Unaccompanied refugee minors*

OGM also issued its first solicitation for URM services. (Ex. O.) ORR had previously asked Michigan to add URM capacity, and other providers had asked to join the program. (ECF No. 18-2, PageID.430–431; JS-14, 71:19–72:14; JS-5, 89:15–

90:20.) Gorski also questioned why federally funded URM agreements had always been sole-sourced, as she understood that federal funding should be awarded competitively. (JS-5, 90:20–91:19.)

Cabanaw's weekly update to OGM leadership on June 5, 2024, listed three reasons for the solicitation: "the need for additional service providers," "[t]he challenges we are experiencing with Bethany Christian Services's hiring practices," and "a shift in how ORR is working with nonresettlement agency partners for URM cases." (JS-3, 27:15–28:2.) Gorski, who made the decision with Cabanaw and URM program manager Jennifer Kalis, testified that OGM issued the solicitation to increase capacity and to replace sole-sourcing with a competitive process, and that the decision was unrelated to Cabanaw's concerns about BCSM's hiring. (JS-5, 89:6–91:19, 95:24–96:14.) She had no concerns at the time about staffing or services in BCSM's URM programs. (*Id.*, 90:4–8.) She acknowledged that departures elsewhere at Bethany may have made it prudent to have additional providers in case staffing became an issue, and she read Cabanaw's reference to "hiring practices" that way. (*Id.*, 241:16–242:11.) Competitive bidding has since become OGM's standard practice for URM services, and OGM plans to rebid the program when the current cycle ends. (*Id.*, 96:4–97:3, 230:23–231:11.)

BCSM bid, and on July 31, 2024, OGM awarded it seven URM agreements. The draft FY2025 grant language included a hiring term similar to the RSS item, but OGM removed the term from BCSM's URM agreements before they were signed. (ECF No. 71, PageID.1418; ECF No. 18-7, PageID.485–489.)

**Events since Plaintiffs filed suit**

On September 9, 2024, Plaintiffs sued three Defendants in their official capacities: LEO Director Susan Corbin, OGM Executive Director Poppy Hernandez, and former OGM Deputy Director Cabanaw. The parties then stipulated to a preliminary injunctive order barring termination of specified BCSM agreements before September 30, 2025. (ECF No. 1; ECF No. 35.) Under that order, OGM continued funding BCSM's Kalamazoo employment and Grand Rapids post-resettlement agreements past September 30, 2024, and BCSM agreed that its Grand Rapids employment agreement would end. No other grantee's FY2024 employment or post-resettlement agreement continued. (ECF No. 35; JS-2, 157:5–18, 232:15–17.) ORR has since rescinded Policy Letter 24-02, and the hiring-plan term no longer appears in OGM's RFPs and has not appeared in any grant after January 23, 2025. (JS-14,57:17–58:6.)

In May 2025, after federal resettlement was suspended and arrivals in BCSM's counties stopped, the federal government required OGM to end funding of domestic medical examination (DME) agreements in areas no longer receiving refugees, including Traverse City. (ECF No. 81-2, PageID.1623, ¶¶242–246.) BCSM's FY2026 transportation and mentoring proposals were not funded for the reasons discussed in Part V.B. LEO renewed all seven of BCSM's URM agreements for FY2026 at up to $17.725 million. (JS ¶16.) Gorski described BCSM as OGM's largest URM provider and its URM agreements as "still great." (JS-14, 70:14–71:10.)

## ARGUMENT

### I. BCS and BCS USA lack standing because every alleged injury belongs to BCSM alone.

In denying Defendants' motion to dismiss, this Court recognized Plaintiffs' alleged injury as "a substantial risk that Defendants will continue to move contracts away from Bethany Christian because of their policy of opposing Bethany Christian's religious exercise." (ECF No. 52, PageID.940.) But neither BCS nor BCS USA has ever bid on a contract at issue and thus Defendants have no contracts to move away from them. (JS-2, 98:8–19; JA, JS-1, 19:4–8; 28:13–15.)

At summary judgment, Plaintiffs must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because " 'standing is not dispensed in gross,' " each Plaintiff " 'must demonstrate standing for each claim that they press' " and "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Each Plaintiff must also assert its own legal rights rather than those of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). And because Plaintiffs seek only prospective relief, each must show a "real and immediate threat" of future injury to itself. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

The Second Amended Complaint treats all three Plaintiffs as a single entity, "Bethany Christian" (ECF No. 71, PageID.1376 n.1), but Michigan and Delaware law treat them as separate persons, *see Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224

(Mich. 1995); 6 Del. C. § 18-201(b). Because discovery shows that every alleged injury belongs to BCSM, the Court should dismiss BCS's and BCS USA's claims.

### A. BCSM bid for and holds the grants at issue.

BCSM alone bids for and hold the grant with LEO, and it has no employees or funds of its own. (JS-1, 26:21–25.; JS-2, 98:4–25.) BCS USA employs all but three of the staff who perform BCSM's grants and retains sole discretion over their assignment and termination. BCS provides BCSM's administrative support as an independent contractor. (Ex. F, ¶¶1–2, 2(b); Ex. G, ¶2.)

Every harm the Second Amended Complaint alleges therefore traces to BCSM's bids and agreements. (ECF No. 71, ¶¶127, 148–150, 168–176, 259.) Having placed the grants in one entity and the workforce in others, Plaintiffs cannot ask this Court to disregard that structure.

### B. BCS and BCS USA suffer, at most, a derivative injury and have no interest of their own in the grants at issue.

Because BCS's interest is purely that of a shareholder, any injury it suffers from the loss of a contract is derivative. The shareholder-standing rule—"a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation"—leaves any such claim to BCSM alone. *Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990); *see Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 602–03 (6th Cir. 1988). This rule applies even when a parent wholly owns and controls its subsidiary. *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 435 (1946) (per

curiam); *see also Pepsico, Inc. v. NLRB*, 382 F.2d 265, 267 (6th Cir. 1967) (dismissing parent petition where its "sole interest . . . was that of a stockholder").

BCS is in the same position. OGM never awarded or denied BCS anything, and its only interest in BCSM's contracts is as a shareholder. Plaintiffs have identified both BCS and BCS USA as BCSM's sole shareholder, though they have produced no corporate record supporting this account. (JS-1, 27:15–23.) Whichever is correct, the result is the same because a shareholder may not sue to redress the corporation's injury.

Beyond ownership, BCS and BCS USA link themselves to the grants only through private intercompany service agreements. These arrangements cannot supply the "invasion of a legally protected interest" that an injury in fact requires. *Lujan*, 504 U.S. at 560. OGM has never contracted with either entity, and no grant condition—including the ELCRA covenant—applies to them. While BCS USA and BCS might suffer downstream losses in lease revenue or service fees if BCSM loses a contract, those losses flow entirely from BCSM's injury rather than any direct action by Defendants.

## II. Most of the relief Plaintiffs seek is moot or barred by the Eleventh Amendment.

Because Plaintiffs sue three state officials in their official capacities, (ECF No. 71, PageID.1376–1377, ¶¶4–6), this suit is, "in all respects other than name," a suit against the State. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The Eleventh Amendment bars such a suit except to the extent it "seek[s] prospective

relief to end a continuing violation of federal law." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984).

Consistent with that limitation, this Court has dismissed with prejudice all relief that *Ex parte Young* does not allow. (ECF No. 165, PageID.2324–2325.) Prospective relief, in turn, requires "a present ongoing harm or imminent future harm" that the requested relief could address. *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (citation omitted).

