UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BETHANY CHRISTIAN SERVICES; BETHANY CHRISTIAN SERVICES OF MICHIGAN; and BETHANY CHRISTIAN SERVICES USA, LLC,

Plaintiffs,

v.

SUSAN CORBIN, in her official capacity as director of the MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC OPPORTUNITY; POPPY SIAS HERNANDEZ, in her official capacity as Executive Director of the OFFICE OF GLOBAL MICHIGAN; and EVA ALEXANDER in her official capacity as Acting Deputy Director of the OFFICE OF GLOBAL MICHIGAN,

Defendants.

Case No. 1:24-cv-0922-JMB-PJG

Hon. Jane M. Beckering

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Oral Argument Requested**

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

Bethany sincerely believes that it must hire other Christians to fulfill its religious mission. .......... 3

Bethany partners with Defendants and their agencies for years without issue. .......... 5

Defendants are "disgusted" by Bethany's Statement of Faith and religious hiring. .......... 6

Cabanaw tells third parties that OGM will terminate its relationship with Bethany because of Bethany's Statement of Faith. .......... 8

Defendants cancel and re-bid Bethany's programs, including those that were not set to expire. .......... 10

Defendants stack the bid-review panels with individuals opposed to Bethany's Statement of Faith. .......... 11

Defendants systematically deny Bethany's bids for programs where convenient replacements are available. .......... 14

Bethany sues to protect its civil rights. .......... 18

Defendants again deny Bethany's bids for RSS funding. .......... 19

Defendants' internal auditor candidly admits what Defendants and their employees cannot seem to remember. .......... 20

LEGAL STANDARD .......... 21

ARGUMENT .......... 22

I. Summary judgment is warranted on Count I because there is no genuine dispute that Defendants targeted Bethany because of its religious hiring practices. .......... 23

A. The background and events leading up to Defendants' decision to move funding away from Bethany all point to religious targeting. .......... 26

Page


B. Defendants' contemporaneous statements demonstrate an impermissible "negative normative evaluation" of Bethany's religious hiring practice and targeting. ....29

C. The falsity of Defendants' explanations provide additional evidence of unlawful targeting....31

II. Count II—there is no genuine dispute that Defendants' actions and policies are neither neutral nor generally applicable. ....33

III. Count III—there is no genuine dispute that Defendants excluded Bethany from otherwise available government benefits because of Bethany's religious hiring practices. ....37

IV. Count IV—there is no genuine dispute that Defendants' policies violate Bethany's expressive-association rights. ....38

V. There is no genuine dispute that Defendants cannot satisfy strict scrutiny. ....41

A. Defendants have no compelling interest. ....43

B. Defendants' actions are not the least restrictive means of advancing their supposed interests....46

CONCLUSION.... 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................43

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000)....................23, 39, 41, 44

*Buck v. Gordon*,
429 F. Supp. 3d 447 (W.D. Mich. 2019)....................26, 29, 30, 32

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................42, 47

*Cantwell v. Connecticut*,
310 U.S. 296 (1940)....................23

*Carson v. Makin*,
596 U.S. 767 (2022)....................23, 24, 37

*Catholic Charities Bureau, Inc. v. Wisconsin Laboratory & Industrial Review Commission*,
605 U.S. 238 (2025)....................45

*Christian Legal Society v. Walker*,
453 F.3d 853 (7th Cir. 2006)....................39

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993).................... *passim*

*City of Boerne v. Flores*,
521 U.S. 507 (1997)....................41

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987)....................43

*Cottonwood Christian Center v. Cypress Redevelopment Agency*,
218 F. Supp. 2d 1203 (C.D. Cal. 2002)....................45

*Dahl v. Board of Trustees of Western Michigan University*,
15 F.4th 728 (6th Cir. 2021)....................24

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020)....................23, 37

Page(s)

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
82 F.4th 664 (9th Cir. 2023) ....................................................................................33

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026)..........................................................................................23, 39, 40

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)........................................................................................... *passim*

*Hartmann v. Stone*,
68 F.3d 973 (6th Cir. 1995) .....................................................................................33

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012)..................................................................................................39

*Hurley v. IrishAmerican Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995)..................................................................................................41

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022)..............................................................................33, 35, 42, 46

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018)........................................................................................... *passim*

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ...............................................................24, 29, 30, 31

*Monclova Christian Academy v. Toledo-Lucas County Health Department*,
984 F.3d 477 (6th Cir. 2020) ....................................................................................35

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)..................................................................................................31

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) .....................................................................................41

*Spivack v. City of Philadelphia*,
109 F.4th 158 (3d Cir. 2024) ....................................................................................33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)..................................................................................................43

*Susan B. Anthony List v. Driehaus*,
814 F.3d 466 (6th Cir. 2016) ....................................................................................42

Page(s)

*Tandon v. Newsom*,
593 U.S. 61 (2021).....35, 42

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017).....1, 23, 37, 38

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000).....42

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012).....24, 32

*Wisconsin v. Yoder*,
406 U.S. 205 (1972).....42

**Statutes**

20 U.S.C. § 1681.....48

42 U.S.C. § 1983.....1

42 U.S.C. § 2000e.....48

**Constitutional Provisions**

U.S. Constitution, Amendment I.....23

**Rules**

Federal Rule of Civil Procedure 56.....21

**Other Authorities**

45 C.F.R. § 87.3.....6, 44, 47

# INTRODUCTION

The First Amendment's Religion Clauses embody a simple constitutional command: government may neither establish religion nor penalize its free exercise. Defendants are government officials who lead Michigan's Department of Labor and Economic Opportunity ("LEO") and the Office of Global Michigan ("OGM"). Because they were "beyond disgusted" at Plaintiffs' ("Bethany") religious practice of hiring co-religionists to advance Bethany's religious mission, they did exactly what the First Amendment prohibits. They moved federal funding for services to refugees away from Bethany because of its religious beliefs. And they did so without a compelling state interest, much less in a narrowly tailored manner. Their violation of Bethany's civil rights is not just contrary to 42 U.S.C. § 1983, it "is odious to our Constitution" and "cannot stand." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

In December 2023, Ben Cabanaw received complaints that Bethany required employees to affirm its Christian Statement of Faith. At the time, Cabanaw was the Deputy Director of OGM, the agency charged with overseeing refugee funding in Michigan. When Cabanaw reported what he had learned to OGM's Director, Poppy Hernandez, he told her that he was "beyond disgusted." In fact, he was so "disgusted and concerned" that he told his government counterparts in the federal government and in other states about Bethany's religious-hiring policy and avowed that OGM "will not support the current practices."

But OGM could not simply end its relationship with Bethany. Bethany served thousands of refugees in Michigan and received millions in annual funding through OGM. Accordingly, Defendants needed a replacement provider. Church World Service ("CWS") fit the bill.

In early 2024, Cabanaw had at least three conference calls with CWS leaders. During those calls, he told CWS that OGM would end its relationship with Bethany because of

Bethany's Statement of Faith, and he promoted CWS to become a partner agency in Michigan. We know this because CWS took notes.

CWS's notes show that Cabanaw "no longer wanted to partner with" Bethany; and because Cabanaw wanted nothing to do with Bethany's religious conviction, it was his "intention - 100% - to end [OGM's] partnership [with Bethany] by FY25"; and that because of the vacuum created by pushing Bethany out, he "encouraged CWS to . . . consider opening a CWS local office(s)." The CWS notes also say that OGM wanted to avoid the drama that would ensue if it terminated Bethany's contracts for cause. To provide cover for itself, OGM would rebid Bethany's contracts later in 2024 via "new Requests for Proposals" that "work[ed] in more clear DEI language for all partners, including some specifics around hiring practices" in line with "program expectations" regarding "hiring individuals that we represent." Cabanaw specifically flagged for CWS that he planned to target Bethany's refugee social services programs ("RSS") in 2024 and that he anticipated those programs would "be awarded to another provider," thus stripping Bethany of funding.

That is exactly what happened. Three months after Cabanaw told CWS that OGM would rebid Bethany's contracts, OGM did so, even for Bethany's RSS programs that were in the middle of three-year terms and were not set to expire until 2025. Three months after Cabanaw told CWS that OGM would be working in specific language regarding "hiring practices," OGM issued new language requiring providers to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served." Five months after Cabanaw told CWS that he anticipated that Bethany's RSS contracts would be "awarded to another provider," OGM moved Bethany's RSS programs in West Michigan to Samaritas and its new subcontractor, CWS.

From that point on, OGM continued to fund Bethany only where it lacked a convenient alternative, such as in the case of unaccompanied-refugee-minor services. Tellingly, those are the *only* Bethany programs that OGM funds now. Today, Bethany holds none of the seven grants for the RSS, health, and mentoring programs it provided in 2024.

On this record, no reasonable jury could conclude anything other than that Defendants moved funding away from Bethany because of Bethany's Statement of Faith. Under binding caselaw, this triggers strict scrutiny on Counts I through IV. Because Defendants' actions cannot withstand strict scrutiny, summary judgment on those counts is required.

## BACKGROUND

### Bethany sincerely believes that it must hire other Christians to fulfill its religious mission.

Bethany is one of the nation's largest Christian social-services organizations. (Shirley Decl. ¶¶4, 8-13, ECF No. 67-1, PageID.1237-1238; Mohsin Decl. ¶¶8-16, ECF No.67-2, PageID.1257-1258.) Its mission is to demonstrate the love and compassion of Jesus Christ by protecting children, empowering youth, and strengthening families. (JS-1, Cureton Tr. 10:15-21, 22:19-23:15.) Bethany sincerely believes its employees must be Christians to authentically demonstrate Jesus Christ's love and compassion to others. (Shirley Decl. ¶5, ECF No.67-1, PageID.1237; JS-1, Pls.' 30(b)(6) (Osburn) Tr. 72:14-73:8.) Accordingly, Bethany has maintained a Statement of Faith for decades and requires every employee to affirm their personal agreement with it. (Shirley Decl. ¶6, ECF No.67-1, PageID.1237; JS-1, Pls.' 30(b)(6) (Nolan) Tr. 42:13-20.) The current Statement of Faith is the Apostles' Creed—one of the oldest and most widely recognized summations of Christian belief, applicable to virtually all denominations. (JS-1, Pls.' 30(b)(6) (Osburn) Tr. 73:14-75:21; Statement of Faith, ECF No.1-7, PageID.198;

Corrected Joint Statement at ¶ 3, ECF No. 237, PageID.3860.) As COO Lorita Shirley explained, the Statement of Faith "identifie[s] Bethany as a Christian organization," and Bethany has "always had a practice of hiring individuals who believe in what we believe in" so that Bethany can "recruit Christian employees who can carry out our mission . . . with fidelity." (JS-1, Shirley Tr. 124:3-11, 187:8-188:1.)

While the Statement of Faith has been modified throughout the years, Bethany's practice of requiring its employees to sign it never has, with rare exemptions from Bethany's CEO for specific situations. (JS-1, Pls.' 30(b)(6) (Nolan) Tr. 42:17-23; JS-1, Shirley Tr. 138:10-14; JS-1, Pls.' 30(b)(6) (Osburn) Tr. 57:22-59:7, 67:11-16.) The hiring requirement is publicly available on Bethany's website and was well known to Bethany's government-contracting partners. (JS-1, Shirley Tr. 194:1-194:15.)