### A. Relief barred by *Ex parte Young* has already been dismissed.

The May 5, 2026 Order of Partial Dismissal eliminated Plaintiffs' request for damages. For paragraph 8 of the prayer, that leaves only fees and costs, which depend on whether Plaintiffs prevail on relief that *Ex parte Young* allows.

Plaintiffs' first two requested declarations also fall within that dismissal. They ask the Court to declare that Defendants' policies and actions "violated the First Amendment" and "caused LEO and OGM to violate the First Amendment." (ECF No. 71, PageID.1417, ¶¶1–2.) *Ex parte Young* "does not permit judgments against state officers declaring that they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). And this Court has already described these paragraphs as seeking "a declaration that Defendants' past actions were unconstitutional," in contrast to the "prospective" relief sought elsewhere in the prayer. (ECF No. 52, PageID.936.)

*Green v. Mansour*, 474 U.S. 64 (1985), independently bars these declarations because, absent an ongoing violation, a declaration that state officials violated federal law in the past would serve only as a basis for damages. *Id.* at 71–73. The only continuing conduct here is the inclusion of the language the ELCRA requires, which Plaintiffs challenge directly in paragraphs 3 through 5 and which is lawful for the reasons in Parts III and IV.[2]

Paragraph 7(b) fails for a related reason. It asks the Court to order Defendants "to cause the contracts for refugee services subject to RFPs in 2024 and 2025 to be re-bid" without penalizing Plaintiffs' religious hiring. (ECF No. 71, PageID.1418–1419.) The RSS agreements awarded through the 2024 RFPs were one-year contracts that expired on September 30, 2025, and those awarded through the 2025 RFPs expired on September 30, 2026. (JS-5, 60:7-16.) The seven URM agreements BCSM won in the 2024 solicitation remain in place. An order reopening those RFPs would end no continuing violation and would instead revisit completed awards. *Ex parte Young* does not permit relief that is "tantamount to an award of damages for a past violation of federal law, even though styled as something else."

[2] Director Corbin should also be dismissed. An official capacity defendant must have "some connection with the enforcement" of the challenged conduct, *Ex parte Young*, 209 U.S. at 157, and general supervisory authority does not suffice. *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415–17 (6th Cir. 1996). Corbin had only a general awareness of the issues with BCSM. For example, she did not attend the December 14, 2023 meeting, approve the challenged contract language, issue RFPs, or score proposals, and grant agreements are signed under authority delegated to LEO's chief financial officer. (JS-19, 11:11–19, 24:18–25:2, 29:15–30:6, 31:24–32:17, 36:3–8, 40:9–14.)

*Papasan v. Allain*, 478 U.S. 265, 278 (1986). Paragraph 7(b) therefore falls within the dismissal, and, in any event, it is also moot. (*See* Part II.B.1).

### B. Plaintiffs' requests directed at completed cycles and superseded RFP practices are moot.

Mootness asks whether events since the complaint was filed have left anything for prospective relief to address because "an injunction cannot be used to redress a purely past injury." *Kentucky v. Yellen*, 54 F.4th 325, 339 (6th Cir. 2022) (citation omitted). At the pleading stage, the Court noted that Defendants did not dispute that Plaintiffs had plausibly alleged standing to challenge the loss of contracts as "an ongoing present injury." (ECF No. 52, PageID.939.) But standing is measured at the time of filing, and mootness turns on what has happened since. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189–92 (2000). Since then, the contract cycles Plaintiffs challenge have expired, and the process and language they attack have been superseded.

#### 1. Plaintiffs' requests tied to expired contract cycles are moot.

Paragraph 7(a) asks the Court to order Defendants "to preserve the status quo regarding Bethany Christian's provision of refugee-related services in the Grand Rapids, Kalamazoo, and Traverse City areas through the dates of the contracts for those services." (ECF No. 71, PageID.1418.) The contracts at issue are the employment and post-resettlement agreements maintained under the Stipulated Preliminary Injunctive Order, (ECF No. 35), and they expired by their

own terms on September 30, 2025. So did the transportation agreement that Plaintiffs say was bid early. (ECF No. 71, PageID.1407, ¶235.) BCSM knew when it bid in 2023 that the agreement would end on September 30, 2025. (JS-2, 141:6–142:1.) Either way, the contract has expired.

Plaintiffs also challenge the decision not to continue BCSM's FY2024 employment and post-resettlement agreements past September 30, 2024. (ECF No. 71, PageID.1394, 1397, ¶¶127, 149–151.) That decision applied to every grantee statewide, and Plaintiffs' designee agreed that it "wasn't targeted" at them. (JS-2, 91:17–21, 93:25–94:10.) BCSM itself agreed that its Grand Rapids employment agreement would end on September 30, 2024. (*Id.*, 157:9–13, 177:13–14.) And under the stipulated order, OGM continued funding BCSM's Kalamazoo employment and Grand Rapids post-resettlement agreements past that date. (ECF No. 35; JS-2, 157:14–18, 232:15–17.) Those agreements have since expired, and nothing remains for prospective relief to address.

#### 2. Plaintiffs' requests directed at the superseded RFP process and discontinued contract language are moot.

Plaintiffs also seek relief concerning RFP and contract language that OGM no longer uses. Paragraph 6 asks the Court to declare unconstitutional and enjoin any contract requirement restricting co-religionist hiring, and it references language included in FY2025 contracts, including the ELCRA's nondiscrimination covenant and the following:

(i) When developing and implementing hiring policies, the grantee will create opportunities to employ staff that represent the

cultural, national origin, and religions of the newcomer populations being served under this agreement.

(ii) Provide DEI training opportunities for staff, volunteers, contractors, and subgrantees, and at minimum require every staff to complete the State of Michigan's Implicit Bias Training or comparable training approved by OGM.

(iii) When developing new programming, ensure that all ORR-eligible populations, regardless of race, religion, gender identity, sexual orientation, disability, or other characteristic(s), receive fair treatment, access, and opportunity under this agreement.

(ECF No. 71, PageID.1418; ECF No. 1-3, PageID.51.) Paragraph 7(c) seeks a corresponding injunction against "any process" or language in grant documents that interferes with BCSM's religious exercise or expressive association. (ECF No. 71, PageID.1419.)

Deposition testimony confirmed that Defendants added the new language in response to Policy Letter 24-02 as well as ORR's focus on lived experience as an integral part of services. (JS-14, 49:17–50:5.) As OGM's designee explained, "OGM interpreted lived experience, part of that to be religion." (*Id.*, 52:2–3.) ORR has since rescinded Policy Letter 24-02. (*Id.*, 57:17–22.) The contract term Plaintiffs quote, which stated that the grantee "will create opportunities to employ staff that represent the religions of the newcomer populations being served under this agreement," has not appeared in any contract issued after January 23, 2025. (*Id.*, 57:23–58:6, 63:10–14.) OGM also removed the term from BCSM's FY2025 URM agreements before they were signed, reverting to the nondiscrimination language in BCSM's prior URM contracts. (ECF No. 18-7, PageID.485–489.)

Paragraphs 6 and 7(c) are therefore moot. A ruling on either would be an advisory opinion about language that OGM no longer uses. *See Preiser v. Newkirk*, 422 U.S. 395, 401–02 (1975). To the extent paragraph 7(c) reaches OGM's review process itself, Plaintiffs identify no ongoing process that penalizes their hiring, for the reasons in Part II.B.3. The remainder of paragraph 6 asks the Court to declare unconstitutional "any contract requirement" restricting co-religionist hiring, which duplicates paragraphs 3 through 5 and rises or falls with them on the merits.