However, unbeknownst to Bethany's executive leadership, hiring managers at Bethany's 36th Street office in Grand Rapids had been granting unauthorized exceptions in violation of Bethany's policy by treating the employee's signature as an "empty formality." (*Id.* at 91:23-92:6; JS-1, Pls.' 30(b)(6) (Osburn) Tr. 67:7-16.) When this came to light in mid-2023, Bethany assured existing employees that they would not be terminated, even if they had been told (erroneously) that they did not need to personally believe in the Statement of Faith. (JS-1, Pls.' 30(b)(6) (Osburn) Tr. 67:2-16.) Around the same time, however, Bethany reaffirmed its hiring policy regarding the Statement of Faith going forward. (JS-1, Shirley Tr. 91:1-92:6, 143:21-144:7.) Specifically, when CEO Keith Cureton took office on July 10, 2023, he determined that he no longer planned to grant exceptions prospectively, in part due to the violations that had occurred at the 36th Steet office. (JS-1, Cureton Dep. 100:22-101:8; Ex. A, Pls.' Supp. Resp. to Am. ROGs and RTPs 6.)

### Bethany partners with Defendants and their agencies for years without issue.

Bethany has operated unaccompanied-refugee-minor ("URM") programs for decades. And it has partnered with OGM, LEO, and their predecessors to provide refugee services in Michigan since approximately 2003. (Mohsin Decl. ¶15, ECF No.67-2, PageID.1258; JS-1, Shirley Tr. 115:6-7.) As of January 2024, Bethany held 18 refugee services grant agreements with OGM. (Gorski Decl. ¶6, ECF No.18-1, PageID.423-424; JS-1, Gorski Tr. 94:10-19.)

These contracts fall into three categories: (1) Reception and Placement ("R&P") services, funded by the U.S. Department of State and administered through designated voluntary agencies, over which OGM exercises consultative influence on allocation decisions; (2) Refugee Support Services, funded by the Office of Refugee Resettlement ("ORR") through LEO/OGM, historically awarded through competitive Requests for Proposals ("RFP") with terms of up to three years; and (3) URM contracts, funding residential and foster-care services for unaccompanied refugee children, for which Bethany is one of only two providers in its service areas given the significant licensing requirements and physical infrastructure. (Second Am. Compl. ¶¶24-39, ECF No.71, PageID.1381; Mohsin Decl. ¶¶6-16, ECF No.67-2, PageID.1257-1258; Shirely Decl. ¶11, ECF No.67-1, PageID.1238.)

OGM's grant agreements incorporate boilerplate non-discrimination provisions from Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). (12/18/ 2023 LEO Letter, ECF No.1-13, PageID.222.) Before the events at issue, LEO/OGM had never invoked these provisions against Bethany's longstanding co-religionist hiring practice—maintained throughout decades of contracting with the State. (JS-1, Pls.' 30(b)(6) (Beimers) Tr. 100:2-6; JS-1, Hernandez Tr. 77:18-22.) Indeed, Bethany's performance evaluations were consistently favorable through the end of 2023. (2025 Cabanaw Tr. 104:4-105:4, ECF No.172-6, PageID.2591-2592.) And, notably,

the applicable federal regulations in effect through April 2024 *expressly* recognized faith-based organizations' right to select employees based on acceptance of the organization's religious tenets. *See* 45 C.F.R. § 87.3(f) (eff. through 4/2/2024) (attached as Ex. B).

### Defendants are "disgusted" by Bethany's Statement of Faith and religious hiring.

In late November and early December 2023, several Bethany managers who disagreed with Bethany's religious employment policies began communicating directly with OGM. Dilli Gautam and Beth Caldwell, mid-level managers within Bethany's refugee services program, contacted former Defendant Cabanaw about their concerns with Bethany's hiring practices.[1] (Cabanaw 11/30/2023 Email, ECF No.25-1, PageID.582-583; 2025 Cabanaw Tr. 44:9-17, 45:22-46:5, ECF No.172-6, PageID.2576-2577.) Around this same time, Gautam, Caldwell, and a third manager organized a competing "Interfaith Breakfast" deliberately scheduled to conflict with Bethany's annual Christmas Breakfast. (JS-1, Shirley Tr. 210:11-212:20; JS-1, Schab Tr. 65:2-66:4.) When Bethany addressed this insubordination, Gautam and Caldwell quit on December 7, 2023. (JS-1, Shirley Tr. 161:23-162:8, 213:1-20.)

Cabanaw immediately made his disdain for Bethany's religious exercise known. When Cabanaw reported what he had learned to OGM's Director, Poppy Hernandez, he told her that he was "beyond disgusted and concerned." (*See* Ex. C, Cabanaw 12/11/2023 Email to Hernandez.) He emailed approximately 20 OGM employees to inform them that the departures of Gautam and Caldwell were "directly related to some of the concerns we discussed with their new hiring

[1] Former Defendant Cabanaw resigned his position as the Deputy Director of OGM in July of 2026. (Notice of Substitution, ECF No.229, PageID.3828.) Eva Alexander is the new acting Deputy Director. (*Id.*)

and employment practices." (Cabanaw 12/07/2023 Email, ECF No.25-3, PageID.588; JS-1, Hernandez Tr. 37:9-38:8.)

As OGM's deputy director, Cabanaw translated his disgust into OGM policy. (12/08/2023 Cabanaw Email, ECF No.25-2, PageID.585; JS-1, Hernandez Tr. 51:5-10.) Between December 11 and 15, 2023, he escalated the matter to six federal officials at ORR, stating that OGM "will not support the current practices" at Bethany. (12/11/2023 Cabanaw Email, ECF No.25-4, PageID.591-592; JS-1, Hernandez Tr. 49:1-51:14; 2026 Cabanaw Tr. 43:23-45:16, ECF No.200-1, PageID.3020.) To further punish Bethany for its religious practices, Cabanaw also forwarded these communications to state refugee coordinators in Colorado, Pennsylvania, Wisconsin, and Washington—states with no involvement in Michigan's contracts. (12/13/2023 Cabanaw Email, ECF No.25-5, PageID.594-595; 12/19/2023 Cabanaw Email, ECF No.25-15, PageID.643; 2025 Cabanaw Tr. 113:21-117:5, ECF No.172-6, PageID.2594-2595.)

On December 14, 2023, Cabanaw and Hernandez finally met with Bethany's leadership. Hernandez announced that Bethany's practices were "inconsistent with the state's values." (Answer ¶98, ECF No.80, PageID.1470.) After the call, Cabanaw and Hernandez sent Bethany a letter invoking Defendant Corbin's authority, in which they demanded three categories of response within three days: (1) an assurance of compliance and a "plan for a hiring exceptions process"; (2) a plan to address staff concerns with anti-retaliation assurances; and (3) a plan to ensure new hires "reflect cultural/linguistic/demographic characteristics of populations served." (12/18/2023 LEO Letter (on Defendant Corbin's letterhead), ECF No.1-13, PageID.222-223.) Bethany responded in early 2024, explaining its religious mission, the legal protections for co-religionist hiring, and the unauthorized nature of the 36th Street exceptions. (BCS's Response,

ECF No.1-14, PageID.225; Answer ¶113 (Admitted), ECF No.80, PageID.1478.) Neither LEO nor OGM ever substantively responded. (Answer ¶122, ECF No.80, PageID.1482-1482.)

## Cabanaw tells third parties that OGM will terminate its relationship with Bethany because of Bethany's Statement of Faith.

But OGM was not quiescent as its silence suggested. It was taking steps to replace Bethany. On January 8, 2024, Cabanaw spoke with CWS (a competitor agency). (Ex. D, Calendar Invitation for 01/08/2024; 2025 Cabanaw Tr. 69:2-69:25, ECF No.200-1, PageID.3026.) CWS's Mia Witte, the Director for Resettlement, memorialized Cabanaw's comments in an internal memorandum. (Witte Tr. 28:10-29:22, ECF No.204, PageID.3083; 2026 Cabanaw Tr. 70:24-71:13, ECF No.200-1, PageID.3027; CWS Documents, ECF No.172-1, PageID.2469.) Witte explained that Cabanaw "had referred the matter [of Bethany's Statement of Faith] to the Attorney General's office and was considering releasing Request for Proposals (RFPs) for Refugee Support Services (RSS) contracts in May as his office no longer wanted to partner with [Bethany]." (*Id.*) In that "meeting [Cabanaw] encouraged CWS to . . . consider opening a CWS local office(s)." (*Id.*)

In early February 2024, Cabanaw spoke with CWS again. (CWS Documents, ECF No. 172-1, PageID.2378.) He stated that even though he "monitored BCS for RSS contracts last week" and "didn't see anything that would otherwise have them cut ties"—it was his "intention - 100% - to end [OGM's] partnership [with Bethany] by FY25." (*Id.*) He told CWS that OGM already had "partners who could take over [BCS's] RSS [contracts] in these locations, but not in Traverse City" and that he "really wants CWS to be a partner agency in the state of Michigan." (*Id.*)

Cabanaw spoke with CWS again in April 2024, and again Witte took detailed notes. (Witte Tr 24:1-25:10, ECF No.204, PageID.3082.) Cabanaw notified CWS that he received

"feedback from [the] AG['s] Office that [OGM] could terminate [Bethany] for cause" because "they were out of compliance for [the] state's non-discrimination practices, but this is not the immediate tact they plan to take." (CWS Documents, ECF No.172-1, PageID.2468.) OGM eschewed that approach, because they were "[d]ealing with a lot of anti-immigrant sentiment in Michigan" and did "not want to add another political battle." (*Id.*) So, instead, OGM would be "[d]rafting new Requests for Proposals" and "work[ing] in more clear DEI language for all partners, including some specifics around hiring practices" in line with "program expectations" regarding "hiring individuals that we represent." (*Id.*) Cabanaw shared that he "want[ed] there to be an additional provider in Grand Rapids," (*id.*), and he "encouraged CWS to apply for the RSS contracts and to consider opening new local offices within both Grand Rapids and Kalamazoo." (*Id.* at PageID.2470.) He told CWS that "the State had decided to share RFPs for RSS contracts that BCS currently holds statewide," and that he "anticipated that all of these contracts *will be awarded to another provider*." (*Id.* at PageID.2469 (emphasis added).) Cabanaw did not deny the accuracy of the CWS memorandum and documents. (*See, e.g.*, Cabanaw Tr. 70:17-24, ECF No.200-1, PageID.3027 (stating "it's fair to assume that she was recording what she thought she heard or did hear."); *see also id.* at 83:8-84:18, PageID.3030.)

Contemporaneously, Cabanaw told Hedy Abdou, a Bethany manager sympathetic to Cabanaw, of OGM's policy of discriminating against Bethany. In a voice message Abdou left for Simone Halilovic (another Bethany manager) on April 9, 2024, Abdou reported that Cabanaw told her OGM would "make the eligibility requirements so strict that Bethany would not be eligible" and that "funding is definitely going to be cut from Bethany." (Abdou Voicemail, ECF No.198-9, PageID.3002.) Cabanaw later testified that Abdou was an honest person and that he

had "no reason to doubt that" he communicated what Abdou reported. (Cabanaw Tr. 108:8-9, ECF No.200-1, PageID.3036.)