**3. Count VI identifies no ongoing or threatened retaliation.**

Count VI alleges that Defendants retaliated against Plaintiffs for filing this lawsuit by terminating BCSM's DME agreement, withholding follow-on agreements, re-bidding a transportation agreement early, and denying BCSM's FY2026 transportation and mentoring bids. (ECF No. 71, PageID.1406–1407, 1416–1417, ¶¶225–235, 311–318.) Because Plaintiffs seek only prospective relief, Count VI survives only if they show a real and immediate threat of future retaliation. *Lyons*, 461 U.S. at 102–03. Past conduct is relevant to that question, *id.* at 102, but each decision Plaintiffs challenge followed from rules that applied to every provider. (Part V.)

Nothing suggests that future cycles will be different. Cabanaw, the former official at the center of Plaintiffs' retaliation allegations, left state employment in July 2026. (JS-13, Hernandez Dep. 10:10–23.) The process that governs future procurements also was not formalized when OGM conducted the 2024 RFPs Plaintiffs challenge. LEO's Grants Division had two staff members in early 2024,

spent the first half of that year on other LEO grants, and did not begin working with OGM to standardize its grant process until after July 2024. (ECF No. 81-3, PageID.1694–1697, ¶¶4–5, 8, 10.) The division was still setting up its process during the FY2025 cycle, and not every FY2025 RFP ran through its electronic grants system. (JS-3, 70:22–71:1, 73:13–22.) It completed its written grants policy in December 2024, and the first OGM RFPs administered under that formal policy were the FY2026 transportation and mentoring RFPs in 2025. (ECF No. 81-3, PageID.1697–1698, ¶¶12–13.)

That process guards against the harm Plaintiffs allege. Every participant in a review, including those who do not score, must certify having no conflict of interest with any applicant, including through prior employment, or must disclose the conflict. (JS-3, 21:15–20, 24:11–25:9, 71:10–13; Ex. V.) The Grants Division assigns applications so that no reviewer scores an applicant with which he or she has a conflict, and a division staff member monitors the team discussions. (ECF No. 81-3, PageID.1699–1701, ¶¶14–15, 18–19.) Disclosed conflicts are escalated to program leadership, and LEO may bring in reviewers from outside OGM, including non-state reviewers. (JS-3, 26:4–13, 38:6–39:4.) A conflict discovered after the fact triggers a review that can reverse the award. (*Id.*, 32:20–33:21.)

Further, OGM has not referred BCSM's current URM agreements to LEO's internal controls for any breach. (JS-14, 75:11–14, 77:15–19.) LEO renewed all seven URM agreements for FY2026 and is renewing them for FY2027 at up to $19.56 million. (*See* JS-14, 72:17–73:6.) OGM's designee testified that OGM

wanted to continue its relationship with BCSM, its largest URM provider, and that those agreements are "still great." (*Id.*, 70:14–71:10.) OGM's Executive Director likewise testified that OGM's wish is to partner with BCSM has never changed and remains true today. (JS-13, 135:16–136:23.)

## III. Plaintiffs' Free Exercise claims (Counts I–III) fail as a matter of law.

Counts I through III advance a single Free Exercise claim under three theories. Count I alleges targeting, Count II alleges that the policies applied to Plaintiffs are not neutral and generally applicable, and Count III alleges exclusion from a public benefit. (ECF No. 71, PageID.1408–1414, ¶¶237–292.) All three theories rest on a premise this Court has already rejected: that the First Amendment protects a religious employer's practice of hiring only co-religionists for non-ministerial positions. (*Id.*, PageID.1392, ¶¶115–118.)

### A. There is no First Amendment right to hire co-religionists for non-ministerial positions.

The Religion Clauses protect a religious institution's autonomy over "internal management decisions that are essential to the institution's central mission," and "a component of this autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). That autonomy is protected through the ministerial exception, which bars courts from adjudicating employment disputes between religious institutions and employees who hold those key roles. *Id.*; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012). But that autonomy "does not

mean that religious institutions enjoy a general immunity from secular laws." *Our Lady*, 591 U.S. at 746. The Supreme Court has never extended constitutional protection to religion-based hiring for positions outside the ministerial exception. The exception is also not a source of affirmative rights against the government. *Hosanna-Tabor*, 565 U.S. at 195 n.4. This Court has already applied that limit here by dismissing Plaintiffs' church-autonomy claim because the positions at issue are not ministerial. (ECF No. 52, PageID.950–953.)

This Court applied the same principles on August 5, 2026, in two cases raising the theory Plaintiffs advance in this case. In *Christian Healthcare Centers, Inc. v. Nessel*, a faith-based medical provider argued that the co-religionist doctrine entitled it to require every employee to affirm its Statement of Faith. No. 1:22-cv-787, 2026 WL 2542702, at *7–8 (W.D. Mich. Aug. 5, 2026). There, the provider sought to use the church autonomy doctrine and the ministerial exception "to support an affirmative right to hire only adherents to its Statement of Faith." *Id.* at *9. The Court held that the provider had identified no binding authority for a co-religionist exception and concluded that the theory "expands the underlying religious autonomy doctrine and ministerial exception more broadly than the Supreme Court's body of caselaw currently permits." *Id.* at *10. The Court reached the same conclusion for a Catholic parish that required all of its staff to share its faith. *Sacred Heart of Jesus Parish v. Nessel*, No. 1:22-cv-1214, 2026 WL 2546217, at *9–12 (W.D. Mich. Aug. 5, 2026).

Both decisions considered and rejected the authorities Plaintiffs have relied on here, including Justice Alito's statement respecting the denial of certiorari in *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022), and *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000). *See* ECF No. 9, PageID.306; *Christian Healthcare*, 2026 WL 2542702, at *10; *Sacred Heart*, 2026 WL 2546217, at *12. The Court also explained that *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), which upheld Title VII's statutory religious-employer exemption, does not require a State to draw its own exemption as broadly. *Christian Healthcare*, 2026 WL 2542702, at *10.

Other courts agree. In *Youth 71Five Ministries v. Williams*, 160 F.4th 964, 975–76 (9th Cir. 2025), the Ninth Circuit considered a state grant condition requiring applicants to certify that they do not discriminate in employment based on religion. The plaintiff was a youth ministry that required all staff and volunteers to sign a Statement of Faith. *Id.* The court held that the ministerial exception and ecclesiastical abstention are defenses "against or limits upon plaintiffs' invocation of judicial authority" and are not "the basis for standalone claims challenging legislative or executive action." *Id.* at 983.

None of Plaintiffs' Free Exercise theories can rest on the premise that the hiring practice is constitutionally protected. Each must instead succeed, if at all, under the ordinary Free Exercise framework. None do.

### B. The ELCRA's nondiscrimination language is neutral and generally applicable (Count II).

Count II alleges that Defendants adopted a policy that they "will not contract with" a religious organization that hires co-religionists "unless that organization is the only option." (ECF No. 71, PageID.1411, ¶267.) Count II also alleges that the ELCRA is not neutral and generally applicable because of its affirmative-action and seniority provisions (*id.*, PageID.1412, ¶¶272–276), that Defendants acted "purely as a matter of discretion" (*id.*, ¶280), and that Defendants enforce the ELCRA selectively (*id.*, PageID.1412–1413, ¶282). These theories fail because the requirement Defendants applied—the language that the ELCRA requires in every state contract—is neutral and generally applicable.[3]

Not every burden on religious exercise triggers strict scrutiny. Laws "incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *see Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). The agreements' nondiscrimination language meets both requirements.