OGM then did exactly what Cabanaw told Abdou and CWS it would do.

### Defendants cancel and re-bid Bethany's programs, including those that were not set to expire.

In July 2024, LEO issued unscheduled RFPs for services Bethany was already providing under existing contracts. (JS-1, Shirley Tr. 247:5-21; Shirley Decl. ¶27, ECF No.67-1, PageID.1239; Gorski Tr. 92:17-95:8; Gorski Decl. ¶6-17, ECF No.18-1, PageID.423-426; CWS Documents, ECF No.172-1, PageID.2468.) To do so, LEO had to terminate three existing RSS contracts with Bethany early. (JS-1, Schab Tr. 103:12-22.) That early termination was contrary to the plain language of the contracts and past practice. (Shirley Decl. ¶29, ECF No.67-1, PageID.1240; *id.* at PageID.1300 (LEO RES Grant 23-4103); *id.* at PageID.1313 (LEO RPRS Grant 23-4103).)

OGM's new RFPs included contract language specifically designed to disqualify Bethany, just as Cabanaw told CWS and Abdou they would. (Abdou Voicemail, ECF No.198-9, PageID.3002.) The new language required contracting agencies to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served." (Answer ¶154 (Admitted), ECF No.80, PageID.1494-1495; RFP No. RSS25-001, ECF No.9-1, PageID.330.) As Defendants well know, Bethany cannot comply with that language because its sincerely held religious beliefs prevent it from hiring non-Christians. (Shirley Decl. ¶33, ECF No.67-1, PageID.1240; Pls.' 30(b)(6) (Osburn) Tr. 78:24-79:8.) When asked whether the new RFP language was motivated by "concerns related to Bethany Christian's practice of hiring coreligionists?" Nicole Gorski (formerly Adams), who had final sign off on the RFP language, confirmed this in bureaucratic doublespeak. (JS-1, Defs.' 30(b)(6) (Gorski) Tr. 44:4-8, 45:5-11.)

Bethany asked for clarification or amendment of this language on July 12, July 16, July 19, July 26, July 31, August 7, August 22, August 27 (three separate times), August 29, August 30, and September 6. (OGM's Refusal to Respond, ECF No.9-2, PageID.346-348.) OGM ignored the requests.

### Defendants stack the bid-review panels with individuals opposed to Bethany's Statement of Faith.

In addition to crafting and including language that excluded Bethany alone, Defendants stacked the bid-review panels with individuals who shared Defendants' loathing. For example, Defendants placed Dilli Gautam and Simone Halilovic in positions of authority with significant influence over the bid process. Defendants knew that Gautam and Halilovic were former Bethany employees who left Bethany *because* of their disagreement with Bethany's Statement of Faith.

Before leaving Bethany, Gautam told Bethany's COO that he never supported the Statement of Faith, never would, and was only at Bethany because it was the only group providing refugee services. (Shirley Decl. ¶17, ECF No.67-1, PageID.1238.) Gautam told third parties that he "often fought" with Bethany leadership, (JS-1, Gautam Tr. 89:4-91:15; Ex. E, Sofia O. Messages), and that Bethany GR is heading in the wrong direction and he "wasn't able to take it any longer" (CWS Documents, ECF No.172-1, PageID.2395). Gautam "left Bethany due to differences of regarding organization's new direction." (JS-1, Gautam Tr. 75:13-23.) He also shared with third parties that "in [his] opinion, Bethany isn't a suitable organization to collaborate with at this time due to a lack of trustworthy personnel." (*Id.* 85:3-89:4; Ex. F, 9/16/2024 Abdelnour Email.) Additionally, he shared in text messages that he was "pissed" after reading Bethany's bid attachment referencing its Christian hiring policy. (JS-1, Gautam Tr. 69:10-15; Ex. G, Gautam/Halilovic Messages.) Despite his bias, Gautam served as a member of

the OGM RFP scoring team that evaluated Bethany's RSS bids in the summer of 2024. (JS-1, Gautam Tr. 72:10-15, 75:1-76:7.) He admitted reviewing Bethany's proposal. (*Id.* 75:24-76:2.)

Like Gautam, Halilovic opposed Bethany's Statement of Faith. While still at Bethany, she compiled a detailed timeline, in which she documented how she and others were "harassed," and overall traumatized by Bethany's commitment to its religious convictions. (JS-1, Halilovic Tr. 37:13-23; 43:14-44:12; Ex. H, Timeline.) Halilovic also documented her contempt for Bethany's faith in her text messages and even her official OGM work notes:

- "f them discriminating aholes," (Ex. I, Caldwell Messages)
- "Michigan must be a leader in this initiative since the beast is at our front door" (Ex. J, 05/30/2024 Abdou Messages.)
- "Bethany doesn't deserve these programs anymore" (Ex. K, Tuleisha Messages,).
- Bethany "should be disqualified" for failing to adhere to the new cultural and religious hiring requirements. (JS-1, Halilovic Tr. 133:1-12; Ex. L, Review Notes.)
- "Potential Disqualifier - bidder does not adhere to non-discrimination & diversity equity and inclusion practices requirements." (JS-1, Halilovic Tr. 128:7-131:19; Ex. M, RSS Notes.)

In April of 2024, Defendants hired Halilovic as the Refugee Integration Analyst and Grant Administrator at OGM. (JS-1, Halilovic Tr. 119:4-120:5.) In that role, she oversaw grant management for all RSS contracts, including Bethany's RSS programs. (*Id.*) As her supervisor, Nicole Gorski explained, the Grant Administrator "rates and reviews bids" and "take[s] a lead on that process," including scheduling meetings, distributing bids, and overseeing the review. (JS-1, Gorski Tr. 42:6-21.) In that role, Halilovic would "have edited the points and the questions based on the RFP that she developed." (JS-1, Defs.' 30(b)(6) (Gorski) Tr. 16:4-17:9.) In other words,

Defendants gave Halilovic a central administrative role in shaping the very framework under which Bethany's bids were later evaluated.

Halilovic's text messages confirm that she was part of the team that crafted the language requiring providers to "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served." (Answer ¶15 (Admitted), ECF No.80, 4, PageID.1494; RFP No. RSS25-001, ECF No.9-1, PageID.330.) She wanted to ensure that the language was sufficiently targeted that Bethany *would not qualify*. (*See, e.g.*, Ex. N, 5/30/2024 Cempel Messages.) So, in June 2024, Halilovic—a government official—workshopped the language over text message with her friends who were not government employees. (*Id.*; Ex. J, 5/30/2024 Abdou Messages.)

Here's what she and her friends said about the draft language:

- Halilovic shared the draft language with a former colleague from Bethany, Sam Cempel, who responded by telling Halilovic that she thought the language needed "to be more specific" and that "inclusion practices should be implemented with tangible asks" so Bethany couldn't "fit their mold." (JS-1, Halilovic Tr. 143:22-145:21; Ex. N.) Cempel also noted that the language should "outlin[e] specific DEI topics as well, otherwise . . . HQ at Bethany would utilize their 'values committee' to develop a training that again fits their mold." (*Id.*) Halilovic enthusiastically agreed: "Yes. Exactly." (*Id.*)
- Halilovic then went a step further: "it would be nice to see a hiring plan written out." (*Id.*) Cempel immediately understood what the requirement of a hiring plan would mean for Bethany: "that would be hard to crawl out of." (*Id.*)
- Halilovic also shared the language with Hedy Abdou, who expressly told Halilovic that the new RFP language "is clear[er] than what we currently have, because it is *targeted*."

(JS-1, Halilovic Tr. 150:3-152:11; Ex. J (emphasis added).) Halilovic did not disagree or correct Abdou. Instead, she told Abdou that even if this new RFP language were to "stur [sic] things up," she was "ready to fight the good fight!" (*Id.*)

After designing the RFP process and assisting in the development of the language that targeted Bethany, Halilovic oversaw the evaluation of Bethany's bids. That evaluation took place in three stages: the individual stage, the group stage, and the final stage presenting the scores to Cabanaw and Gorski. At the individual stage, Halilovic reviewed every submission. (JS-1, Halilovic Tr. 122:15-21.) At the group stage, Halilovic testified she would "go off the grant requirements and my scores," and she would encourage the reviewers to deduct points "if they fe[lt] that points need to be deducted, . . . since I was leading that group" (*Id.* at 122:20-21, 123:17-124:9, 125:11-16.) And at the final stage, Halilovic was responsible for bringing the group score to Cabanaw and Gorski for final decision, which is "where the determination of the grant came from." (*Id.* at 123:2-5.) In short, Halilovic was at the center of the 2024 bid evaluation: she reviewed every submission including Bethany's, led the group scoring deliberations and instructed reviewers on when to deduct points, and personally presented the final scores to the decision-makers and together determined funding, including discussions about Bethany. (*Id.* at 122:8-123:5, 125:13-24, 126:19-127:7; Ex. I (stating "when Ben, Nicole, and I made the decision [for BCS to lose the RSS bid] we became worried…").)

## Defendants systematically deny Bethany's bids for programs where convenient replacements are available.

With the fix in, OGM denied Bethany's bids where LEO had feasible alternatives. (Shirley Decl. ¶34, ECF No.67-1, PageID.1240.) This is aptly illustrated by Defendants direction of the R&P and URM programming. OGM had promoted CWS to become a direct provider of R&P services in West Michigan. (Answer ¶144, ECF No.80, PageID.1491.) But CWS needed

time to develop the infrastructure required to replace Bethany. (Mohsin Decl. ¶28, ECF No.67-2, PageID.1259; JS-1, Mohsin Tr. 97:23-99:15 (noting that it would have taken CWS years to build the infrastructure needed to replace Bethany's capacity for R&P contracts).) Accordingly, Defendants could not avoid Bethany receiving certain federal grants for one more fiscal year, after which Defendants said they would support CWS alone. (Mohsin Decl. ¶28, ECF No.67-2, PageID.1259; Answer ¶¶138, 143, ECF No.80, PageID.1488-1489, 1490.) Indeed, Cabanaw raised the "changes in hiring and DEI practices" at Bethany when he explained to the federal government why OGM was promoting CWS's new field office in Grand Rapids. (*See id.* ¶¶134-135, 144, PageID.1486-1497, 1491; Cabanaw 7/18/2024 Email, ECF No.25-10, PageID.622.)

So too with the URM contracts. Before 2024, OGM had never issued RFPs for those programs. (Gorski Decl. ¶9, ECF No.18-1, PageID.424; Answer ¶146 (Admitted), ECF No.80, PageID.1491.) In 2024, it did so "due to . . . the challenges we are experiencing with Bethany Christian Services' hiring practices[.]" (Cabanaw 06/05/2024 Email, ECF No.25-8, PageID.613.) Bethany, however, has been providing these services in Michigan for decades, and as a result has developed robust infrastructure to house and service unaccompanied youth. There is only one other provider of URM services in Michigan, Samaritas. (JS-1, Gorski Tr. 227:7-21.) And Bethany, without question, "has always had a larger URM program than Samaritas." (*Id.* 230:15-17.) Other providers simply do not have that ability, or are outfitted to serve foster children, rather than refugees. (Cabanaw Tr. 181:4-183:2, ECF No.172-6, PageID.2611; JS-1, Gorski Tr. 227:22-229:12.) In Director Hernandez's words, Bethany is "essential for [OGM] to be able to deliver services" in this area. (JS-1, Hernandez Tr. 136:8-9.) And Cabanaw shared a similar sentiment with CWS when he told them that replacing Bethany would be "10 times more complicated on the URM program (largest in the country)". (CWS Documents, ECF No.172-1,

PageID.2500.) So OGM had no choice but to continue working with Bethany.[2] (Shirley Decl. ¶31, ECF No.67-1, PageID.1240; Refugee Plan, ECF No.67-3, PageID.1291-1293 (listing placement options for URM, almost exclusively Bethany).)