#### 1. The nondiscrimination requirement is neutral.

A law is not neutral if it "refers to a religious practice without a secular meaning discernable from the language or context," or if its object "is to infringe

---

[3] Plaintiffs' allegation that Defendants sought to replace BCSM is addressed in Part III.C.2.

upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

This lawsuit centers on the nondiscrimination language contained in all state grant agreements, which bars every grantee from discriminating in employment "because of . . . religion" and other protected characteristics." This language implements § 209 of the ELCRA, which requires the covenant in every state contract. Mich. Comp. Laws § 37.2209. The requirement appears in all LEO agreements, binds every grantee, and does not mention any religious practice.

The requirement's object is secular as well. Prohibiting religious discrimination is "unquestionably an appropriate, secular legislative purpose." *Boyajian v. Gatzunis*, 212 F.3d 1, 5 (1st Cir. 2000). Courts have held that a nondiscrimination requirement remains neutral even though religion is one of the characteristics it protects. *St. Dominic Acad. v. Makin*, 181 F.4th 11, 42–44 (1st Cir. 2026); *see also St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 766 (10th Cir. 2025), cert. granted, No. 25-581 (U.S. Apr. 20, 2026). And the ELCRA's nondiscrimination requirement does not single out religious organizations. As the Ninth Circuit explained, "[g]overnment agencies, secular corporations, and religious ministries alike might engage in religion-based employment discrimination," and a requirement that reaches all of them "does not discriminate based on religious status or exercise." *Youth 71Five*, 160 F.4th at 979–80.

**2. The nondiscrimination language is generally applicable.**

A law is not generally applicable if it provides "a mechanism for individualized exemptions," *Fulton*, 593 U.S. at 533 (citation omitted), or if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *id.* at 534. The nondiscrimination language does neither.

Plaintiffs allege that Defendants acted "purely as a matter of discretion." (ECF No. 71, PageID.1412, ¶280.) But the ELCRA makes the nondiscrimination language a mandatory term of every state contract, and no state official may waive it. Mich. Comp. Laws § 37.2209. For that same reason, the Ninth Circuit held that a comparable grant condition was likely generally applicable. *Youth 71Five*, 160 F.4th at 980–81.

The two ELCRA provisions Plaintiffs reference in their complaint do not create a system of exemptions either. (ECF No. 71, PageID.1412, ¶¶273–274, 276.) The first permits an employer to adopt a plan "to eliminate present effects of past discriminatory practices or assure equal opportunity" if the Civil Rights Commission approves it under its rules. Mich. Comp. Laws § 37.2210. Any employer, religious or secular, may seek approval on the same terms. The Commission's review is limited to whether the plan meets that remedial standard, much like the structured BFOQ process this Court has already found consistent with *Fulton*. *Christian Healthcare*, 2026 WL 2542702, at *15–17; *see also Sacred Heart*, 2026 WL 2546217, at *14–16. The second provision, covering bona fide seniority and merit systems, permits employers to reward long-term and high-

performing employees. Mich. Comp. Laws § 37.2211. Neither provision allows any employer to refuse to hire because of religion.

Plaintiffs' comparator theories also fail. They contend that Defendants treat "organizations that do not hire co-religionists more favorably." (ECF No. 71, PageID.1411, ¶271.) But the ELCRA bars every employer from hiring on the basis of religion. A secular grantee that refused to hire applicants of a particular faith would breach the same term. So would an atheist organization that refused to employ anyone who professes a religious belief. *See Youth 71Five*, 160 F.4th at 987. Plaintiffs also allege that OGM allows other grantees to discriminate on protected grounds (ECF No. 71, PageID.1412–13, ¶282), but discovery produced no evidence of any such grantee. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (explaining that it is the plaintiffs' burden to identify comparable secular conduct that the State treats more favorably).

That leaves the hiring-plan language, which Plaintiffs say shows that Defendants pursued religion-conscious hiring while penalizing BCSM for its own. (ECF No. 71, PageID.1407, ¶¶230–233.) The language appeared as a grant term and as a scored RFP item. (ECF No. 71, PageID.1418; JS-14, 19:18–22, 63:10–14.) Neither was an eligibility requirement, and neither directed any bidder to hire or reject an applicant because of religion. The language concerned recruitment: widening the applicant pool to include people who share the backgrounds of the refugees served. It grew out of ORR's focus on lived experience in Policy Letter 24-02, which includes religion, and it tracks longstanding federal requirements that

services be culturally compatible and that each unaccompanied minor's heritage be preserved. (JS-14, 49:17–50:12, 50:20–51:4, 52:1–12; ECF No. 18-5, PageID.470–474; JS-13, 132:1–10.) Plaintiffs themselves agree that religion is a "[v]ital" part of a person's culture. (JS-8, Osburn 30(b)(6) Dep. 33:11–18.)

The language also applied to every bidder, religious or secular. Other bidders, including the Islamic Center of Detroit, lost points on it, and Samaritas, another faith-based organization, received awards under it. (Gorski Decl., ECF No. 18-1, PageID.426–427, ¶¶20–21; JS-11, 142:6, 143:1–2.)

### C. Defendants applied the nondiscrimination requirement neutrally (Count I).

Count I claims that Plaintiffs' "religious exercise is the target of OGM's policy and actions." (ECF No. 71, PageID.1408, ¶242.) Specifically, Plaintiffs allege that Cabanaw took various actions because he believed BCSM's hiring practice violated the nondiscrimination requirement in the contracts at issue. (*Id.*, PageID.1409–1410, ¶¶244–260.)

Government action is not neutral when its object "is to infringe upon or restrict practices because of their religious motivation," *Lukumi*, 508 U.S. at 533, or when officials act with hostility toward religion, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617, 634–37 (2018). But the neutrality requirement does not prevent the State from applying a neutral rule to religiously motivated conduct. *Smith*, 494 U.S. at 879; *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). Defendants do not enforce the ELCRA, which is the role of the Civil

Rights Commission and the courts. Mich. Const. 1963, art. 5, § 29; Mich. Comp. Laws §§ 37.2209, 37.2801. Instead, Defendants administer grant agreements that must contain the ELCRA's nondiscrimination language. Concluding that the language reaches a grantee's religiously motivated hiring is not hostility because discriminatory purpose requires action "because of," not merely "in spite of," the burden on religious practice. *Cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1077 (9th Cir. 2015).

The cases finding official hostility involve hostility expressed by the decisionmaker in the course of the decision. In *Masterpiece*, for example, commissioners adjudicating the baker's case disparaged his faith at public hearings. 584 U.S. at 634–36. In *Meriwether v. Hartop*, the provost hearing a professor's grievance responded to an explanation of his religious beliefs "with open laughter," and, even there, the Sixth Circuit held only that hostility was plausibly alleged. 992 F.3d 492, 513 (6th Cir. 2021). The record here is not comparable. No decisionmaker disparaged Christianity or Plaintiffs' beliefs, and the intemperate messages Plaintiffs cite were sent by staff who did not control the outcomes of the grant decisions. (*See* Part III.C.3.)

### 1. Defendants' inquiry into Plaintiffs' hiring practices followed BCSM's own change in policy and focused on contract compliance.