Tellingly, Defendants did not include the new hiring language that excluded Bethany alone in the RFPs for URM contracts. (Shirley Decl. ¶¶30-32, ECF No.67-1, PageID.1240; Gorski Decl. ¶¶20-22, ECF No.18-1, PageID.426-427). But after awarding URM contracts to Bethany through a process that omitted this criterion, Defendants attempted to insert the language into the contracts after the fact. (Answer ¶¶218-221 (Admitted), ECF No.80, PageID.1513-1514; *see also* Ex. O, URM Grant 25-9901.) Defendants removed the post-award hiring language only after Bethany sued. (OGM Agreement Revisions Email, ECF No.18-7, PageID.487-489.)

In instances unlike URM and R&P, where OGM did have alternative service providers, it systematically replaced Bethany. In the RSS space, OGM had identified Samaritas as a potential replacement, and it recruited CWS to provide additional capacity. (JS-1, Halilovic Tr. 168:25-169:6; Ex. I, Caldwell Messages (stating "When Ben, Nicole, and I made the decision, we were worried about Samaritas holding so many . . . Thankfully CWS is stepping in").) As Cabanaw told CWS in January 2024—only mere days after receiving Bethany's formal response to OGM's inquiries about the Statement of Faith policy—OGM "already ha[d] commitments from other organizations to temporary [sic] take over that work, even potentially hire the staff from BCS as contingency planning, especially for RSS piece." (CWS 1/8/2024 Notes, ECF No.172-1, PageID.2500.)

[2] The RFPs for Bethany's URM contracts were also mid-cycle. (*See, e.g.*, LEO FY23 URM Contracts Excerpt, ECF No.67-2, PageID.1326.)

Consistent with the policy Defendants led OGM to adopt, Bethany lost all of its refugee-employment-services contracts, including those in Grand Rapids and Kalamazoo, as well as remote services (which were all rebid as integrated RSS contracts). OGM denied contracts to Bethany for three RSS contracts (year 2025 Grant Contract Numbers: RSS25-0002, RSS25-7004, and RSS25-6005) for which Bethany was the incumbent service provider and for which OGM had prematurely terminated Bethany's existing contracts. (Gorski Decl. ¶¶18, 20, ECF No.18-1, PageID.426-427.) In fact, Bethany received scores on two supplemental-services contract bids that were so low that it was disqualified from participating in the programs altogether, even though it was currently providing those same services under pending contracts without complaint from OGM. (Answer ¶170 (Admitted), ECF No.80, PageID.1499.) OGM awarded this RSS funding—nearly $2 million annually—to Samaritas and its new subcontractor, CWS.[3] (JS-1, Halilovic Tr. 163:4-25 ("Samaritas was contracting some of those [RSS] services out to CWS"); Ex. I ("Thankfully CWS is stepping in").)

OGM's scoring sheets for these bids further demonstrate Defendants' animus. Bethany received 0 out of 3 points on the new requirement to "describe a hiring plan of culturally proficient and competent staff that represent the cultural, national origin, and religions of the newcomer populations being served." (RFP Scoring Criteria RSS25-001, ECF No.18-4, PageID.452; Scoring Sheet, ECF No.18-10, PageID.502.) Bethany also lost points in adjacent categories functioning as proxies for religious discrimination. Even though Bethany has been serving refugees in Michigan since 1962, and as a contractor for the state of Michigan since 1981, Defendants suddenly developed grave concerns with Bethany's "understanding of the

[3] Halilovic, Cabanaw, and Gorski were all personally involved in the decision to deny Bethany this funding in 2024. (Ex. I ("When Ben, Nicole, and I made the decision . . . I shouldn't have mentioned I was part of the decision.").)

service area and needs of the targeted population." (Bethany Scoring Sheet for RSS 25-0001, ECF No.9-4, PageID.352-354.) Notably, the amount allocated for these categories was also conspicuously changed: while the hiring plan was worth only two points for contracts where Bethany's points were substantially lower than its competitors, such as RSS25-002, the category inexplicably was worth 3 points in contracts where the scores were tied and Bethany would otherwise have won the contract outright, such as RSS25-001. (JS-1, Gorski Tr. 212:10-213:3,; Scoring Sheet RSS25-002, ECF No.18-9, PageID.497; *cf.* Scoring Sheet RSS25-001, ECF No.18-10, PageID.502.)

## Bethany sues to protect its civil rights.

Bethany filed this lawsuit on September 9, 2024, alleging that Defendants Hernandez and Corbin were violating its religious-liberty rights under the First Amendment. (*See generally* Verified Compl., ECF No.1.) Two days later, Bethany moved for a preliminary injunction, seeking to preserve the status quo regarding its provision of refugee-related services pending the outcome of this lawsuit. (Mot. for Prelim. Injunct., ECF No.8, PageID.279-280.) Two weeks later, Defendants stipulated to entry of an injunction under which Defendants agreed to "rescind the early termination of grant agreements RPRS23-4103 and RES23-3902 which will be amended to provide funding for post-resettlement and employment services, respectively, in an amount not less than $1,000,000." (ECF No.35, PageID.677.) Under the stipulated injunction, Defendants also agreed to the following additional funding:

1. Contract No. DME25-0002 in the amount of $65,000;
2. Contract No. RSS 25-2808 in the amount of $156,797;
3. Contract No. UHPAS25-2803 in the amount of $43,203;
4. Contract No. RTS25-0002 in the amount of $200,000;

5. Contract No. RYM25-4101 in the amount of $100,000.

6. URM Contract No. 25-9901 in the amount of $5,850,000;

7. URM Contract No. 25-9903 in the amount of $2,700,000;

8. URM Contract No. 25-9904 in the amount of $350,000;

9. URM Contract No. 25-9905 in the amount of $725,000;

10. URM Contract No. 25-9909 in the amount of $3,800,000;

11. URM Contract No. 25-9911 in the amount of $675,000; and

12. URM Contract No. 25-9913 in the amount of $700,000.

(*Id.* at PageID.676-677.) The stipulated injunction required Defendants to maintain the contracts between LEO and Bethany until the earlier of September 30, 2025, or further order of this Court. (*Id.* at PageID.676.)

## Defendants again deny Bethany's bids for RSS funding.

Apart from the URM grants (where, again, OGM has no choice), OGM continued *none* of the funding established in the stipulated injunction past September 30, 2025. (*See* Corrected Joint Statement ¶¶ 14-16, ECF No.237, PageID.3863-3866.) Instead, during the 2025 bid cycle, OGM again denied Bethany's bids where OGM had alternative providers. OGM refused to provide Bethany with any transportation-service funding under RTS26-0002. (Transportation Services Bid Denial Email, ECF No.67-7, PageID.1333-1334.) The scoring sheets for those programs confirm that OGM continued to discriminate against Bethany because of its religious exercise. (*Id.* at PageID.1349 (RTS 2026 Scoring Sheet Grand Rapids); *id.* at PageID.1353 (RTS Scoring Sheet Traverse City).)

For example, the scoring sheet for the Grand Rapids transportation program reveals that Defendants continued to ask applicants to demonstrate a "hiring plan of culturally proficient and

competent staff that represent the cultural, national origin, *and religions* of the newcomer populations" and again penalized Bethany for failing to demonstrate "hiring plan [that] does not clear[ly] show how staff will be culturally proficient and competent" or "understanding of the service area and needs of the targeted population" despite recognizing that Bethany "provided 700 transportation services last fiscal year." (RTS 2026 Scoring Sheet Grand Rapids, ECF No.67-9, PageID.1350-1351 (emphasis added).) For the Traverse City transportation program, in contrast, Bethany scored well, but Defendants nevertheless decided not to award Bethany a contract. (RTS Scoring Sheet Traverse City, ECF.67-10, PageID.1355.)

Defendants also denied Bethany's bid for the Refugee Youth Mentoring program in Grand Rapids (RYM26-4101). Here too, Defendants gave Bethany a score that was so low that Bethany was prevented from participating in the program altogether. (RYM 26-4101 Scoring Sheet, ECF No.67-11, PageID.1359.)

Today, as alluded to above, OGM contracts with Bethany only for URM programs.

### Defendants' internal auditor candidly admits what Defendants and their employees cannot seem to remember.

The documentary evidence in this case tells a damning story of religious discrimination. But when Defendants and their employees were asked about their own documents in their depositions, they suffered from a sudden onset of collective amnesia.

Former Defendant Cabanaw was plagued by forgetfulness. He could not remember why he was "disgusted" with Bethany. (2026 Cabanaw Tr. 43:5-18, ECF No.200-1, PageID.3020.) He could not remember what he told CWS, or what he told Abdou.[4] (*Id.* at 83:8-15,

[4] As set forth in Bethany's motion for spoliation sanctions, Cabanaw did not merely forget. He deleted. (ECF No.198, PageID.2884.) He manually deleted text messages related to this lawsuit, and Magistrate Judge Green has already granted Bethany's motion for sanctions in part and has

PageID.3030; *id.* at 107:2-18, PageID.3036.) Halilovic likewise suffered from memory loss. She could not remember why she thought Bethany "no longer deserved" contracts, who was the "beast at the door," or what she meant when she told her friends that she wanted Bethany to provide a written "hiring plan." (JS-1, Halilovic Tr. 89:21-91:20; 146:1-13; 156:15-158:22.)

But LEO's own auditor, Allen Williams, recognized the issue. Cabanaw looped in the auditor's office on December 11, 2023, even before meeting with Bethany's leadership. (Ex. P, 12/11/2023 Compliance Email.) Cabanaw then reached out to Williams for advice shortly after Bethany submitted its detailed response on January 5, 2024. (Ex. Q, LEO-OGM Emails.) Williams told Cabanaw at that time that Bethany made compelling arguments in its response. (*Id.*) And Williams testified at his deposition that he remained involved for advice throughout 2024, and that he had concerns about the series of events that unfolded. (JS-1, Williams Tr. 136:7-14.) In fact, when asked directly if he had "concerns in 2024 that contracts or funding were being moved away from Bethany because of its practice of hiring coreligionists," Williams testified that he "thought that that had a bearing on it, yes." (*Id.* 96:8-12.) And when he was asked why, he responded that "that was the discussion for most of the period." (*Id.* 96:7-15.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

held the issue of adverse inferences in abeyance pending the results of the forensic examination of Cabanaw's devices. (Order, ECF No.226, PageID.3680.)

## ARGUMENT

Plaintiffs seek summary judgment on:

- Count I for Targeting in Violation of the First Amendment Free Exercise Clause
- Count II for Violation of the First Amendment Free Exercise Clause - Not Neutral and Generally Applicable;
- Count III for Violation of the First Amendment Free Exercise Clause - Exclusion from Otherwise Available Government Benefits; and
- Count IV Violation of the First Amendment Free Speech and Assembly Clauses Expressive Association.