The sequence of events in this case began with a change at Bethany, not the State. In July 2023, Plaintiffs' new CEO ended the exception process under which staff who did not sign the Statement of Faith were hired. (JS-6, 17:3–25; JS-7,

85:6–11.) OGM's concern arose when it learned three things: (1) that BCSM had stopped allowing safe space symbols, (2) that it had stopped granting exceptions to its Statement of Faith policy, and (3) that several staff working on state-funded refugee programs had resigned or been terminated as a result. (See Ex. BB.) Bethany employees then working on BCSM's state-funded programs communicated with Cabanaw about the change, and one provided documents regarding HR complaints. (Ex. X.) Courts have declined to infer hostility from an agency's inquiry into a grantee's hiring practices when the inquiry began with a complaint. *See Youth 71Five*, 160 F.4th at 979 (no animus where agency's review of a Christian ministry's website followed an anonymous complaint about its religious hiring); *cf. Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628 (1986) (commission investigating a religious school's employment decision on a teacher's complaint "violates no constitutional rights").

In response, on December 7, 2023, Cabanaw asked BCSM to meet "to discuss these changes and ensure any hiring practices align with our contract requirements." (ECF No. 1-11, PageID.212.) The next day, under the subject line "Changes at BCS and Contract Compliance," he wrote LEO's finance director that he believed BCSM was in violation of the contract clause "but will find out and research more." (ECF No. 25-2, PageID.585.) After a December 14 meeting, OGM sent a letter prepared with LEO's Office of Internal Controls. (Ex. AA; ECF No. 1-13, PageID.222–223.) The letter cited the nondiscrimination language and the federal cultural-compatibility requirement, and it relayed staff reports that

managers had been told not to interview or hire Muslim applicants or those uncomfortable with the Statement of Faith. (*Id.*) It asked for an assurance of compliance and "a plan for a hiring exceptions process," a plan to address concerns from staff, partners, and clients, and a plan to replace three departed program directors because OGM was "concerned about the integrity of the programming and the consistency of service delivery."[4] (*Id.*)

Notably, the letter did not demand that BCSM abandon its Statement of Faith. It instead asked BCSM to show how it would staff state-funded programs consistent with the agreement it had signed. (*Id.*) The letter identified the exceptions process BCSM had used for years, under which applicants who did not sign the Statement of Faith could still be hired, as one way to make that showing, not as an exemption from the nondiscrimination requirement. (*Id.*) BCSM itself represented that the exceptions process remained available. In BCSM's January 2024 response, it told OGM that its CEO "continues to retain the discretion, within the hiring process, to consider and approve exceptions to the Statement of Faith for the benefit of a specific program." (Compl. Ex. N, ECF No. 1-14, PageID.225–234.)

That inquiry is what the Free Exercise Clause permits. In *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, the Supreme Court explained that a state civil rights commission "violates no constitutional rights by merely

---

[4] OGM was not alone in its concerns. Universities, Kent County, Lutheran Immigration and Refugee Services, Church World Service, donors, and other partners raised the same questions. (JS-9, 257:1–258:6.)

investigating" a religious school's employment decision, "if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge." 477 U.S. at 628. OGM's position is stronger. It did not investigate BCSM or charge it with violating the ELCRA. As a party to grant agreements containing the nondiscrimination language, it asked its grantee to explain a change in its hiring practice and to confirm that it would comply with a term it had signed.

BCSM's full response in January 2024 took the position that the ELCRA could not constitutionally be applied to its hiring policy. (ECF No. 71, ¶¶113–118; ECF No. 1-14.) Cabanaw forwarded that response to LEO's Internal Controls Division and finance directors the next business day. (JS-4, 148:4–6.) In doing so, he wrote that he was "not looking into a legal dispute regarding [the ELCRA]," and then three days later, he told colleagues that OGM was "proceeding with existing contracts pending continued review." (*Id.*, 148:11–13, 8–11.) OGM never issued a corrective action plan regarding the issue, (*id.*, 213:17–20), and never terminated a BCSM agreement for cause.

This sequence is the reverse of the one in *Buck v. Gordon*. There, the State's new position conflicted with a statute protecting faith-based agencies and with existing contracts and practice, and it followed campaign statements by the official who directed it. 429 F. Supp. 3d 447, 462–63 (W.D. Mich. 2019). Here, Defendants' position never changed. The legislature has required the language in every state contract since 1977, and BCSM signed it in every agreement. The change came from Plaintiffs, and OGM's inquiry followed that change by four months. Enforcing

a longstanding, unchanged contract term after a contractor changes its own practice is not a departure from neutrality.

OGM's inquiry also reflected a concern about service delivery. (Ex. M; JS-10, 75:3–8, 83:10–15.) Its December 18 letter asked BCSM for a plan to replace three departed program directors because OGM was "concerned about the integrity of the programming and the consistency of service delivery moving forward." (ECF No. 1-13, PageID.222–223.) At a December 2023 meeting, OGM asked Bethany whether the policy changes were affecting morale and might cause more staff to leave. (JS-9, 92:2–9, 99:9–18.) Gorski testified that her concern was whether BCSM could hire "fully qualified and credentialed" staff "to provide the best services possible," and that OGM continued "to monitor compliance and service delivery." (JS-5, 99:23–100:1, 181:8–11.) Plaintiffs' Chief Communications Officer, Annie Osburn, likewise understood that the conversations with OGM concerned Bethany's "competence in delivering exceptional services in accordance with the contracts." (JS-8, 62:14–19.)

Plaintiffs' own records show why. Between December 2023 and September 2024, Plaintiffs recorded dozens of departures from their Michigan refugee and immigrant programs. (Ex. M–N.) At least 16 were coded "misalignment of values," including the Grand Rapids branch director, the refugee and immigrant services program director, and program directors and managers in Grand Rapids and Kalamazoo. (*See id.*) Plaintiffs' designee agreed that employees quit because of the policy changes. (JS-2, 61:4–18, 63:13–20.) Bethany's regional vice president testified that the turnover was concentrated in refugee services leadership, i.e., the

staff who held the program's institutional knowledge and were "in charge of making sure that the plans run well." (JS-9, 138:1–139:9.)

#### 2. The RFPs Plaintiffs challenge applied the same rules to every bidder.

Plaintiffs contend that OGM re-bid the RSS contracts and added the hiring-plan criterion to push BCSM out. Discovery shows otherwise. OGM ended every such agreement statewide to fix the administrative problems the 2023 split had created. (JS-14, 43:12–44:21.) Plaintiffs' designees agreed that the decision "wasn't targeted" at Plaintiffs but applied to "everyone across the board." (JS-2, 93:25–94:10.) And as explained in Part III.B.2, the hiring-plan criterion originated with ORR, applied to every bidder, and could be satisfied through subcontracted staff.

Furthermore, the first URM solicitation responded to ORR's request for more capacity and to Gorski's sole-sourcing concern. (ECF No. 18-2, PageID.430–431; JS-14, 71:19–72:14; JS-5, 90:20–91:19.) Cabanaw's June 5, 2024 update to OGM leadership also listed "challenges we are experiencing with Bethany Christian Services's hiring practices" among the reasons for it. (JS-4, 178:9–15.) But the RFP did not exclude BCSM or penalize its hiring. BCSM bid, OGM awarded it seven URM agreements, and OGM removed the hiring term from those agreements before they were signed. (ECF No. 18-7, PageID.485–489; ECF No. 71, PageID.1418.) An RFP that broadened the pool of providers while awarding BCSM every agreement does not show an object of suppressing BCSM's religious exercise.