Strict scrutiny applies under each of these four Counts.

Strict scrutiny applies under Count I, because the record establishes impermissible religious targeting under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018). Indeed, it is difficult to imagine a stronger case of religious targeting. Defendants' actions, hostile statements, and pretextual explanations conclusively demonstrate their hostility towards Bethany's religious exercise.

As to Count II, strict scrutiny applies because Defendants' policies fail both the neutrality and general-applicability requirements of *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). There is no genuine dispute that the new cultural- and religious-hiring criteria were crafted specifically to burden Bethany's religious exercise.

Pursuant to the *Trinity Lutheran-Espinoza-Carson* trilogy, strict scrutiny is triggered under Count III because Defendants excluded Bethany from otherwise available government benefits solely due to its religious character. Through their undisputed statements and actions, Defendants conditioned continued funding on Bethany's abandonment of its co-religionist hiring practice—the precise form of status- and use-based discrimination the Supreme Court has

repeatedly condemned. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *Carson v. Makin*, 596 U.S. 767 (2022).

Finally, Defendants actions are subject to strict scrutiny under Count IV for violating Bethany's First Amendment expressive-association rights under *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026), when Defendants coerced Bethany into hiring employees who cannot affirm or communicate its religious mission as a condition of grant eligibility.

Having triggered strict scrutiny in four distinct ways, Defendants cannot establish that their actions were justified by a compelling interest and narrowly tailored. Defendants possess no compelling interest justifying the targeted burden on Bethany's religious exercise. And their selective enforcement and their failure to consider less restrictive alternatives is fatal to the narrow-tailoring requirement.

The Court should enter summary judgment in Plaintiffs' favor on Counts I-IV.

## I. Summary judgment is warranted on Count I because there is no genuine dispute that Defendants targeted Bethany because of its religious hiring practices.

Summary judgment on Count I—targeting—is required, because the undisputed facts of the case show that Defendants systematically moved funding and contracts away from Bethany because of Bethany's belief that it must hire other Christians to carry out its religious mission. The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). The First Amendment protects against direct burdens on religious exercise, "as where a state

criminalizes a particular faith or religious practice."[5] *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021). But additionally, "the First Amendment protects against indirect coercion or penalties on the free exercise of religion." *Carson*, 596 U.S. at 778 (citation omitted). Accordingly, "a law targeting religious beliefs as such is never permissible[.]" *Lukumi*, 508 U.S. at 533 (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978)).

"The Free Exercise Clause protects against governmental hostility which is masked." *Lukumi,* 508 U.S. at 534 (cleaned up). As a result, where policies are "veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it advances interests of the highest order and is narrowly tailored in pursuit of those interests." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (cleaned up). "[C]ourts have an obligation to *meticulously scrutinize irregularities* to determine whether a law is being used to suppress religious beliefs." *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021) (emphasis added).

Government officials are "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [religious actors'] religious beliefs." *Masterpiece*, 584 U.S. at 638. When official decisionmakers instead evince "clear and impermissible hostility toward the sincere religious beliefs that motivated" a party's conduct, the resulting government action cannot survive constitutional scrutiny. *Id.* at 634. It is not necessary to show that an entire

[5] There is no genuine dispute that Defendants burdened Bethany's religious exercise. Defendants' demand that Bethany abandon its sincerely held belief that it must hire other Christians to fulfil its religious mission—or else forfeit its participation in OGM-controlled, federally funded grants to serve refugees—strikes at the heart of Bethany's religious identity and forces it into an untenable choice between fidelity to its faith and continuation of its decades-long service to refugee communities. (*See* Employee Handbook, ECF No.1-9, PageID.203.) This is a substantial burden on Bethany' religious exercise and expressive association—and even if this burden was only incidental, Defendants' actions would still be subject to strict scrutiny. *See Fulton*, 593 U.S. at 533.

regulatory scheme was conceived in animus; rather, targeting is present when government officials express a "negative normative 'evaluation'" of the specific religious practices at issue. *Id.* at 639.

Factors relevant to assess if government action is directed at religious practice include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi,* 508 U.S. at 525-28, 536, 540.

*Lukumi* and *Masterpiece* provide illustrative examples. In *Lukumi*, the Supreme Court struck down a set of city ordinances because their object was to suppress the Santeria religion. 508 U.S. at 542. Santeria adherents had faced widespread persecution in Cuba and practiced in secret, and the Church announced plans in 1987 that it would bring its practices, including animal sacrifice, "into the open" in Hialeah. *Id.* at 525-26. The city council answered with an emergency session just weeks later, even though it had never before tried to address the problems it said animal sacrifice caused. *Id.* at 526, 541. At that session, council members and city officials openly showed hostility toward the faith. *Id.* at 526. Indeed, the ordinance itself noted that the city was committed to prohibiting religious acts that were "inconsistent with public morals." *Id.* From this record, the Court concluded that the ordinances "had as their object the suppression of religion." *Id.* at 542.

Similarly, in *Masterpiece*, when Colorado baker Jack Phillips declined to make a cake for a same-sex wedding, the state's civil rights division found probable cause that Phillips had violated the Colorado Anti-Discrimination Act, and it sent the case to a state ALJ, who entered summary judgment against Phillips. 584 U.S. at 629. The Supreme Court set aside the ruling,

finding that the sequence of events showed hostility. *Id.* at 638. For example, the commissioners' statements revealed hostility, where one commissioner called Phillips's reliance on his faith "one of the most despicable pieces of rhetoric that people can use." *Id.* at 635. Ultimately, the Court found there was "every appearance" that the commission had "adjudicate[ed] Phillips' objection based on a negative normative 'evaluation of the particular justification' for his objection and the religious grounds for it." *Id.* at 639 (quoting *Lukumi*, 508 U.S. at 537).

Applying these principles, this Court recently concluded that St. Vincent Catholic Charities was likely to prevail against the Michigan Department of Health and Human Services ("MDHHS") because there was substantial evidence that the State, including a statewide elected official, targeted St. Vincent and other religious organizations for their religious beliefs. *Buck v. Gordon*, 429 F. Supp. 3d 447, 461-65 (W.D. Mich. 2019). Eventually, MDHHS agreed to entry of judgment against it for violating St. Vincent's Free Exercise rights. (*Buck v. Gordon*, W.D. Mich. Case No. 1:19-cv-00286, Stipulation 4, ECF No.112, PageID.3109-3120.)

Here, three points demonstrate Defendants' targeting. First, the historical background, purpose, and operation of Defendants' actions show that Defendants targeted Bethany because of its religious hiring. Second, the statements of Defendants and their employees demonstrate their "negative normative evaluation" of Bethany's religious hiring. Third, the falsity of Defendants' explanations demonstrates targeting. Each point is addressed below.

### A. The background and events leading up to Defendants' decision to move funding away from Bethany all point to religious targeting.

Like in *Lukumi* and *Masterpiece*, the historical background, specific series of events, and statements of Defendants all demonstrate religious targeting. After speaking with a Bethany employee in late November 2023, Cabanaw told Defendant Hernandez that he was "beyond disgusted and concerned." (Ex. C.) Then, like the pronouncements made by the city council in

*Lukumi* that the Santeria religion's "practices which . . . are inconsistent with public morals," *Lukumi*, 508 U.S. at 526, Hernandez informed Bethany that its practices were "inconsistent with state values." (Answer ¶98 (Admitted), ECF No.80, PageID.1470.)

After announcing disdain for Bethany's religious exercise, Cabanaw began reaching out to third parties and discussing Defendants' plans to "end [OGM's] partnership" with Bethany by FY25. (CWS Documents, ECF No.172-1, PageID.2378; 2026 Cabanaw Tr. 83:8-25, ECF No.200-1, PageID.3030.) For example, Cabanaw told CWS that even though he "monitored BCS for RSS contracts last week" and "didn't see anything that would otherwise have them cut ties," it was his "intention - 100% - to end [OGM's] partnership [with Bethany] by FY25." (CWS Documents, ECF No.172-1, PageID.2378; Witte Tr. 17:5-19:5, ECF No.204, PageID.3080-3081; 2026 Cabanaw Tr. 82:9-83:25, ECF No.200-1, PageID.3030.) He told CWS that his office would be "[d]rafting new Requests for Proposals" and "work[ing] in more clear DEI language for all partners, including some specifics around hiring practices" in line with "program expectations" regarding "hiring individuals that we represent." (CWS Documents, ECF No.172-1, PageID.2468.) Similarly, Cabanaw told Abdou that he would be revising the eligibility requirements for supplemental services contracts, making them "so strict that Bethany would not be eligible. Anyone is welcome to apply but . . . even if Bethany were to apply, Bethany would not be awarded that grant." (Abdou Voicemail, ECF No.198-9, PageID.3001.)

As Cabanaw candidly explained to CWS and Abdou (*id.*; 2026 Cabanaw Tr. 83:8-25, ECF No.200-1, PageID.3030), the object of the new RFPs and accompanying requirements was to ensure that Bethany's religious hiring practices would not be able to proceed. Defendants' policy of religious targeting even extended to seeking to disrupt Bethany's business relationships

with federal funders and other states. Like in *Lukumi*, the Constitution forbids such hostility and targeting of religious practice. 508 U.S. at 533.

Government targeting can also "become[] evident . . . when the ordinances' operation is considered." *Lukumi*, 508 U.S. at 535. Here, the new policies, i.e., the new contract requirement that grants recipients have a "hiring plan of culturally proficient and competent staff that represent the cultural, national origin, and religions of the newcomer populations being served" were aimed at Bethany. (RFP Scoring Criteria, ECF No.18-4, PageID.452.) Within OGM, Simone Halilovic and Dilli Gautam—who later participated in scoring Bethany's bids—participated in crafting and providing feedback for this new policy language. (*See* Ex. R, 05/30/2024 OGM Email Re: DEI/Hiring Contract Language; JS-1, Halilovic Tr. 138:24-143:2.) Halilovic's text messages shortly before OGM adopted the policy demonstrate it was clear to OGM's personnel that the new language was aimed at solving the "challenge" with Bethany. (*See*, *e.g.*, *id.* at 150:3-151:7; Ex. J, 05/30/2024 Abdou Messages (emphasis added).) Halilovic and others within OGM then treated Bethany's inability to satisfy that language as "disqualifying" whenever they had a convenient alternative to Bethany. (*See* JS-1, Halilovic Tr 128:10-129:25; Ex. M, RSS Notes.)

The statements made by Cabanaw to CWS and Abdou about Defendants' intent to move contracts away from Bethany through implementation of new policy requirements, as well as the employees' impressions of the effect of the policy at the time it was adopted by OGM mirror the "historical background of the decision" of the policy adopted in *Lukumi.* The Court can and should hold that OGM's actions are subject to strict scrutiny under Count I on this basis alone.

### B. Defendants' contemporaneous statements demonstrate an impermissible "negative normative evaluation" of Bethany's religious hiring practice and targeting.