Once the RFPs opened, the outcomes also turned on how each proposal scored. BCSM's own RSS proposals show this most clearly. BCSM–Kalamazoo and BCSM–Grand Rapids came from the same organization under the same Statement of Faith and received identical scores on the hiring and training items, yet the first scored 93 and the second 76. (RSS25-0001 Score Sheet, ECF No. 18-10, PageID.501–502, 504.) The difference was found elsewhere. BCSM–Grand Rapids relied on statewide figures, did not identify the populations it would serve or how many clients, and left one item unanswered. (Prop. 6 Score Sheet, ECF No. 18-10, PageID.504.) It lost points on need, barriers, funding sources, program design, and budget for those reasons. (*Id.*)

The scores also defeat causation. A plaintiff challenging an individual decision must show both that the decision was made "because of" its religious exercise, *Feeney*, 442 U.S. at 279, and that the challenged policy actually burdened that exercise, *Kennedy*, 597 U.S. at 525. Outside Kalamazoo, the hiring-plan criterion did not cost BCSM any award. Its remote RSS proposal scored 74.5. (ECF No. 18-9, PageID.496–497.) Full credit on the hiring-related question would have raised it only to 76.5, below the 80-point eligibility threshold. (JS-5, 56:13–18, 201:1–18.) Full credit on the program implementation question as well would have left it at 78.5. BCSM–GR would have scored 81 with full credit on both items, well below Samaritas-West's 93.5 for the same region. (ECF No. 18-10, PageID.501, 504; Ex. Q.) And no agency received the Traverse City health promotion award because arrivals in that region no longer supported the program. (JS-5, 223:18–23.)

That leaves Kalamazoo, the only region in which the hiring-plan item could have changed the outcome. BCSM–Kalamazoo tied Samaritas-Southwest at 93, (ECF No. 18-10, PageID.501–503), and when eligible proposals score that closely, OGM compares their value to the State. (JS-5, 59:9–17.) In that regard, Samaritas-Southwest proposed both programs that the RFP sought, while BCSM–Kalamazoo proposed only the employment program. (ECF No. 18-10, PageID.501.)[5] Samaritas-Southwest also proposed to serve 500 clients for $740,000 (approximately $1,480 per client) (ECF No. 18-11, PageID.513–514); BCSM–Kalamazoo proposed to serve 50 to 70 clients for $725,000 (between $10,350 and $14,500 per client). And although the RFP called for services to begin on October 1, 2024, BCSM–Kalamazoo's timeline did not begin some services until December 2024 and others until March 2025. (ECF No. 18-11, PageID.511; ECF No. 18-10, PageID.502 ) The final award decision rested with OGM leadership (JS-3, 10:16–18, 22:10–15), but the tie-break turned on scope, cost, and timing documented in the proposals themselves. The score sheet reflected these reviewer concerns, noting that BCSM-Kalamazoo's "[b]udget is high for proposed number of clients" and that it was "[u]nclear why [the] bidder would not start Oct. 1." (ECF No. 18-10, PageID.502.) Plaintiffs' own witnesses agree that awarding a grant to a bidder offering more services for less money is legitimate, and BCSM admits that price may be considered. (JS-10, 261:29–25; Ex. E, RTA 30.)

[5] For example, the score sheet summary lists "RES" for BCSM and "RES & RPRS" for Samaritas. (*Id.*)

### 3. No decisionmaker expressed hostility toward Plaintiffs' faith.

Plaintiffs' evidence of hostility consists of statements by two groups: officials who objected to BCSM's hiring practice, and former Bethany employees who later joined OGM. Neither shows that any decisionmaker acted because of BCSM's religion.

The officials' statements addressed whether BCSM's hiring practice complied with the nondiscrimination language. Cabanaw's December 11, 2023 email to federal officials said he believed BCSM was "in direct violation of our nondiscrimination clauses." (ECF No. 25-4, PageID.591–592.) Hernandez's reported remark that the hiring practice was "inconsistent with our state values" addressed the same point. (ECF No. 71, PageID.1389, ¶98.) None of these communications disparaged Christianity, the Apostles' Creed, or BCSM's religious beliefs. In fact, a Bethany leader who attended the meeting could not say whether Hernandez's statement concerned hiring at all or Bethany's separate advocacy policy, but she testified that neither official ever expressed a problem with Bethany's beliefs. (JS-9, 97:21–98:22.) And Hernandez testified that her direction at the time was to "[p]rotect the relationship" with BCSM. (JS-13, 83:6–14.)

Disapproval of a hiring practice is not hostility toward the faith of those who engage in it. The First Circuit recently rejected an argument premised on officials' public criticism of religious schools' discriminatory practices. *St. Dominic*, 181 F.4th at 42–44. It explained that the argument confused animus toward a practice with animus toward the religious group that engages in it. *Id.* It also explained

that officials need not "avoid criticizing any practice in which any religious group engages" to escape a charge of religious hostility. *Id.* The same is true here. Cabanaw and Hernandez objected to a hiring practice they understood the contract language to prohibit. They did not object to the faith that motivated it. Even Plaintiffs' own branch leader described the officials' disagreement as one with Plaintiffs' "practices, not its faith." (JS-9, 204:17–25.)

Plaintiffs also rely on a voice message in which Hedy Abdou, a Bethany employee assigned to BCSM's programs, told Simone Halilovic that Cabanaw had said the RFP requirements would be strict enough that BCSM would not be awarded the contracts. Halilovic then repeated that account to another BCSM employee. (JS-15, Cabanaw Dep. II 106:11–13.) Cabanaw denies saying it. (*Id.*, 106:20–107:4; 108:11–15.) The account is hearsay within hearsay, Fed. R. Evid. 805; Fed. R. Civ. P. 56(c)(2); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009), and, more importantly, the record contradicts it. The RFPs contained no eligibility criterion that excluded BCSM. BCSM bid on every solicitation, tied for the highest score in Kalamazoo, and received seven FY2025 URM agreements in the same cycle. (JS-5, 156:1–7, 210:12–15; ECF No. 71, ¶218.)

Plaintiffs further rely on text messages from Halilovic and Dilli Gautam. Both left BCSM after disagreeing with the decision to end exceptions to the Statement of Faith, and OGM later hired them. (JS-11, 102:7–24, 117:4–8; JS-12, 44–47.) Some of the messages they sent after joining OGM were intemperate, and Halilovic acknowledged that she held personal concerns about BCSM's practice.

(JS-11, 167:14–23.) But neither employee made the award decisions Plaintiffs challenge and neither scored BCSM's Grand Rapids proposal. (JS-12, 75:24–76:1; JS-14, 22:17–24, 54:10–12.) And the terms Plaintiffs challenge came from the ELCRA and ORR's Policy Letter 24-02, not from Halilovic. (Mich. Comp. Laws § 37.2209; ECF No. 18-5, PageID.470–474; JS-14, 49:17–50:5.) She also did not score any BCSM bid, and although she was present when the scoring team discussed BCSM's proposals, she did not take part. (*Id.*, 122:8–19, 124:18, 126:13–18; JS-14, 22:22–23:7, 54:10–14.) Gautam scored the Kalamazoo bid, and his contemporaneous texts show that he disagreed with the hiring position BCSM described in its bid attachment. (JS-12, 66:22–72:25.) But the scoring team gave that bid a score that tied for the highest in the region, and it lost on the tie-break factors discussed in Part III.C.2. (JS-5, 210:11–15.) Gautam has not scored a BCSM proposal since September 2024. (JS-12, 50:7–51:24, 76:8–20.)

Halilovic also attended the meeting at which OGM leadership reviewed the final scores. (JS-11, 123:2–5, 126:22–127:7.) Her role there was to answer questions about what each bid proposed. (*Id.*, 127:22–128:6.) The answers came from the bids themselves, and the reasons for the Kalamazoo tie-break are documented in the proposals (*see* Part III.C.2), and thus, any personal views Halilovic had did not play a part. Nor did she try to steer the result. Gorski testified that Halilovic, who was new to the process, asked her how to resolve the tie and was not "pushing for either way." (JS-5, 214:7–13.)