Defendants' targeting is cemented by the "negative normative 'evaluation'" of Bethany's religious practices. The Sixth Circuit has held that hostile statements alone "cast doubt on the fairness" of the application of an otherwise neutral policy. *Meriwether*, 992 F.3d at 513-14. In *Meriwether*, for example, a university leader remarked that that religion "oppresses students" and said that even its "presence" at universities is "counterproductive," and that "Christian doctrines should not be taught." *Id.* at 512-13. The Sixth Circuit explained that the statements had the "makings of the very religious intolerances that 'gave concern to those who drafted the Free Exercise Clause.'" *Id.* at 513 (quoting *Lukumi*, 508 U.S. at 532). This is particularly the case where the policymakers are the ones making the hostile statements. *See Masterpiece*, 584 U.S. 636 (noting that hostile statements should properly be taken into account where they are made "by an adjudicatory body deciding a particular [issue]").

Similarly, in *Buck*, a defendant made comments calling proponents of a religious viewpoint "hate-mongers," accusing them of "discriminatory animus" and calling their position "indefensible." 429 F. Supp. 3d at 467. These comments were particularly concerning because they were made by the policy maker, leading to a strong inference that the plaintiff religious entity was targeted based on its religious belief, and that it was a defendant who targeted it. *Id.*

Here, the policy makers are Hernandez, Cabanaw, and their subordinates who were involved in crafting the new cultural and religious hiring RFP language and in scoring bids, like Gautam and Halilovic. Cabanaw repeatedly made statements demonstrating a negative normative evaluation of Bethany's religious practices. For example, Cabanaw said he was "beyond disgusted" by Bethany's hiring practices, that Defendants were "disheartened" by Bethany's Statement of Faith policy, and that OGM would "not support" Bethany's hiring practices. (*See,*

*e.g.*, Ex. C, Cabanaw 12/11/2023 Email; Cabanaw 12/07/2023 Email, ECF No.25-3, PageID.588; Cabanaw 12/15/2023 Email, ECF No.25-4, PageID.592.) Hernandez told Bethany that its religious-hiring practices were "inconsistent with our state values." (Answer ¶98 (Admitted), ECF No.80, PageID.1470.) Halilovic referred to Bethany as the "beast at the door," "not deserv[ing]" of state contracts," and "discriminating aholes." (Ex. J, 05/30/2024 Abdou Messages; Ex. K, Tuleisha messages; Ex. I, Caldwell Messages.) Gautam emphatically told Bethany that he would never support its Statement of Faith. (Shirley Decl. ¶17, ECF No.67-1, PageID.1238.)

These comments are similar to those deemed disparaging in *Masterpiece*, where members of the reviewing commission noted that a baker could "believe what he wants to believe but cannot act on his religious beliefs if he decides to do business in the state," and that "it is one of the most despicable pieces of rhetoric that people can use to - to use their religion to hurt others." 584 U.S. at 634-35. And, like in *Buck*, Cabanaw, Hernandez, Halilovic, and Gautam are "pivotal players" "at the very heart of this case," 429 F. Supp. 3d at 467 (cleaned up). Their statements demonstrate intolerance for Bethany's religious beliefs, creating a strong inference of religious hostility. *See Meriwether*, 992 F.3d at 513-14. The impact of their hostility for Bethany's religious exercise on the bid process is undisputed: LEO's own auditor testified that he believed Bethany's religious practices "had a bearing on" Bethany's loss of funding and contracts because Bethany's religious hiring was the topic of conversation "for most of the period." (JS-1, Williams Tr. 96:7-15.)

Bethany is "entitled to a neutral decisionmaker" on its bids. But Cabanaw and Halilovic's comments—and Defendants' own auditor's assessment—demonstrate that "religious hostility infected" Defendants choice to exclude Bethany from participating in refugee services programs.

*See Meriwether*, 992 F.3d at 512, 514. Because there is no genuine dispute of material fact here, the Defendants' "negative normative evaluation" of Bethany's religious exercise triggers strict scrutiny under Count I as well.

### C. The falsity of Defendants' explanations provide additional evidence of unlawful targeting.

Defendants claim that their adverse determinations against Bethany were motivated by benign factors, and that Bethany's religious exercise played no role in their agencies' decision. Not so. The falsity of Defendants' explanations and the temporal proximity of Defendants' hostile comments to the termination of Bethany's services is further evidence of unlawful targeting. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation."). For example:

- Cabanaw swears to this Court that "OGM neither participated in nor influenced CWS's decision" and "[t]here was never a plan for CWS to replace BCSM." (Cabanaw Aff. ¶¶67-69, 71, 121-122, ECF No.81-2, PageID.1606, 1611.) But CWS's notes show Cabanaw told them it was "100%" his intent to end OGM's partnership with Bethany and that he "really wants CWS to be a partner agency in the state of Michigan." (CWS Documents, ECF No.172-1, PageID.2378.)
- Cabanaw avers the new RFP language was prompted by ORR's Policy Letter, released June 3, 2024. (Cabanaw Aff. ¶¶189-190, ECF No.81-2, PageID.1618.) But CWS notes show Cabanaw described his plan for DEI language "around hiring practices" on April 16, 2024—two months before the Policy Letter existed. (CWS Notes, ECF No.172-1, PageID.2378.)

- Cabanaw says, under oath, that he canceled existing RSS contracts to "return to normal model." (Cabanaw Aff. ¶175, ECF No.81-2, PageID.1617.) But he told CWS the off-cycle RFPs were an alternative to canceling Bethany's contracts for cause, and that it was "100%" his intent to end the relationship by FY2025. (CWS Documents, ECF No.172-1, PageID.2378.)
- Defendants claimed other bids were simply better and that Samaritas won "fair and square." (Defs.' Resp. to Renewed Mot. for Prelim. Inj., ECF No.81, PageID.1562-1563.) But contemporaneous communications establish that Cabanaw foreordained the outcome before bidding even commenced. (CWS Documents, ECF No.172-1, PageID.2469; Abdou Voicemail, ECF No.198-9, PageID.3001.)
- Defendants claim that Bethany Kalamazoo lost the award to Samaritas because its budget proposed $14,500/client compared to $1,480/client for Samaritas. (*See* Defs' Resp Opp Renewed PI, ECF No.81, PageID.1564.) But when LEO scored Bethany's bid, Bethany received 20/20 points on their budget proposal. (Scoresheet, ECF No.81-2, PageID.1669.) In other words, value was not the real reason for the lower score.

Defendants' "after-the-fact invention[s]" create an additional inference of religious discrimination. *See Ward*, 667 F.3d at 735-36. On this record, there is no dispute that Defendants targeted Bethany for its religious exercise. Accordingly, Defendants must satisfy strict scrutiny—i.e., their actions satisfy "the First Amendment only if [they] 'advance interests of the highest order and [are] narrowly tailored in pursuit of those interests.'" *Buck*, 429 F. Supp. 3d at 461 (quoting *Ward*, 667 F.3d at 738).

## II. Count II—there is no genuine dispute that Defendants' actions and policies are neither neutral nor generally applicable.

Beyond overt targeting, Defendants' policies are also subject to strict scrutiny because the undisputed facts show that they burden Plaintiffs' religious exercise and are not neutral and generally applicable. *Fulton*, 593 U.S. at 533, 541.

A governmental burden on religion fails "neutrality" and triggers strict scrutiny "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 533. And it flunks "general applicability" if it prohibits "religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534. These are "bedrock requirements of the Free Exercise Clause," and if the government "transgress[es]" either it triggers "strict scrutiny." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc); ac*cord Spivack v. City of Philadelphia*, 109 F.4th 158, 166 (3d Cir. 2024). Defendants' actions here fail both.

***Neutrality.*** "Neutral" in the context of a free exercise claim means that the law or policy does not distinguish "among religions" or "between religion and non-religion." *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995); *see also Lukumi*, 508 U.S. at 532 ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion, or of religion in general."). "A government policy will not qualify as neutral if it is specifically directed at religious practice." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (cleaned up). Said another way, a rule "is not neutral" if its "object . . . is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. The "Free Exercise Clause . . . extends beyond facial discrimination" and "'forbids" even 'subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Id.* at 534 (cleaned up).

Here, the undisputed facts show that Defendants scrutinized Plaintiffs' hiring practices more closely than those of other organizations. Halilovic's testimony on this issue is illustrative of the problem. (JS-1, Halilovic Tr. 134:12-18; Ex. M, RSS Notes.) She testified that she would not have had concerns about funding the Islamic Center of Detroit, even if she had known that the Islamic Center exists to "serve the most vulnerable . . . through the Musim faith, Islamic principles, and the fundamental belief of assisting others." (JS-1, Halilovic Tr. 134:12-138:6.) That would not have concerned her because she does not "think that serving people through your faith . . . is a bad thing." (*Id.* at 137:12-14.) Rather, "it would really come down to" whether the Islamic Center was "only serving Muslims or are they going to be serving all of the ORR eligible population." (*Id.* at 138:3-6.) She then admitted that there was *never* any concern "that Bethany Christian was only willing to serve Christian clients." (*Id.* at 138:7-10 (cleaned up).)

Under Halilovic's stated rationale, Bethany and the Islamic Center of Detroit should have been treated similarly. But Halilovic supported OGM's decision to fund the Islamic Center of Detroit, and in fact did so. (*Id.* at 134-135; Cabanaw Aff. ¶219, ECF No.81-2, PageID.1621.) And she viewed Bethany's religious exercise as "disqualifying," and did in fact disqualify Bethany. (JS-1, Halilovic Tr. 128:10-129:25; Ex. M, RSS Notes.)

Worse yet, there is no dispute that OGM partners with organizations who publicly hold themselves out as existing to serve select groups. (*See, e.g.*, About Us, Muslim Foster Care Association, available at: website https://muslimfostercare.org/ ("At the Muslim Foster Care Association, we strive to enable Muslim children in the foster care system to thrive, flourish and be their best as human beings, Muslims, and contributing members of society."); Puertas Abiertas, available at: https://puertasabiertasgr.org/en ("Empowering Latina women to make healthy choices and live free from violence."); About Us, Les Clay, available at:

https://www.lesclay.org/about-us ("Les Clay seeks to empower African immigrants to be active contributors in American Society."); Ukrainian Society of Michigan, available at: https://www.uasmi.org/ ("Our top priority is to provide physical and psychological assistance to those Ukrainians who, as a result of the Russian invasion, were forced to flee their homes and seek refuge in Michigan."); Zaman, available at: https://zamaninternational.org/ ("Zaman empowers women to break the cycle of intergenerational poverty by providing mothers the support, training, and employment needed to lift their families out of poverty.").) Unlike these organizations, Bethany has never held itself out as serving Christians alone or discriminating in the populations it serves. (*See* JS-1, Halilovic Tr. 138:7-10.)

In short, Defendants have not neutrally applied any non-discrimination concerns that they may have. Instead, they singled out Plaintiffs alone because they disagreed with Bethany's legally protected hiring practices. *Cf. Kennedy*, 597 U.S. at 543 n.8 ("protected speech or religious exercise" does not "readily give way to a 'heckler's veto'"). The First Amendment forbids "proposals for state intervention" when there is "even slight suspicion" they "stem from animosity to religion or distrust of its practices." *Lukumi*, 508 U.S. at 547.

***General Applicability.*** For many of the same reasons, Defendants' policies are not generally applicable. A policy is not generally applicable when the government treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *see also Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020). In *Fulton*, the Supreme Court explained that a law treats secular activity more favorably than religious activity where it "incorporates a system of individual exemptions," or includes "a formal system of entirely discretionary exceptions." 593 U.S. at 535-36.