Nor do Halilovic's personal notes show that the outcome was predetermined. Her early notes stated that "BCS should be disqualified" for not adhering to the nondiscrimination requirements. (JS-11, 133:3–7.) She wrote them at first glance, before scoring, after BCSM attached to its bid a proposal to rewrite the statutory nondiscrimination language. (*Id.*, 131:13–19, 133:20–134:11.) OGM has no authority to waive that covenant. Mich. Comp. Laws § 37.2209. And BCSM was not disqualified. When reviewers asked whether to consider BCSM's attachment, Halilovic told them not to. (Ex. FF, ¶¶77–78.) Reviewers had not considered the attachments in their bid grading so no scores were changed, and BCSM-Kalamazoo's bid tied for the highest score in the region. (JS-5, 211:1–2; Ex. FF, ¶79.) The awards followed those scores, not her notes.

LEO's review of BCSM's bid protest reached the same conclusion. It found that three reviewers who had disclosed an appearance of a conflict took part in the group review, and it deemed that inappropriate. But it concluded that those conditions "did not play a material role in the outcome of the selection process," and every reviewer stated that no one had instructed or coerced them to score any bidder favorably or unfavorably. (JS-18, 147:4–12.)

#### 4. Defendants' later conduct confirms the absence of hostility.

Defendants' later conduct points the same way. LEO never terminated a BCSM agreement for cause, and the February 2024 monitoring visit Cabanaw attended required no corrective action and called BCSM "an exceptional refugee service provider." (JS-7, 283:9–11.) BCSM's COO conceded that an official intent on harming the organization would have weaponized that audit. (*Id.*, 283:17–21.) Cabanaw also wrote the letter BCSM needed to apply as a direct federal resettlement provider, though nothing required him to, and Plaintiffs' witnesses agreed that without it BCSM could not have applied. (ECF No. 1-5, PageID.194; JS-17, Mohsin Dep. 73:19–21, 74:2–5; JS-2, 89:21–23, 114:16–20, 115:17–20.) And OGM has increased BCSM's URM funding every year. (JSF ¶¶14–16.)

### D. Defendants have not excluded BCSM from any public benefit because of religion (Count III).

Count III relies on cases holding that the government may not exclude otherwise eligible recipients from a public benefit because of their religious status or exercise. (ECF No. 71, PageID.1413–1414, ¶¶285–292.) Each involved a rule that singled out religion. Missouri, for example, denied playground grants to churches. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 454–55, 462 (2017). Montana barred religious schools from a scholarship program. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 474–75 (2020). And Maine withheld tuition assistance from schools that provided religious instruction. *Carson v. Makin*, 596 U.S. 767, 773–75, 789 (2022).

The nondiscrimination language in the grant agreements is not comparable. It does not disqualify religious organizations, religious hiring, or any religious use of funds. Rather, it imposes the same condition on every grantee. When a contract condition applies to every contractor, the Supreme Court has analyzed it under the neutrality and general applicability framework, *see Fulton*, 593 U.S. at 533–41, which the nondiscrimination language satisfies (*see* Part III.B). And, as shown in Part III.A, the First Amendment does not entitle BCSM to make religion-based hiring decisions for non-ministerial positions free from such a condition.

Count III also fails on the facts because BCSM has not been excluded from anything. The *Trinity Lutheran* line remedies disqualification from competing, the "refusal to allow the Church . . . to compete with secular organizations for a grant." 582 U.S. at 463. BCSM has bid on every RFP at issue on the same terms as every other bidder. OGM supported its application to become a direct resettlement provider, and BCSM remains the State's largest URM provider. (JS-7, 265:3–6, 271–73; JS-5, 229–30; JS-14, 72–73.) The awards it did not receive turned on criteria applied to all bidders. (*See* Part III.C.2.) Although *Carson* and *Trinity Lutheran* forbid excluding an organization from competition because it is religious, they do not guarantee success in a competition it was free to enter.

### E. Even if strict scrutiny applied, Defendants would satisfy it.

If the Court concluded that the nondiscrimination language or its application was not neutral or generally applicable, Plaintiffs' claims would still fail. The question is whether the State has a compelling interest "in denying an exception to"

the particular claimant. *Fulton*, 593 U.S. at 541. The State's interest in eradicating discrimination is compelling. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984). The positions at issue are funded by public grants to provide public services, and Defendants have a compelling interest in keeping those jobs open to qualified applicants of every faith. Plaintiffs' own designee agreed that people of other religions can provide these social services well, and that under Plaintiffs' policy, a minimally qualified candidate willing to sign the Statement of Faith could be hired over a more qualified candidate who is not Christian. (JS-8, 66:3–13; 79:10–19.)

The State has also done nothing to weaken its interest. Unlike the city in *Fulton*, it has no system of exceptions. The ELCRA requires the language in every state contract, and OGM cannot waive it. 593 U.S. at 542; Mich. Comp. Laws § 37.2209. An exception for BCSM would require the State to fund religion-based hiring that the ELCRA forbids for every other grantee, religious or secular.

Federal law does not diminish the State's interest either. Plaintiffs contend that federal regulations permit faith-based HHS recipients to hire co-religionists (ECF No. 71, ¶118), but those regulations only preserve Title VII exemptions without displacing state law. *See* 45 C.F.R. § 87.3(f). Indeed, Title VII leaves state antidiscrimination laws intact unless they require conduct federal law forbids—which Mich. Comp. Laws § 37.2209 does not. 42 U.S.C. § 2000e-7; *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 282–83 (1987).

The nondiscrimination language is also narrowly tailored. It imposes no obligation beyond the employment provisions that already apply to every Michigan

employer, which this Court has held to be neutral and generally applicable. *Christian Healthcare*, 2026 WL 2542702, at *14–17; *Sacred Heart*, 2026 WL 2546217, at *15–19. At the same time, it respects the ministerial exception, which this Court has held does not reach Plaintiffs' refugee caseworkers. (ECF No. 52, PageID.950–953.) It also leaves BCSM free to meet staffing needs through contractors, as grantees commonly do and as Plaintiffs concede their Statement of Faith permits. (JS-5, 261:23–263:7; *see* Part III.B.2.)

For these reasons, Defendants are entitled to summary judgment on Counts I, II, and III.

## IV. Plaintiffs' expressive association claim fails (Count IV).

In Count IV, Plaintiffs allege that conditioning state grants on compliance with the nondiscrimination language forces BCSM to associate with employees who do not share its religious views in violation of its rights of expressive association and assembly. (ECF No. 71, ¶¶293–301.) This Court has considered the same theory on a summary judgment record in *Christian Healthcare* and *Sacred Heart*. In doing so, it held that the right of expressive association does not extend to a religious employer's hiring decisions. *Christian Healthcare*, 2026 WL 2542702, at *11–12; *Sacred Heart*, 2026 WL 2546217, at *13–14. The same holding should apply here, and this record offers further reasons to reach it.

The Sixth Circuit asks three questions in evaluating an expressive association claim: (1) whether the group associates to express a message; (2) whether the challenged action significantly burdens its ability to do so; and (3)

whether that burden outweighs the government's interests. *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 882 (6th Cir. 2024) (citation omitted).