The undisputed facts show that OGM's policies are not generally applicable because OGM has not even applied them evenly to *Bethany itself*. OGM used its targeted RFPs to deny every contract to Bethany where Defendants had an alternative provider, but they still awarded Bethany certain contracts—such as the URM contracts—without the new hiring requirements. (Shirley Decl. ¶¶30-31, ECF No.67-1, PageID.1240.)

Additionally, there were contracts Bethany held that OGM chose not to rebid in 2024, including Bethany's transportation program. (JS-1, Halilovic Tr 151:14-17.) Because those programs were not rebid, no religious hiring requirement was inserted into those contracts. OGM was on notice that this was internally inconsistent. As noted above, Halilovic sent the proposed language—requiring organizations to hire employees representative of the religions of the populations being served—to Abdou. Abdou immediately saw the issue: OGM "shouldn't do this unless they go all in," because "[i]t makes no sense to have this" for the rebid programs "and then let [Bethany] keep the Transportation program." (Ex. J, 05/30/2024 Abdou Messages.) She continued "I just think that if this language is included in new RFPs then once organizations are awarded the grant and th[e]se . . . programs are taken from Bethany, *OGM will then officially be inconsistently applying hiring requirements, and that alone will open up a whole . . . can[] of worms*." (*Id.* (emphasis added).) Abdou was right, but OGM did not heed her advice.

Instead, OGM proceeded full steam ahead on its mission to exclude Bethany. Because Defendants' policies were not generally applied across the board, they are subject to strict scrutiny.

## III. Count III—there is no genuine dispute that Defendants excluded Bethany from otherwise available government benefits because of Bethany's religious hiring practices.

Defendants' actions are subject to strict scrutiny for the additional reason that Defendants excluded Bethany from a government benefit on the basis of Bethany's religious hiring. In a trilogy of recent Free Exercise cases, the Supreme Court has reiterated a simple, longstanding rule: When government offers a benefit, it may not "expressly discriminate[] against otherwise eligible recipients by disqualifying them . . . solely because of their religious character." *Trinity Lutheran*, 582 U.S. at 462; *accord Espinoza*, 591 U.S. at 484 ("'repeatedly confirmed'"); *Carson*, 596 U.S. at 780 ("unremarkable" and "basic" principle). "That is discrimination against religion" and it triggers "the strictest scrutiny." *Carson*, 596 U.S. at 780-81 (quoting *Espinoza*, 591 U.S. at 478).

The leading case is *Trinity Lutheran*. There, Missouri offered grants to help preschools resurface playgrounds, but it "had a policy of categorically disqualifying . . . religious organizations" from accessing the grants. 582 U.S. at 453-54. This "policy impose[d] a penalty on the free exercise of religion that trigger[ed] the most exacting scrutiny." *Id.* at 462. Even when the government offers a "gratuitous benefit," the Court held, it may not "disqualify[]" "otherwise eligible recipients . . . solely because of their religious character." *Id.* at 462-63. Such discrimination "is odious to our Constitution" and "cannot stand." *Id.* at 467.

Here, the undisputed facts show that Defendants did exactly what these cases forbid: They made the availability of a benefit hinge "solely on account of religious identity." *Id.* at 458. In early 2024, Cabanaw told CWS that his office no longer wanted to partner with Bethany because of Bethany's religious exercise. (2026 Cabanaw Tr. 96:1-97:18, 99:3-100:25, ECF No.200-1; Witte Tr. 17:5-19:5, ECF No.204, PageID.3080-3081.) He told Abdou that OGM

planned to issue new RFPs with "eligibility requirements so strict that Bethany would not be eligible" and that "even if Bethany were to apply, Bethany would not be awarded that grant." (Abdou Voicemail, ECF No.198-9, PageID.3001.)

Defendants proceeded to do exactly what Cabanaw told Abdou and Witte they would. OGM issued off-cycle RFPs that included new cultural and religious hiring language that Bethany could not comply with. When Bethany sent OGM requests for clarification and amendment (which Defendants ignored (JS-1, Defs.' 30(b)(6) (Gorski) Tr. 65:14-17)), Defendants doubled down: they told each other and themselves (in their contemporaneous notes) that Bethany's practices were "potentially disqualifying" and "grounds for docking points on their proposal" regardless of "where it fits in." (*See, e.g.*, *id.* at 133:1-12; Ex. M, RSS Notes (listing "Potential Disqualifier - bidder does not adhere to non-discrimination & diversity equity and inclusion practices requirements."; Ex. S, 8/1/24 Gorski Text; JS-1, Gorski Tr. 197:4-198:19.) The result of their policy: OGM denied Bethany's grants except where it had no alternative provider. (2025 Cabanaw Tr. 181:4-183:2, ECF No.172-6, PageID.2611; JS-1, Gorski Tr. 227:7-229:12.)

There is no genuine dispute that Defendants excluded Bethany from otherwise available government funding because of Bethany's religious character. Defendants' religious discrimination "is odious to our Constitution" and subject to strict scrutiny. *Trinity Lutheran*, 582 U.S. at 467.

## IV. Count IV—there is no genuine dispute that Defendants' policies violate Bethany's expressive-association rights.

Finally, Defendants' policies are subject to strict scrutiny because they violated Bethany's expressive-association rights when they attempted to coerce Bethany into abandoning its religious-based hiring practices to remain eligible to receive refugee-services funding.

"The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice*, 146 S. Ct. at 1122. And it has been "long understood" that "[e]ach of these rights . . . necessarily carries with it 'a corresponding right to associate with others.'" *Id.* (*quoting Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021)). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Dale*, 530 U.S. at 647-48. The government violates this freedom of association when it "den[ies] benefits to an organization based on its message, or punish[es] individuals for their affiliations." *First Choice*, 146 S. Ct. at 1122; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (cannot discriminate against a group by "impos[ing] penalties or withhold[ing] benefits from individuals because" they associate for religious reasons). Such "government actions . . . warrant 'the closest scrutiny.'" *First Choice*, 146 S. Ct. at 1122 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U. S. 449, 460-461 (1958)).

This right to expressive association includes the "freedom not to associate" with people who "may impair the [group's] ability" to express its views. *Dale*, 530 U.S. at 648 (citation omitted). So when an association expresses a message, the First Amendment prohibits the government from forcing the association to admit those who disagree or would express a contrary view. *Id.* The right applies if (1) "the group engages in 'expressive association,'" and (2) "[t]he forced inclusion" of a person "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. Bethany satisfies both elements.

***First***, "[r]eligious groups" like Bethany "are the archetype of" expressive associations. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring). Bethany's expressive mission is "to demonstrate the love and compassion of

Jesus Christ by protecting children, empowering youth, and strengthening families through the highest quality social services." (Bethany Handbook at 5, ECF No.1-9, PageID.203.) Bethany's expressive character permeates every aspect of the organization. Staff members pray before meetings. Leadership messages routinely focus on applying the Bible to Bethany's services and the workplace. (JS-1, Pls.' 30(b)(6) (Nolan) Tr. 41:20-42:10.) And, as COO Shirley explained, Bethany has "always had a practice of hiring individuals who believe in what we believe in" so that Bethany can "recruit Christian employees who can carry out our mission . . . with fidelity." (JS-1, Shirley Tr. 124:3-4, 187:8-188:1.)

***Second***, the undisputed facts show that Defendants' attempt to force Bethany to choose between eligibility for government contracts and hiring employees who do not hold the organization's religious views significantly impairs Bethany's expressive mission. Bethany believes that only people who believe in Jesus Christ can authentically show the love and compassion of Jesus Christ. Bethany's entire expressive model depends on the sincerity of its messengers, which is why it has maintained its Statement of Faith requirement for decades and required every employee to affirm personal agreement with the Apostles' Creed. (Statement of Faith, ECF No.1-7, PageID.198; JS-1, Shirley Tr. 138:10-14; JS-1, Pls.' 30(b)(6) (Nolan) Tr. 42:14-20.) Bethany could not comply with the new RFP language without impairing its expression. (*See* JS-1, Shirley Tr. 124:3-20; JS-1, Pls.' 30(b)(6) (Osburn) Tr. 71:14-72:20.)

Accordingly, the coercive nature of Defendants' actions in opposition to Bethany's expression is unmistakable. By stripping Bethany of its existing contracts, issuing unscheduled RFPs with language specifically designed to disqualify it, and recruiting replacement providers, Defendants have "den[ied] benefits to [Bethany] based on its message" and "punish[ed]" Bethany "for [its] affiliations." *First Choice*, 146 S. Ct. at 1122.

Courts must "give deference to an association's view of what would impair its expression." *Dale*, 530 U.S. at 653. Indeed, as in *Dale*, "the forced inclusion of" employees who do not share Bethany's faith would "significantly affect" Bethany's "ability to advocate" the religious viewpoints that define its mission. *Id.* at 650. Indeed, the impact here is more severe than in *Dale*, because Defendants are not merely requiring Bethany to retain a single individual—they are demanding that Bethany restructure its entire workforce to include people of other faiths, fundamentally transforming the religious character of the organization. *See also Slattery v. Hochul*, 61 F.4th 278, 288 (2d Cir. 2023) ("The right to expressive association allows [Bethany] to determine that its message will be effectively conveyed only by employees who sincerely share its views.").

In sum, because Defendants' policies would force Bethany to change its hiring practices to include employees who can neither affirm nor communicate the organization's religious beliefs, Defendants' action "violates the fundamental rule of protection under the First Amendment, that [Bethany] has the autonomy to choose the content of his own message." *Hurley v. IrishAm. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Their actions are therefore subject to strict scrutiny. *See Dale*, 530 U.S. at 653-56; *Slattery*, 61 F.4th at 288.

## V. There is no genuine dispute that Defendants cannot satisfy strict scrutiny.

As set forth above, Defendants' policies and actions—which "discriminate[] against some or all religious beliefs or regulate[] or prohibit[] conduct because it is undertaken for religious reasons"—trigger strict scrutiny. *Lukumi*, 508 U.S. at 532. This level of scrutiny is, in the Supreme Court's words, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997); *Lukumi*, 508 U.S. at 546 ("A law that targets

religious conduct . . . will survive strict scrutiny only in rare cases.”). When strict scrutiny applies, “the burden shifts to” Defendants to show their “restrictions on [Plaintiffs’] protected rights serve a compelling interest and are narrowly tailored to that end.” *Kennedy*, 597 U.S. at 531-32; *see also Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016). This “standard ‘is not watered down’; it ‘really means what it says.’” *Tandon*, 593 U.S. at 65 (quoting *Lukumi*, 508 U.S. at 546). “[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.” *Fulton*, 593 U.S. at 541.

A compelling interest is an interest “of the highest order,” of the type that would justify the most serious government infringements upon constitutional rights. *Lukumi*, 508 U.S. at 546; *see also Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). When considering a claim of compelling interest, courts must “scrutiniz[e] the asserted harm of granting specific exemption to particular religious claimants—in other words, to look to the marginal interest in enforcing the [policy] in these cases.” *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014) (cleaned up). And “broadly formulated interests” are insufficient; instead, a “more precise analysis” and scrutiny are required. *Fulton,* 593 U.S. at 541.