Count IV fails at the first step because the Supreme Court's expressive association cases concern membership, not employment. *Roberts*, 468 U.S. at 615; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644, 648 (2000). As this Court observed, the Boy Scouts acknowledged in *Dale* that they would have to obey a law prohibiting employment discrimination, and no authority extends the doctrine to employment. *Christian Healthcare*, 2026 WL 2542702, at *11–12 (citing *Dale*, 530 U.S. at 672 (Stevens, J., dissenting)). The ELCRA regulates whom a grantee may refuse to hire, not who may belong to any religious association. Plaintiffs' assembly theory fails for the same reason. *Id.*

Plaintiffs also fail at step two because, for years, they worked alongside employees, contractors, and interns who did not share their beliefs, and their prior CEOs approved exceptions as recently as May 2023. (*See* Part III.B.2.)

At step three, the balance favors Defendants. *Roberts* upheld a public-accommodations law over an expressive association objection because of the State's compelling interest in eradicating discrimination. 468 U.S. at 623–29. The ELCRA's nondiscrimination language advances that interest directly by governing how public money is spent on public programs. Defendants are entitled to summary judgment on Count IV.

## V. Plaintiffs cannot establish their retaliation claim (Count VI).

Count VI alleges that Defendants retaliated against Plaintiffs for filing this lawsuit by terminating BCSM's DME agreement, withholding follow-on agreements for the contracts covered by the stipulated injunction, bidding a transportation agreement early, denying BCSM's FY2026 transportation and mentoring bids, and docking BCSM points on the hiring-plan criteria. (ECF No. 71, PageID.1406–1407, 1416–1417, ¶¶225–235, 310–318.) None of these actions can be redressed by the relief available here, and none was caused by the lawsuit.

### A. The relief available in this case cannot redress the alleged actions Plaintiffs challenge.

Because Plaintiffs sue state officials in their official capacities, they may obtain only prospective relief. (Part II.A.) That limitation is fatal here because every action Count VI challenges is complete. An injunction "cannot be used to redress a purely past injury," *Yellen*, 54 F.4th at 339 (citation omitted), and the Eleventh Amendment bars a declaration that Defendants retaliated in the past, *Green*, 474 U.S. at 73. With no evidence of a threat of future retaliation (Part II.B.3), Count VI fails at the threshold.

### B. Plaintiffs cannot show that the lawsuit caused any decision they challenge.

The claim fails on the merits as well. To prevail, Plaintiffs must show three things: (1) protected conduct, (2) an adverse action that would deter a person of ordinary firmness, and (3) that the adverse action was motivated at least in part by

the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The protected conduct must be "a 'but-for' cause" of the action, *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (citation omitted), and a defendant prevails if it would have taken the same action anyway, *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287 (1977). Defendants do not dispute that filing this lawsuit is protected conduct, but Plaintiffs cannot satisfy causation.

The contract decisions Plaintiffs challenge followed from funding and program changes that applied to every provider. OGM awarded BCSM seven URM agreements on July 31, 2024, before this suit was filed, and contrary to Plaintiffs' allegation (ECF No. 71, PageID.1407, ¶234), it renewed all seven for FY2026 and is renewing them for FY2027. (ECF No. 81-2, PageID.1614, ¶148.) The other agreements under the injunction ended with their programs. OGM ended RES and RPRS services for every grantee in 2024 (Part II.B.1), and the two Ukrainian agreements were funded by temporary federal appropriations that were never intended to be re-bid. (ECF No. 81-2, PageID.1617–1618, 1622–1623, ¶¶179–185, 234–241.) The DME agreement ended because OGM may fund those examinations only within 90 days of a refugee's arrival, and after the federal government suspended resettlement in early 2025, arrivals in BCSM's counties stopped. OGM ended the DME agreements in those counties and gave the work to no one else. (*Id.*, PageID.1623, ¶¶242–246.)

The early re-bid allegation rests on a typographical error. The transportation pilot was a two-year program ending September 30, 2025. The FY2024 agreement

mistakenly listed a third year, and OGM corrected the date in the FY2025 agreement it offered BCSM before this suit was filed. (*Id.*, PageID.1622, ¶¶229–233.)

The FY2026 awards turned on neutral scores and funding limits. BCSM-GR received full points in the FY26 RYM process on the question at issue. Full points is not retaliation.

Every transportation bidder needed 80 points, and BCSM-GR's proposal scored 76 because it described refugee populations statewide rather than in the counties it proposed to serve and did not identify the characteristics of its target populations. (ECF No. 81-3, PageID.1698, ¶13; Ex. U, p. 1; Ex. CC, ¶¶34–37; Ex. GG, ¶¶12, 27–28, 31.) Scores fell for many bidders during the review team's discussion, including three other proposals that one reviewer had initially scored at 100. (Ex. GG, ¶¶33–35.) Two of the three reviewers did not know of this lawsuit or BCSM's Statement of Faith, and no one mentioned either during scoring. (Ex. CC, ¶¶34–37; Ex. GG, ¶¶36, 40–42.) BCSM's Traverse City proposal scored 94.83, but OGM had never funded transportation services there and awarded no agreement in that region to anyone. (ECF No. 81-2, PageID.1625, ¶¶258–260.) BCSM's mentoring proposal qualified, but with limited funds OGM funded only the three highest scoring proposals, including the Refugee Education Center, which scored higher (84.75 to 81.75) and requested $50,000 less. (*Id.*, PageID.1625–1626, ¶¶263–269; Ex. T, p 1; Ex. HH ¶¶53–54, 68.) Cabanaw also had no role in scoring. He and Gorski joined the review only after the teams had scored and ranked the proposals,

the reviewers unanimously recommended the three highest-scoring proposals, and no one mentioned any bidder's statement of faith or religious affiliation. (Ex. HH, ¶¶65–70.)

The hiring-plan criterion made no difference. (ECF No. 71, PageID.1407, ¶233.) BCSM-GR's and Traverse City transportation proposals received 1.66 and 1.83 of 2 points on that item, and its mentoring proposal received full credit from both reviewers, who never discussed BCSM's hiring. (Ex. DD, ¶¶70-71; Ex. HH, ¶¶16, 51–52.) Two transportation reviewers gave both proposals full credit. (Ex. CC, ¶19; Ex. GG, ¶29.) The third gave 1 point to BCSM-GR and 1.5 point to BCSM-TC, even though neither proposal addressed the cultures or religions of its target populations, and the small difference between them reflected whether each had described the populations in its service area. (Ex. CC, ¶¶27–29; Ex. EE, ¶¶41-45.) Even full credit for the entire section containing the item would have left the Grand Rapids proposal at 77, below the threshold. (ECF No. 67-9, PageID.1350–1351.)

Timing does not help Plaintiffs. The DME agreement ended eight months after Plaintiffs sued, and the FY2026 reviews took place nearly a year after. Over that span, a plaintiff "must couple temporal proximity with other evidence of retaliatory conduct." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Plaintiffs have none. The statements they rely on predate the lawsuit. And because each decision followed from funding limits and scoring rules applied to every provider, each would have been the same without the suit. *Mt. Healthy*, 429 U.S. at 287.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendants ask this Court to grant summary judgment in their favor on all claims under Fed. R. Civ. P. 56(a) and to dismiss this case with prejudice.

Respectfully submitted,

/s/ *Kyla L. Barranco*
Kyla L. Barranco
Assistant Solicitor General
Attorney for Defendants
State Operations Division
P.O. Box 30754
Lansing, MI 48909
517.335.7573
barrancok@michigan.gov
P81082

Dated: October 9, 2026

## CERTIFICATE OF SERVICE

I certify that on October 9, 2026, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record, and I certify that my secretary has mailed by U.S. Postal Service the papers to any non-ECF participant.

/s/ *Kyla L. Barranco*
Kyla L. Barranco
Assistant Solicitor General
Attorney for Defendants