The least-restrictive-means standard is also “exceptionally demanding,” and requires the government to “sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].” *Hobby Lobby,* 573 U.S. at 728. “[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.” *United States v. Playboy Entm’t Grp., Inc.*, 529 U.S. 803, 815 (2000). A policy fails this prong if “[the proffered] interest could be achieved by narrower [policies] that burde[n] [the right] to a far lesser degree.” *Lukumi*, 508 U.S. at 546.

Defendants can demonstrate neither a compelling interest, nor least restrictive means.

### A. Defendants have no compelling interest.

Defendants have previously claimed a compelling interest in "ensuring that organizations receiving government funding and providing services on behalf of the state are not engaging in hiring discrimination." (Defs.' MTD FAC, ECF No.48, PageID.828.) This purported interest fails for three reasons.

***Not specific.*** When, as here, the government discriminates based on a protected trait, the government must advance more than an "amorphous end to justify it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) ("SFFA"). Defendants cannot simply "rely on 'broadly formulated interests.'" *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). "The question, then, is not whether [Defendants] ha[ve] a compelling interest in enforcing [their] non-discrimination policies generally, but whether [they have] such an interest in denying an exception to" Bethany specifically. *Id.* But Defendants have not advanced any compelling interest in denying Bethany specifically an exception to Defendants' preferred hiring practices. Defendants appear to believe that a service worker of a different religion than a refugee would change the quality of the services provided. But "[s]uch speculation is insufficient to satisfy strict scrutiny." 593 U.S. at 542.

***No legitimate interest in banning Bethany's faith-based hiring practices.*** As a matter of law, Defendants have no legitimate (let alone compelling) interest under the First Amendment in punishing Plaintiffs for their religious hiring practices. Forming a religious community around shared religious beliefs is how a religious organization defines itself. *See Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). The Supreme Court has repeatedly held that a state's interest in combatting discrimination cannot justify violating a person's First Amendment rights. *See, e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 602-03

(2023); *Fulton*, 593 U.S. at 541; *Dale*, 530 U.S. at 659. Moreover, when Defendants raised their concerns, federal law governing the funding at issue expressly authorized faith-based hiring by government-funded religious organizations. *See* 45 C.F.R. § 87.3(f) (eff. through April 2, 2024) (attached as Ex. B). A religious organization's co-religionist hiring is an affirmative good that the First Amendment and federal law secures from state interference. Therefore, Defendants can have no legitimate interest in halting Bethany's faith-based hiring practices.

***Not treated as compelling in practice.*** Finally, four separate points demonstrate that Defendants do not treat their supposed interest in stopping Bethany's co-religionist hiring as compelling in practice.

First, compelling interests are not kept hidden behind closed doors. But that is exactly how Defendants have treated their interest here. They have occasionally acted as if Bethany's practices violate the Michigan ELCRA non-discrimination clause in Defendants' grant agreements (Defs.' Resp. in Opp'n to Mot. for PI, ECF No.18, PageID.395), but they have declined to take that position publicly. (*See, e.g.*, Ex. T, Defs.' Resp. to Second Set of Disc. Req., Interrog. 10.) Instead, as Cabanaw's comments to CWS suggest, Defendants' interest in enforcing that non-discrimination language is not sufficiently compelling to warrant the drama it would cause if they publicly took the position that Bethany's practices violate ELCRA.

Second, the boilerplate contract language at issue has been in place as for the entirety of Bethany's decades-long contracting relationship with the State, and LEO/OGM had never invoked it against Bethany's publicly known hiring practices before December 2023. (JS-1, Pls.' 30(b)(6) (Beimers) Tr. 99:9-23.) A government cannot claim its interest in enforcing a non-discrimination provision is "of the highest order," *Lukumi*, 508 U.S. at 547, when it sat on that provision for twenty years while Bethany's co-religionist hiring was openly practiced, publicly

posted on its website, and well known to Defendants themselves. (JS-1, Shirley Tr. 193:1-194:15.) Alleged governmental interests "ring hollow" when the government has been "complacent" about a subject only to "suddenly burst into action." *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1225, 1228 (C.D. Cal. 2002). The sudden invocation of longstanding boilerplate language, only after disgruntled employees brought their complaints to Cabanaw in late 2023, is not the mark of a compelling interest.

Third, the same facts that show that Defendants' practices are not neutral and generally applicable prove fatal to Defendants' compelling-interest argument. As *Fulton* explained, "[t]he creation of a system of exceptions . . . undermines" any claim Defendants might make that its interest in Plaintiffs' hiring practices "can brook no departures." 593 U.S. at 542. Here, far from "brook[ing] no departures," Defendants' supposed interest in preventing Bethany's co-religionist hiring evaporated the moment enforcing that interest would have inconvenienced Defendants. *See supra*, Section II.

Fourth, Defendants' new RFP language itself requires a form of religious hiring discrimination. The RFPs mandate that contracting agencies "create opportunities to employ staff that represent the . . . religions of the newcomer populations being served." (Answer ¶154, ECF No.80, PageID.1494; RFP No. RSS25-001, ECF No.9-1, PageID.330.) This language *mandates* religion-based hiring practices. Defendants thus have no principled objection to faith-based hiring criteria; they object only when it is *Bethany's* faith that drives the hiring decision, which is likely an Establishment Clause violation in its own right. *See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025).

Because Defendants do not treat co-religionist hiring as contrary to any compelling state interest, their policies fail strict scrutiny.

### B. Defendants' actions are not the least restrictive means of advancing their supposed interests.

Defendants have also failed to show that their means of advancing their purported interest is "narrowly tailored." *Kennedy*, 597 U.S. at 525. Here, there are many less restrictive means for Defendants to ensure that Bethany's hiring practices do not interfere with OGM's goal of providing "a welcoming environment to newcomers." (Office of Global Michigan, available at https://www.michigan.gov/ogm.) First, Defendants could have simply continued the status quo. For decades, Bethany contracted with OGM and its predecessors to provide refugee services and URM programs, all while maintaining the very same co-religionist hiring practices Defendants now claim to find objectionable. Under these long-existing standards, Bethany's performance evaluations were consistently favorable through the end of 2023. (2025 Cabanaw Tr. 104:4-105:4, ECF No.172-6, PageID.2591-2592.) Hernandez even testified that Bethany was an important partner for OGM, and that "they were essential for [OGM] to be able to deliver services." (JS-1, Hernandez Tr. 136:7-9.) If Defendants' interest was truly in ensuring quality services for newcomers, the record demonstrates that Bethany was already delivering exactly that. After all, Defendants did not include the religion-specific hiring criterion in the RFPs for URM contracts when Bethany was OGM's only option. (2025 Cabanaw Tr. 181:4-183:2, ECF No.172-6, PageID.2611; Shirley Decl. ¶¶30-32, ECF No.67-1, PageID.1240; *see* Ex. U, URM24-9901 RFP.) They only did so where they had alternatives, such as the RFPs for RSS contracts. (*See* RFP No.RSS-001 10, ECF No.9-1, PageID.330.)

Second, Defendants could have monitored service quality directly rather than targeting Bethany's religious identity. Nothing prevented OGM from continuing to evaluate Bethany's performance through the established monitoring framework that had governed their relationship for years. Cabanaw himself admitted that when he "monitored BCS for RSS contracts" in

February 2024, he "didn't see anything that would otherwise have them cut ties." (CWS Documents, ECF No.172-1, PageID.2378; 2026 Cabanaw Tr. 82:9-83:25, ECF No.200-1, PageID.3030.) If direct monitoring of Bethany's service delivery revealed no deficiencies, Defendants had no need to target Bethany's religious hiring to protect newcomers.

Third, Defendants could have required cultural and linguistic competency training. If Defendants were genuinely concerned about ensuring that Bethany's staff could serve refugee populations of diverse backgrounds, a far less burdensome approach would have been to require specific cultural competency or language training for employees who interact with newcomers. Bethany itself had already demonstrated its commitment to this goal—its CEO approved hiring exceptions for Dari speakers following the fall of Kabul, precisely to meet urgent language needs while maintaining its religious mission. (*See* Ex. V, Resp. to Defs.' Reqs. for Admis., No. 3.)

Fourth, at the time of the events at issue, 45 C.F.R. § 87.3(f) expressly permitted faith-based organizations receiving government funding to select employees based on acceptance of the organization's religious tenets. *See* 45 C.F.R. § 87.3(f) (eff. through April 2, 2024) (attached as Ex. B). Thus, the federal government—the entity that ultimately funds the programs at issue—had already concluded that its interests in effective service delivery could be fully advanced while respecting co-religionist hiring. In *Hobby Lobby*, the Supreme Court held that the federal government's own accommodation scheme for religious organizations established that there was a less restrictive alternative. 573 U.S. at 728. The same logic applies here: because the federal government determined that accommodating co-religionist hiring was consistent with effective refugee services, Defendants cannot credibly claim that only eliminating that practice could serve their interests. Other federal nondiscrimination laws also include exceptions without undermining the laws' civil-rights purposes. Title VII, for example, allows religious

organizations to discriminate in hiring decisions, 42 U.S.C. § 2000e-1(a), and Title IX exempts religious schools from sex nondiscrimination requirements, 20 U.S.C. § 1681(a)(3)—yet these exemptions have not gutted the federal civil rights framework.

But here, Defendants leapt to the most restrictive option imaginable: stripping Bethany of its contracts, crafting RFP language specifically designed to disqualify Bethany, and recruiting replacement providers to take Bethany's place—all because Bethany chose to remain faithful to the religious beliefs that have animated its mission for over eighty years. Far from narrow tailoring, Defendants' actions demonstrate blatant discrimination.

## CONCLUSION

For these reasons, Bethany respectfully requests that the Court grant its summary judgment motion.

Dated: October 9, 2026

/s/ *Daniel S. Brookins*
Jonathan E. Lauderbach (P51313)
Matthew T. Nelson (P64786)
Daniel S. Brookins (P86665)
Alexia A. Jansen (P84788)
Katrin B. Kelley (P88133)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave. NW, Ste. 1500
Grand Rapids, MI 49503
jlauderbach@wnj.com
mnelson@wnj.com
dbrookins@wnj.com
ajansen@wnj.com
kkelley@wnj.com

Lori D. Kepner
Steven T. McFarland
Center For Law & Religious Freedom
CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Ste. 302
Springfield, VA 22151

*Attorneys for Plaintiffs*

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ASA | Afghan Supplemental Act |
| CWS | Church World Service |
| DME | Domestic Medical Screening |
| ELCRA | Elliott-Larsen Civil Rights Act |
| LEO | Michigan Department of Labor and Economic Opportunity |
| OGM | Office of Global Michigan |
| ORR | Office of Refugee Resettlement |
| R&P | Reception and Placement |
| RES | Refugee Employment Services |
| RFP | Requests for Proposals |
| RMH | Refugee Mental Health Services |
| RPRS | Refugee Post-Resettlement Services |
| RSS | Refugee Social Services Programs |
| RTS | Refugee Transportation Services |
| RYM | Refugee Youth Mentoring |
| SRC | State Refugee Coordinator |
| UHPAS | Ukrainian Humanitarian Parolee Assistance Services |
| URM | Unaccompanied Refugee Minor |